IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

| | | |
|---|---|---|
| D. J. T. (a minor), by and through his next friend and father, A. J. T., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-CV-2195-JWL |
| | ) | |
| TONGANOXIE UNIFIED SCHOOL DISTRICT NO. 464, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**SUGGESTIONS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

ARTHUR BENSON & ASSOCIATES

Arthur A. Benson II  D.Kan. # 70134
Jamie Kathryn Lansford D.Kan #70220
Aften P. McKinney  Ks. Bar. #09507
4006 Central Avenue (Courier Zip: 64111)
P.O. Box 119007
Kansas City, Missouri 64171-9007
(816) 531-6565
(816) 531-6688 (telefacsimile)
abenson@bensonlaw.com
jlansford@bensonlaw.com
amckinney@bensonlaw.com

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

| | | |
|---|---|---|
| D. J. T. (a minor), by and through his next friend and father, A. J. T., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-CV-2195-JWL |
| | ) | |
| TONGANOXIE UNIFIED SCHOOL DISTRICT NO. 464, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## SUGGESTIONS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

### STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

As will be demonstrated in these suggestions and the accompanying evidentiary submissions, Plaintiff Dylan Theno has adduced substantial evidence to raise genuine issues of material fact as to the following disputed elements of his Title IX claim:

(a) that the Tonganoxie Unified School District No. 464 had actual knowledge of

(b) and was deliberately indifferent to

(c) harassment that was so severe, pervasive, and objectively offensive that it

(d) deprived Dylan[1] of access to the educational benefits or opportunities

provided by the school.

Furthermore, Plaintiff has established the existence of a legal duty and has adduced substantial evidence to raise genuine issues of material fact as to the following disputed elements

---

[1]For purposes of factual clarity, Plaintiff Dylan Theno, his parents, Alan and Cheryl Theno, and his sister, Shannan Theno, are referred to by first name.  No disrespect is intended. Their depositions are cited by initials, *i.e.*, D.J.T. Dep., C.T. Dep., A.J.T. Dep., S.T. Dep.

of his negligent supervision claim:

    (a)  that the duty was undertaken;

    (b)  that the duty was breached; and

    (c)  that the breach caused damage.

**SPECIFIC RESPONSES TO DEFENDANTS' STATEMENT OF FACTS**

1.  Admitted.

2.  Admitted.

3.  Admitted.

4.  Admitted.

5.  Admitted.

6.  Admitted.

7.  Admitted.

8.  Admitted.

9.  Admitted.

10.  Plaintiff admits only that Exhibits 12 and 13 to Defendants' Motion are Erickson Deposition Exhibits 20 and 21.  There is no testimony cited that identifies the exhibits as policies adopted by Tonganoxie Unified School District No. 464 (hereinafter "the District").  *See infra* at ¶ 229.

11.  Admitted, *but see infra* at ¶ 229.

12.  Admitted, *but see infra* at ¶ 229.

13.  (a)  - (c)  Admitted, *but see infra* at ¶ 229.

14.  Admitted, *but see infra* at ¶ 229.

15.  Admitted, *but see infra* at ¶ 229.

**Seventh Grade Events**

16.  Admitted, except as to footnote 3 which is denied.

17.  Admitted.

18.  Admitted, although the testimony that places this event after Christmas of Dylan's seventh grade year appears at pages 39-40.

19.  Admitted.

20.  Admitted, although the testimony that establishes that this event took place two days later appears at page 45.

21.  Admitted.

22.  Admitted.

23.  Denied.

24.  Admitted.

25.  Admitted.

26.  Admitted.

27.  Admitted.

28.  Admitted.

29.  Admitted.

30.  Admitted.

31.  Admitted.

32.  Admitted.

33.  Admitted.

34.  Admitted except as to the alleged in-school suspension for H.J. that is admitted only in that H.J. was given the in-school suspension for fighting, not for sexual harassment; the third

sentence is admitted only as to *later* complaints in seventh grade.

35.  Admitted.

36.  Admitted.

37.  Denied.  In seventh grade, Dylan had problems with M.M. and S.M.  They spat on the wall in the bathroom and said, "Look, Dylan was here."  They also called him fag and made fun of him about the rumor of his masturbating in the bathroom.  D.J.T. Dep. (Exhibit 1) 163:15-164:20.

**Eighth Grade Events**

38.  Admitted, although Dylan indicated that at the first of the year, he heard references to the rumors of his masturbating in the bathroom.  D.J.T. Dep. 63:14- 63:7; *see also infra* at ¶ 41.

39.  Admitted.

40.  Admitted, except that he never really stopped.  Like the others, D.W.#1[2] stopped for awhile, but then he resumed.  D.J.T. Dep. 148:3-23.  During the eighth grade, after basketball was over, D.W.#1 also used ice cream bars to taunt Dylan by rubbing the ice cream around his mouth and making crude comments.  D.J.T. Dep. 147:1-20; 148:18-23.

41.  Admitted; *but see supra* at ¶ 38.

42.  Admitted.

43.  Admitted.

---

[2]There are two students who were involved in incidents of harassment whose initials are "D.W.".  The individual who was first involved in the harassment of Dylan during junior high is identified as "D.W.#1" and the individual who was not identified as having participated in the harassment of Dylan until he was in high school is denoted "D.W.#2".

**Ninth Grade Events**

44. Admitted.

45. Admitted.

46. Admitted.

47. Admitted.

48. Admitted.

49. Admitted.

50. Admitted.

51. Admitted.

52. In the first sentence, admitted only that Erickson *seemed* concerned to Alan. The balance is admitted.

53. Admitted.

54. Admitted that Plaintiff recalled no further specific incidents.

55. Admitted. However, Dylan's reports were recurring. Furthermore, it can be difficult to get adolescents to speak openly to adults. Devin Dep. (Exhibit 4) 43:20-23. It is not unusual to get a cursory "fine" in response to an adult's question regarding how things are going or how school went today. *Id.* at 44:3-16. To get an adolescent to speak openly with adults can depend on the development of a relationship that leads to a sense of trust and safety. *Id.* at 44:23-45:13. Defense expert witness Dr. Mary Devin does not disagree with the results of the 2001 survey conducted and published by the American Association of University Women which concluded, *inter alia*, that students do not easily tell adults about sexual harassment experiences. Devin Dep. 82:1-82:23. Furthermore, Dylan is "distrusting of virtually any support system of peers or authority figures outside of his immediate family" and feels authority figures in the school

environment have failed to protect him.  *See infra* at ¶¶ 290 (b) (quoting Exhibit 23, Lucke Evaluation Report, at 4-5.  Additionally, because reporting the harassment did not yield sufficient consequences to the perpetrators to send a message to the rest of the school population that would stop the harassment, and, at times, it made things worse, Dylan would ask his parents not to go to school to report things because it would make it worse.  C.T. Dep. (Exhibit 2) 92:10-93:7.

56.  Admitted.

57.  Admitted as to occurring in Dylan's seventh grade year.

**Tenth Grade Events**

58.  Admitted.

59.  Admitted.

60.  Admitted, *but see* response to ¶ 55.

61.  Admitted, *but see* response to ¶ 55.

62.  Admitted.

63.  Admitted.

64.  Admitted.

65.  Admitted, *but see* response to ¶ 55.

66.  Admitted that Smith so testified but contradicted by the testimony of M.W., who said that Smith talked to the trio as a group thus casting doubt as to the substance.  M.W. Dep. (Exhibit 6) 9:22-10:6; 41:23-42:3.  *And see infra* ¶ 176.

67.  Admitted.

68.  Admitted.

69.  Admitted.

70.  Admitted.

71.  Admitted.

72.  Admitted.

73.  Admitted.

74.  Admitted.

75.  Admitted.

76.  Admitted.

77.  Admitted, *but see* response to ¶ 55.

78.  Admitted, *but see* response to ¶ 55.

79.  Admitted, *but see* response to ¶ 55.

80.  Admitted.

81.  Admitted, *but see* response to ¶ 55.

82.  Admitted.

83.  Admitted.

84.  Admitted that Smith's notes state that A.E. so indicated; denied that A.E. could speak for the motivation of all students who were engaged in the banana boy comments.

85.  Admitted that Smith's notes so state.

86.  Admitted.

87.  Admitted.

88.  Admitted.

89.  Admitted.

90.  Admitted, *but see infra* at ¶ 182.

**Eleventh Grade Events**

91.  Admitted.

92.  Admitted.

93.  Admitted that Smith so testified, but the testimony was contradicted by that of M.W. who does not remember Smith following up the following school year.  He was only talked to the one time by Smith.  M.W. Dep. 25:20-26:6.  *And see infra* at ¶ 185.

94.  Admitted, *but see infra* at ¶¶ 186, 224.

95.  Admitted.

96.  Admitted.

97.  Admit the material in the text of the paragraph; denied as to footnote 5.

98.  Admitted.

99.  Admitted.

100.  Admitted.

101.  Admitted, *but see* response to ¶ 55.

102.  Admitted, *but see* response to ¶ 55.

103.  Admitted.

104.  Admitted.

105.  Admitted, *but see infra* at ¶ 196.

106.  Admitted.

107.  Admitted, *but see infra* at ¶ 197.

108.  Admitted, *but see* response to ¶ 55.

109.  Admitted, *but see* response to ¶ 55.

110.  Admitted.

111.  Admitted, *but see infra* at ¶¶ 119, 201.

112.  Admitted, *but see infra* at ¶¶ 119, 201.

113.  Admitted, *but see* response to ¶ 55, *and see infra* at ¶¶ 119, 201.

114.  Admitted, *but see* response to ¶ 55, *and see infra* at ¶¶ 119, 201.

115.  Admitted.

116.  Admitted, *but see* response to ¶ 55.

117.  Admitted.

118.  Admitted.

119.  Admitted.

120.  Admitted, *but see* response to ¶ 55.

121.  Admitted, *but see* response to ¶ 55.

122.  Admitted that Plaintiff did not recall additional specific instances, *but see* response to ¶ 55.

123.  Admitted, *but see infra* at ¶ 225.

124.  Admitted.

### Other Background Facts

125.  Admitted.

126.  Admitted.

127.  Admitted, *but see infra* at ¶ 208.

128.  Admitted.

129.  Admitted that Plaintiff did not recall additional specific perpetrators.

130.  Admitted.

131.  Admitted.

132.  Admitted.

**PLAINTIFF'S RESPONSES TO DEFENDANTS' STATEMENT OF FACTS AND
STATEMENT OF ADDITIONAL FACTS**

**Seventh Grade Events**

133.  In seventh grade, Dylan and K.L. got into a shoving match because K.L was

harassing Dylan and kicking his feet from behind trying to trip Dylan.  He was calling Dylan a

faggot.  Dylan pushed K.L. into an ironing board in the home economics room (where they were

in Ms. Nickell's English class).  Ms. Nickell took them to the office where they saw the assistant

principal, Ms. Strong.  D.J.T. Dep. 32:24-34:22.  She talked to them both at the same time as

well as individually, and told them that if they did it again, they would get in-school suspensions.

*Id.* at 35:11-37:23.  Dylan told Ms. Strong that K.L. was calling him faggot.  *Id.* at 35:1-6.  She

was going to give Dylan a suspension, but the counselor, Mrs. Walschmidt, talked her out of it.

*Id.* at 36:4-38:4.  This took place in late October, 1999.  C.T. Dep. 85:7-19.

134.  C.C. was also called in over the incident as he had been verbally harassing Dylan at

the same time that K.L. had been, saying the same things that K.L. had been.  C.C. was also

given a warning in Dylan's presence.  D.J.T. Dep. 38:5-39:4.  Dylan also had problems with

C.C. later that year, after Christmas, when the rumors that he got caught masturbating in the

bathroom started.  *Id.* at 43:18-44:2; *see infra* at ¶ 136.

135.  In November, 1999, Dylan and S.S. got in a fight at a school basketball game.

D.J.T. Dep. 24:8-22.  The fight started when S.S. started throwing rocks at Dylan.  *Id.* at 24:23-

24.  S.S. was walking down the sidewalk yelling "Dylan's a fag.  Dylan likes to suck cock."  *Id.*

at 152:21-153:1.  Dylan punched S.S. and S.S. then told Ms. Strong.  D.J.T. Dep. 24:25-25:6.

Dylan received a three day out-of-school suspension for the fight.  *Id.* at 25:7-9; 153:5-7.  He

was told that S.S. received only a one day in-school suspension.  *Id.* at 153:8-11.  Dylan talked

with Principal Stephen Woolf ("Woolf") about the fight with S.S.  *Id.* at 152:8-153:3.

136.   On more than one occasion in February, 2000, Dylan was harassed by students in the lunch room who were calling Dylan a fag and making comments such as "How was it fag?", "Dylan masturbates with fish," and "Don't you need to make a trip to the bathroom?"  D.J.T. Dep. 43:18-44:10.  On one occasion, G.P., C.C. , L.D., and K.L. were making comments.  One day, G.P. put a piece of string cheese in his mouth and said, "I'm Dylan sucking a dick."  D.J.T. Dep. 44:18-45:12.  On another day it was A.E. who mocked Dylan, saying "Look, I'm Dylan, my name is Jack, I jack off."  D.J.T. Dep. 55:14-21.  Both Dylan and and his mother, Cheryl, talked to Woolf about the lunchroom incidents.  *Id.* at 151:13-24.  Cheryl had gone to see Ms. Strong about it, but she was unavailable due to a meeting, so Cheryl saw Woolf.  C.T. Dep. 31:4-21.  Dylan had gotten BISTed (a disciplinary measure) because he had retaliated against the others by saying, "You guys are the fags,", and Cheryl was upset about that.  *Id.* at 31:22-25.  When Cheryl first saw Woolf about the lunchroom incidents, Woolf told her that he was aware of the teasing that week.  *Id.* at 35:6-13.  She went back the next day and saw Woolf again.  *Id.* at 36:9-11.  Woolf told her that he had removed Dylan's name from the BIST sheet or had torn up his BIST sheet.  *Id.* at 36:12-16; D.J.T. Dep. at 151:13-152:5.  Woolf also said that he had talked that morning to G.P.'s parents, but when Alan later talked with G.P.'s father, the father claimed not to have known anything about it.  C.T. Dep. at 37:17-20; A.J.T. Dep. (Exhibit 3) 22:4-6; 23:18-24:1 (*see infra* at ¶ 149).  There is no documentation that Woolf actually spoke to G.P.'s father.

137.   Each class that ate lunch in a given session was given three tables at which the students could eat and they could choose any of the three.  The following Monday, Dylan asked Woolf if he could sit at a different lunch table and Woolf told him that he could not that day, but

that he would look into it.  A few days later, after his mother had talked to Woolf and Strong about the rumor that started (*see infra* at ¶ 138) and requested that the boys be separated at lunch, The harassing students were not reassigned or otherwise sanctioned.  Dylan, however, was assigned to sit at the disciplinary BIST table across the room and ate there alone for a couple of weeks before he was allowed to return to one of the three tables for his class.  D.J.T. Dep. 76:25-79:9; C.T. Dep. 50:5-51:14.

138.  Also in late February, 2000, one day before school while they were congregating in the cafeteria before the bell for class rang, a couple of kids – D.C. and M.M. – started making fun of Dylan.  They were asking Dylan "how it was" that he got caught masturbating in the bathroom.  D.J.T. Dep. 39:19-40:11.  Dylan asked them what they were talking about and they told him that they had heard the rumor from G.P.  Although Dylan told them the rumor was not true, they kept making fun of him, not just that one time, but after that as well.  *Id.* at 40:13-41:6.  The next time he heard the rumor was later that day in Mr. Lankenau's class from female student D.S., who asked, Dylan, "Didn't you get caught?"  Dylan asked her what she was talking about and she said, "I heard you got caught masturbating in the bathroom."  At lunch, G.P., C.C., L.D., and K.L. were laughing about it and G.P. was asking Dylan if he needed to make a trip back to the bathroom.  *Id.* at 43:12-47:2.

139.  Dylan left the lunchroom and went to see Ms. Strong.  He told her that he needed to talk, but she was busy and told him to go back to class.  He said he would not go back to class so she allowed him to sit in the waiting area.  He waited about thirty minutes.  D.J.T. Dep. 47:3-16.  When she was available, Dylan told her what had happened.  She said okay and it was Dylan's understanding that she left to go talk with the other kids.  Meanwhile, Mr. Woolf pulled Dylan into his office wanting to know what had happened.  Ms. Strong returned and said, "I warned

them again.  I told them if gay, fag or queer ever left their mouth that they would be three days out-of-school suspended."  D.J.T. Dep. 47:25-50:21.

140.   Dylan was going to go back to his class, but he saw his sister, Shannan, and told her to call his mother.  D.J.T. Dep. 50:22-25.  Shannan does not recall exactly why she had headed to the office to call her mother – she had forgotten her lunch or was calling to say she was going to stay late – but she saw her brother in or just outside Ms. Strong's office, crying.  She asked him what was going on and he told her that somebody had started a rumor that he was caught in the restroom masturbating.  Shannan called her mother, told her about the rumor, and told her that she should come up to the junior high.  S.T. Dep. (Exhibit 7) 29:14-32:3.

141.   When Shannan called, their mother came to the school and Dylan told her what was happening and that the administrators had "just warned them again".  Cheryl went into the office to talk with the principal.  D.J.T. Dep. at 51:1-6.  Cheryl left for the school within ten minutes of Shannan's telephone call.  C.T. Dep. 42:22-24.  When she found Dylan, he was standing in the doorway of Ms. Strong's office.  *Id.* at 42:25-43:5.  Shannan had told her mother that G.P. had started the rumor and that one of Shannan's friends had told her that.  Dylan also told his mother that he had told Ms. Strong that G.P. had started the rumor and that N.B. had told him that.  Ms. Strong had told Dylan not take what N.B. said to heart.  *Id.* at 43:12-44:17  (However, Dylan had heard the rumor more than once by now and had been teased about it by G.P. in the lunchroom as well.  *See supra* at ¶¶ 136, 138).

142.   Cheryl observed that her son was in pain.  C.T. Dep. 45:3-8.  She walked into the office and when asked by someone if that person could help her, she indicated she was there to take care of the ongoing problem with her son and that it was "a bunch of crap."  *Id.* at 45:25-46:14.  Mr. Woolf left the outer office and she followed him into his office and apologized for

using the word "crap".  Woolf walked out of his office and a few seconds later, Cheryl followed

him.  Ms. Strong asked Cheryl for a five minutes of her time and the two of them talked.  Cheryl

told Ms. Strong that N.B. was not the problem, that G.P. had admitted to N.B., who, in turn, had

told Dylan, that G.P. had started the rumor, and nothing had been done to G.P.  *Id.* at 46:15-

47:22; 49:6-18.  Cheryl was not happy that the other boys were only warned.  *Id.* at 51:15-21;

54:9-10.  It was her belief that the boys should have been suspended for the verbal statements

that they had made.  *Id.* at 55:7-9.  She believed that in not suspending the boys and stopping the

sexual harassment, Woolf and Strong were not doing their job and were discriminating against

Dylan.  *Id.* at 55:11-56:8.

 143.  Dylan and Cheryl left Ms. Strong's office and went to Dr. Erickson's office, but he

was not there.  D.J.T. Dep. 51:22-52:8.  Later, Cheryl spoke with Dr. Erickson by telephone and

she raised concerns about Dylan's treatment at the junior high and asked him to review the

situation and the way that the principal and assistant principal had handled the situation.  That

was the first Dr. Erickson had heard of any allegations of student-on-student verbal sexual

harassment.  He told Cheryl that he would look into it and get back to her.  *Id.* at 57:3-5;

Erickson Dep. (Exhibit 8) 22:8-23:15; 150:5-17.  That was on a Friday and he called her back on

Monday.  Erickson Dep. 160:18-24.  Erickson had visited with Woolf and Strong, and reviewed

the Code of Conduct.  He felt the administrators had handled the situation in accordance with the

student handbook and he told Cheryl that.  She responded that she was disappointed to hear the

response.  *Id.* at 150:25-152:16.

 144.  Meanwhile, the day after Strong, Woolf, and Erickson learned of the rumor from

Dylan and Cheryl, an 8th grader in Dylan's gym class called him the jack off kid.  That was

D.W.#1.  C.T. Dep. 57:16-19; D.J.T. Dep. 144:3-13.

14

145.  Also during seventh grade, two boys, Dylan thinks it was M.M. and S.M., spat on the wall in the bathroom and said, "Look, Dylan was here."  They would also call him fag and make fun of him about the rumor that had been started.  D.J.T. Dep. 163:13-164:16.

146.  The first time Dylan's father, Alan, became aware of Dylan's complaints of harassment by other students was in the first part of 2000.  A.J.T. Dep. 12:2-6.  When Alan came home from work, Dylan was talking to his mother and was saying that some boys at school were giving him a hard time calling him things like masturbator and jack off boy.  *Id.* at 12:8-14.  Alan talked to him and suggested that it was just boys fooling around and that perhaps it would settle itself.  Dylan told Alan that it had been going on for a little while before he told Alan, but Alan was hoping at that point that it would just die down and that would be the end of it so he did not pursue the matter.  *Id.* at 13:11-23.  Later that week, however, it was more of the same.  *Id.* at 14:10-17.  It was kind of a weekly occurrence; every week, something would come up about it.  *Id.*

147.  The second conversation Alan had with Dylan was about the same as the first.  The same things were being said by pretty much the same boys.  A.J.T. Dep. 15:4-9.  Alan believes that in the meantime, his wife had gone to the school to talk about the problems with Dylan.  She had reported the experience as frustrating.  *Id.* at 18:6-19:2.  She had tried to talk to Ms. Strong, but Ms. Strong would not and so she talked to Mr. Woolf, but he just kind of blew it off and did not act as if he really wanted to talk about it or do anything about it.  *Id.* at 19:15.

148.  After that second conversation, it became an ongoing conversation.  Alan would check with Dylan at night and ask how the day went.  If something happened, they would discuss it.  A.J.T. Dep. 19:16-25.  The harassment was just an ongoing thing.  One specific example Alan recalled Dylan recounting was a boy having a banana that he was showing and telling

15

Dylan to stick it in his rear.  *Id.* at 20:1-11.

149.  One week in February, 2000, it seemed to Alan that all he heard was that G.P. would do this and that and it did not seem that the school was doing anything to fix it and it was getting worse, so he thought he would try to talk to G.P. and his father and straighten it out. A.J.T. Dep. 31:23-32:1; 21:1-12.  Alan initially telephoned Mr. P. and told him that the boys were having trouble at school and that he would like to talk to him and his son and try to get the boys to settle it before it got even more out of hand than it was.  He asked Mr. P. if they could meet at the VFW park.  *Id.* at 21:23-22:14.  Mr. P. said he did not know there had been any problems (even though Mr. Woolf had told Cheryl that he had met with G.P.'s parents that morning) and agreed to meet in 15 or 20 minutes.  At the park, Alan repeated that Woolf had said he had talked with all the parents and Mr. P. said no one from the school had contacted him or his wife.  *Id.* at 22:4-6; 23:18-24:1.

150.  Later that spring, H.F./H.J told Dylan that K.W. had put a note in Dylan's locker with the words "flamer" and "you're gay" on it.  D.J.T. Dep. 160:7-161:23; H.F. Dep. (Exhibit 18) 13:9-17.  He reported this to Ms. Strong.  D.J.T. Dep. 160:10-14; 161:24-162:3.  She told him that she warned them, but Dylan did have further problems with K.W. and H.F./H.J. in that they still called him flamer.  *Id.* at 162:4-17.

151.  Also later that spring, after spring break, Dylan reported to Cheryl that N.B. had started calling him gay or fag and Cheryl went up to school and told Ms. Strong, who said she would look into it.  Cheryl asked Dylan the next day about it and he said that nothing had happened to N.B.  He did not report any other comments about N.B. at that time.  C.T. Dep. 64:7-65:15.  N.B. called him fag or gay again in the 11th grade after the announcement of the policy that no one could use words like gay or fag.  D.J.T. Dep. 180:12-81:24.

16

152.   During Dylan's seventh grade year, when Dylan went to join some of the boys at the little bike ramp they had made, Alan heard the boys tell Dylan that "we don't let any fags come out here and jump on our ramp", so Dylan had to go ride elsewhere.  A.J.T. Dep. 104:10-105:3.  Also during the summer before or after seventh grade year, Dylan had been at his friend J.'s house and he had to walk past several houses to get there.  When he came home for lunch, he was upset.  Alan asked whether he was going to go back to J.'s because J. had a new game and the boys had been planning on it.  Dylan said that A.D. had a bunch of his friends up there and they were yelling at Dylan every time he walked by.  Alan told Dylan to go on back to J.'s.  Alan cut through the neighbor's yard and stood behind an old privacy fence and as Dylan walked up, three or four of the nine or so boys were yelling masturbator, jack off boy, and another yelled, "suck this."  Alan revealed his presence and asked them what they were doing.  They ignored him, so he approached one in particular, the A____ boy, and confronted him, asking why don't you just leave him alone; he's not bothering you.  The boy did not say anything, and Alan went on to the next boy he had seen yelling and asked if Dylan had ever done anything to him.  The answer was no, so Alan asked why they were saying these things to him and he just shrugged his shoulders.  He did this to two or three of the boys.  Dylan went on to J.'s house and played and he does not think that they bothered Dylan on the way home.  *Id.* at 105:4-108:4; 109:20-110:1.

153.   Alan recalls that there were complaints from Dylan about incidents of harassment between February, 2000 and January, 2001; it was an ongoing thing.  The kids basically said the same things over and over.  When it would get to the point that Dylan just could not stand it anymore, they would go to school and complain, and it would die down for a few days or a week and then it would continue.  A.J.T. Dep. 35:25-38:12.  The harassment never stopped between the seventh and eighth grade and between the eighth and ninth grade, but Dylan would ask them

17

not to go to the school because it would make it worse (and it did), so they only went to school when it was severe.  C.T. Dep. 92:10-93:14.

### Eighth Grade Events

154.  In the eighth grade, things were quieter at first, although random people would make fun of Dylan.  As he was walking down the hall, someone would say, "hey, masturbator." He would not report these incidents.  D.J.T. Dep. 62:2-63:7.  But then, during basketball season, Dylan had problems with D.W.#1 harassing him.  D.W.#1 called Dylan a masturbator and told the other kids that Dylan had his hands in his pants playing with himself.  Dylan recalls this being during basketball practice when they were changing.  *Id.* at 146:1-14.  D.W.#1 kept calling Dylan faggot, queer, masturbator.  Then, on one occasion when they were coming back from basketball practice on the bus, D.W.#1 drew a picture of Dylan (in the condensation) on the window and said to the team, "Look, it's Dylan, jacking off."  Dylan just tried to ignore D.W.#1, hoping it would stop.  There were coaches sitting up at the front of the bus, but Dylan went to Woolf about D.W.#1 the next day.  *Id.* at 63:14-66:8; 146:15-18.  Woolf thinks he remembers that something happened and that Dylan got blamed for losing a basketball game.  Woolf Dep. (Exhibit 9) 61:8-10; 64:24-1.

155.  Dylan told Woolf what D.W.#1 was doing and Woolf said that he would take care of it.  Later, Woolf called Dylan back into the office and said he had talked to D.W.#1 and told him that if he kept making fun of Dylan that he would be kicked off the basketball team.  D.J.T. Dep. 66:10-19.  D.W.#1 stopped making fun of him for a while, but Dylan had more problems with him at other times in the eighth grade, in the ninth grade, and in the tenth grade.  *See infra* at ¶¶ 156; 162-164; 260-261.

156.  Dylan also went to Woolf about D.W.#1 when he would buy ice cream bars and rub

18

the ice cream around his mouth and say, "Dylan, this look familiar?" and Dylan would try to ignore it; he didn't run to the principal every time something was said, but only once it got bad enough that he could not take it anymore. D.J.T. Dep. 143:3-19;146:1-149:10.

157. Also during the eighth grade, at an away basketball game, Dylan missed a shot, and one of the kids on the bench shouted, "Way to go, queer Theno." His parents could hear it in the stands. D.J.T. Dep. 163:2-12; A.J.T. Dep. 110:2-21.

158. Also during the eighth grade, J.H., who was an eighth grader the year that Dylan was in seventh grade, had gym class with Dylan. He would make fun of Dylan all the time during gym class. He would say stuff in front of the gym teacher. For example, Dylan would ask to use the restroom and J.H. would walk over and tell the gym teacher, Phil Jeannin, that he needed to go check on Dylan because he might be jacking off over there. The teacher told him to be quiet, but he continued to make comments out of the teacher's hearing, making fun of Dylan about the rumor and telling him to go jack off. D.J.T. Dep. 164:23-167:20.

159. Dylan believes he reported other problems that year to Woolf. D.J.T. Dep. 71:15-23; 150:16-20.

160. Alan first took action (other than talking with Dylan or Cheryl, and talking with G.P. and his father in the VFW Park) in January, 2001, when he went to school to talk to Mr. Woolf about D.W.#1. A.J.T. Dep. 20:12-21:24. He went because Woolf had been blowing off Cheryl who had been to school earlier that week. *Id.* at 40:14-21; 41:8-10. Alan was at school several times that year. *Id.* at 42:16-17. The next time Alan went to talk to Woolf was after or during a basketball game. *Id.* at 42:24-43:6. Alan told Woolf the harassment was still continuing. *Id.* at 43:9-10. The third time Alan talked with Woolf was again during the basketball season. *Id.* at 44:4-7. He thinks he met Woolf at two or three basketball games. *Id.* at

45:5-7.  He told Woolf the harassment was getting worse.  *Id.* at 44:9-14.  Alan thinks he also

met with Woolf in his office that year after the basketball season had concluded.  *Id.* at 45:8-17.

Woolf remembers Alan coming into the office and being upset because someone had called

Dylan something along the lines of a masturbator and teased him about playing with himself or

having his hands in his pants.  Woolf Dep. 65:20-66:2.

161.  Again, the harassment did not really stop, but Dylan would ask his parents not to go

to the school for fear of making it worse.  A.J.T. Dep. 35:25-38:12; C.T. Dep. 92:10-93:14.

### Ninth Grade Events

162.  In January, Dylan had trouble with D.W.#1 in gym class.  D.W.#1 wrote Dylan's a

fag, masturbates, etc., on the chalkboard in the locker room.  D.J.T. Dep. 67:2-20.  Dylan told

Mr. Woolf.  *Id.* at 68:3-11; 69:24-70:5.  Woolf thinks he remembers this.  Woolf Dep. 62:9-19.

163.  Dylan erased it one time after they all left because he did not want the next class to

see it and start making fun of him.  Then, he went and talked to Mr. Woolf about it.  D.J.T. Dep.

67:13-68:15.

164.  Dylan told Woolf that he heard that D.W.#1 wrote "Dylan is a fag".  Woolf Dep.

70:17-22.  Woolf told Dylan that he would handle it.  D.J.T. Dep. at 68:4-6.  A couple of days

later, D.W.#1 did it again and Dylan went back to Woolf.  Woolf said he was sorry, that he had

forgotten; he'd been really busy.  *Id.* 68:5-11; 68:22-70:19.  D.W.#1 told Woolf that he saw it,

but had not written it.  Woolf Dep. 73:23-25.  Ultimately, the third time that D.W.#1 wrote

things on the chalk board, Woolf talked to D.W.#1 in Dylan's presence and D.W.#1 admitted he

had done it.  Although D.W.#1 admitted the offense, he was not reprimanded, warned, or

sanctioned.  Dylan had talked with Woolf twice before this.  D.J.T. Dep. 156:14-16.  Woolf

made D.W.#1 go erase it.  Woolf Dep. 75:13-76:9.  Since Dylan had not erased the chalk board

this time and it was right next to M. Bond's office, Dylan assumed that Bond saw it.  D.J.T. Dep. 74:18-25.  Woolf talked to the teacher, Matt Bond, and told him to keep an eye on Dylan and to make sure this does not occur.  Woolf Dep. 75:1-7; 77:4-13.

165.  Alan also talked with Woolf.  D.J.T. Dep. 156:3-5; Cheryl Dep. 96:14-16; 97:6-9. Alan also met with Superintendent Erickson at Erickson's office on February 9, 2002.  A.J.T. Dep. 47:18-25; Erickson Dep. 152:19-22.  This was the first time that Alan talked with Erickson. Alan talked to Erickson about several incidents or name calling over some period of time. Erickson Dep. 154:1-16.  Shortly after visiting with Alan, Erickson visited with Woolf.  *Id.* at 156:1-5.  Erickson got Woolf on the speaker phone.  A.J.T. Dep. 49:25-50:3.  Erickson and Woolf reviewed the incidents based on the info that Alan had given Erickson.  Erickson Dep. 156:15-20.  The incidents involved name calling faggot, etc.  *Id.* at 157:9-15.

166.  On February 27, 2002, Alan wrote a letter to Erickson.  A.J.T. Dep. 50:21-23; Erickson Dep. 160:4-6.  In the letter, Alan reiterated the complaints he had voiced in their earlier meeting and complained that the harassment of Dylan had been going on for two and a half years.  A.J.T. Dep. 50:24-51:11; Erickson Dep. 160:7-12.  Woolf knew that Alan had written a letter to Erickson complaining about the way Woolf handled the situation.  Woolf Dep. 79:3-7. Woolf explained to Erickson about the chalkboard incidents.  *Id.* at 80:18-23; Erickson Dep. 160:13-22.  Woolf and Erickson may have talked about previous incidents.  Woolf Dep. 81:9-16. Erickson asked Woolf about Alan's allegation that this harassment had happened over and over for the last  two and a half years.  Woolf Dep. 81:19-23; compare with Erickson Dep. 160:23-161:2.  Woolf remembered in the conversation with Erickson that in the 8th grade, Dylan had come to him and told him he heard the kids were calling him a masturbator.  Woolf  Dep. 81:19-82:17.

167.  Cheryl did not recall Dylan reporting any further specific incidents of harassment during the remainder of his ninth grade year, but the harassment was daily.  Dylan would report incidents, but he would say, "please don't go to the school.  You're only going to make it worse."  C.T. Dep. 99:10-19.

168.  Sometime during this year, Cheryl believes that Dylan first sought care from a medical professional related to the harassment he was enduring.  He saw Dr. Gammill with stomach complaints and she prescribed a stomach medicine – Zantac – for him.  He took one prescription of it and then it became available over the counter.  He took it for some time, and Cheryl does not recall when he stopped taking it.  C.T. Dep. 144:17-145:17.

### Tenth Grade Events

169.  The high school does not receive a list of students who are moving up from the junior high so the high school administrators and faculty first learn who the students will be when they come during enrollment or on the first day of school.  Smith Dep. (Exhibit 10) 10:7-17.  When Dylan left the ninth grade and moved to the high school, Woolf did not talk to anyone in the high school to inform them that Dylan had experienced these problems or that his parents had raised complaints.  Woolf Dep. 92:5-9.

170.  In the strength training room in February 2003, T.H. started making fun of Dylan saying Dylan got caught masturbating in the bathroom.  D.J.T. Dep. 84:5-21.  This happened more than once; it was an ongoing thing.  *Id.* at 85:22-86:9.  Alan reported it to Assistant Principal Brent Smith and afterward, Dylan went in and told Smith what had happened.  It had been going on a week or so before Dylan told his dad about it.  *Id.* at 86:10-24.  After the report, T.H. changed his tactics from calling Dylan names such as faggot or queer to "Don't go tell your dad, Dylan" or "Please don't go tell Mr. Smith".  *Id.* at 86:25-87:11; 94:4-8; 94:11-22.

171.  Dylan had the same problems with N.S. and M.W. in strength training class, because T.H. kind of got them into making fun of Dylan.  D.J.T. Dep. 89:21-90:8.  Dylan believed that M. Bond, the instructor, heard comments.  Once, T.H. walked by when Dylan was talking to Bond and said, "Mr. Bond, watch out, Dylan might go jack off in the bathroom."  *Id.* at 89:1-23.  Bond just laughed.  *Id.* at 89:24-25; 90:8.

172.  M. Bond recalls Dylan was in a strength training class that also included M.W. and T.H., but is not sure whether N.S. was in that class.  M. Bond Dep. 34:2-8.

173.  Principal Bogart first learned from Assistant Principal Smith (verbally) that Dylan was being sexually harassed by T.H., N.S., and M.W.  Bogart Dep. (Exhibit 12) 30:3-12; 68:22-25; 99:7-20; 104:9-20.  Smith reported to Bogart.  *Id.* at 108:19-20.  Bogart thinks that Alan notified Smith of the problem.  *Id.* at 105:5-7.  Alan came to school on or about February 21, 2003, and visited with Smith about the incident.  Smith Dep. 62:21-63:1; D.J.T. Dep. 86:12-13; C.T. Dep. 98:15-21; A.J.T. Dep. 57:19-22.  This was the first time Alan had talked to Smith.  A.J.T. Dep. 57:23-58:1.  Alan's concerns were the incidents in the strength-training class – T.H., N.S. and M.W.'s  references to Dylan masturbating – and Dylan being called Banana Boy in Mrs. Lee's class[3].  *Id.* at 58:22-60:5; Smith Dep. 63:3-12.  Alan mentioned problems Dylan had in seventh grade.  Smith Dep. 64:1-2; 85:20-86:4.

174.  When Smith called Dylan into his office on about February 22, 2003, the day after Alan had visited Smith's office, and asked what was going on, it was the first time that Smith had met Dylan.  D.J.T. Dep. 86:14-17; Smith Dep. 62:4-9; 67:4-7.  After Dylan reported what the boys were saying, Smith told Dylan he should report any further comments to him.  Dylan had a follow up conversation with Smith.  D.J.T. Dep. 90:21-22; 91:19-20; 93:4-14; 93:19-21.

---

[3]This incident is discussed more fully *infra* at ¶ 178.

175.  Smith and Bogart claim Smith conferenced separately with the boys and Bogart was not involved.  Bogart Dep. 106:16-20; 120:18-21; Smith Dep. 70:2-6.  Alan thinks his next conversation with Smith was on about February 25, 2003, when he called Smith.  A.J.T. Dep. 60:6-11.  On about March 4, 2003, after Smith had talked to all the boys, Mrs. Lee, and Mr. Bond, he called the Thenos, and Alan came to his office at the end of the school day.  Smith Dep. 82:6-8; 83:5-25.

176.  With respect to ¶ 66, and the testimony of Smith and Bogart cited *supra* at ¶ 175, M.W. testified that Smith talked to them as a group and not individually.  M.W. Dep. 10:4-11

177.  M. Bond believes that M.W., N.S., and T.H. were called to the office about comments they may have made to Dylan in strength class.  M. Bond Dep. 38:21-39:2.  M. Bond had a conversation with Smith in which Smith asked Bond whether he had been present for any comments directed at Dylan.  M. Bond reported to Smith that M.W. and T.H. had not made comments in Bond's presence.  *Id.* at 39:2-23.  Smith did not ask Bond to report to him or Principal Bogart if anything inappropriate was said by a student to Dylan nor does Bond believe that Smith asked Bond to let him know if any of these kind of derogatory comments were said to Dylan.  *Id.* at 41:6-15.

178.  Also during tenth grade, Dylan was called banana boy in Ms. Lee's class.  One of the students even got Ms. Lee to call him that and she did not stop calling him that until Dylan talked with Mr. Smith about it.  A.E. was the only student that Dylan reported to Smith as having participated in this, although there were others, such as A.W.  D.J.T. Dep. 95:10-98:2.

179.  On about March 6, 2003, Alan called school board member Dr. Richard Dean at home and outlined some of Dylan's problems.  A.J.T. Dep. 82:22-83:4.  Alan thinks he alone met with Dean in his office for fifteen to twenty minutes.  A.J.T. Dep. 84:7-12.

24

180.  On about March 12, 2003, Dylan, his mother, and father talked with Dr. Dean a second time about the harassment.  D.J.T. Dep. 141:2-12; C.T. Dep. 109:1-10; A.J.T. Dep. 84:18-24.  No one called Alan back after this meeting.  A.J.T. Dep. 86:13-18.  Dean shared with the Board of Education the concerns that Alan had expressed to him in March and gave each board member a copy of the log of incidents prepared by Cheryl Theno.  Erickson Dep. 163:4-9; SOF ¶ 181.  The Board in its March meeting directed that help be given to Dylan and that the school administration document all situations that applied to Dylan.  *Id.* at 164:12-18.

181.  In March, Smith received a letter, or log of incidents, from Alan via the Board Office, which made Smith and Bogart feel they needed to take a proactive stand and talk to the other boys.  Smith Dep. 95:10-20; 96:1-9; 98:1-5.  Bogart asked Smith to speak with each of the other students.  *Id.* at 96:20-22.  The boys (G.P., J.V.,[4] A.E., N.B., D.W.#1, and K.L.[5] ) were verbally admonished, possibly on March 11, 2003.  Bogart Dep. 109:11-15; 115:16-20; Smith Dep. 71:15-17; 73:19-22; 95:5-9; 102:13-17.

182.  With respect to ¶ 90, the meeting between Alan and T.H.'s father at the VFW park took place during the summer between Dylan's tenth and eleventh grade years, not long after T.H. had seen Dylan and, in Alan's presence, made a jacking motion with his hand at his crotch, saying, "Hey, Dylan, the bathroom's back there."  A.J.T. Dep. 102:13-103:24.

183.  Also during the summer between tenth and eleventh grades, Alan provided Smith with information including the names of students who had harassed Dylan.  Bogart Dep. 110:19-22.  Alan's visit raised alarms.  *Id.* at 119:3-4.  Alan also contacted Counselor Kathy Walker in her office on August 12 or 13, 2003 and told her about Dylan's harassment.  Walker went to

---

[4]Bogart Dep. 112:24-113:6.

[5]Bogart Dep. 114:13-19.

Smith who sent her to Bogart.  Smith Dep. 125:9-21.

184.  At Bogart's initiation, Bogart, Assistant Principal Brent Smith and another school counselor, Scott Smith, had a conference in regard to Dylan's problems on or about August 12. Smith Dep. 117:16-118:13.  Bogart wanted Assistant Principal Smith to make sure that Dylan's teachers kept their eye out for problems in relation to Dylan.  *Id.* at 121:25-122:4.  Smith claims he talked to Dylan's teachers after school started on August 20 and 21.  *Id.* at 122:17-24; 135:13-21; 136:9-12, 16-20; Bogart Dep. 127:9-19; *but see infra* at ¶ 186 (M. Bond does not recall it). Smith's visits were brought about by Alan's visit to the school in the summer and by Mrs. Walker's concern.  Bogart Dep. 127:20-24.

### Eleventh Grade Events

185.  With respect to ¶ 93, M.W. does not remember Smith following up the next school year even though Bogart and Smith testified that on the second day of school Bogart called four or five boys (A.E., M.W., T.H., N.S., N.B., and K.L.) into his office, for a meeting at which Smith was allegedly present; and during which the boys were told they would get into trouble if they used the word fag, specifically to Dylan; and during which the boys acknowledged they had done it, but would not do it again.  M.W. was only talked to the one time by Smith.  M.W. Dep. 25:20-26:6; Bogart Dep. 110:23-111:16; 112:16-18; 115:5-8; 116:4-16; Smith Dep. 131:1-9; 133:10-14.  Nothing was put into the students' records.  Bogart Dep. 119:17-21.

186.  With respect to ¶ 94 and ¶ 184, M. Bond does not recall Assistant Principal Smith coming to him just before school started or within a couple of weeks of school starting and indicating that he was going around talking to each of Dylan's teachers about Dylan being called inappropriate names or telling Bond that he would like for Bond to be alert for any inappropriate comments that might be directed to Dylan.  M.Bond Dep. (Exhibit 11) 41:16-44:2.

187.   Bogart never pulled Dylan into his office to ask him whether he was being harassed by other students.  Bogart Dep. 145:14-17.

188.   Only days after school started, D.O. was sitting at the same lunch table as Dylan and started making fun of Dylan at the lunch table, calling him fag, referring to the rumor about masturbating in the bathroom.  Dylan tried to ignore it, hoping that it would stop, and did not say anything.  D.J.T. Dep. 98:17-100:8.  This was the first time Dylan had experienced problems with D.O.  *Id.* at 100:9-20.

189.   After D.O. started harassing Dylan at lunch, problems had arisen outside of school between Dylan and D.O. when Dylan was driving down Fourth Street in Tonganoxie and D.O. was standing out in front of his house and started making a motion like he was masturbating and was pointing and laughing at Dylan.  D.J.T. Dep. 100:21-101:10.

190.   On September 8, 2003, as Dylan opened the door to walk into school, D.O. was there with three of his friends and he stepped forward into Dylan's face and said "Faggot, faggot, faggot."  Dylan hit D.O. and a fight ensued.  D.J.T. Dep. 102:1-23.  After H.G. broke up the fight by getting between the two boys, Mr. Williams took Dylan to Mr. Smith's office.  D.J.T. Dep. 111:23-24.  Dylan told Smith what D.O. had been doing.  *Id.* at 112:4-12; Bogart Dep. 96:22-24.  At some point, D.O. was brought to Bogart's office.  Smith Dep. 137:8-9.  Dylan also told Mike Bogart what D.O. had said.  D.J.T. Dep. 195: 3-21.  Bogart knew Dylan was called a fag.  Bogart Dep. 69:2-7; Smith Dep. 140:16-21.  Bogart decided to suspend Dylan and D.O. for three days each for fighting.  Smith Dep. 139:15-17; 141:1-4.

191.   Bogart met with Alan immediately after the fight.  Bogart Dep. 92:2-4; C.T. Dep. 117:20-24.  Smith was present when Bogart met with Alan.  Bogart Dep. 95:2-11.  Bogart told Alan that Dylan had been called a fag.  Bogart Dep. 96:19-20.  The only time that Alan met with

27

Bogart was when he went to pick up Dylan.  A.J.T. Dep. 123:12-16.  Bogart called Erickson that

day and told him about the fight.  Erickson Dep. 168:11-20.  Bogart told Erickson that D.O. had

used inappropriate language with Dylan and Dylan had retaliated by hitting him.  Erickson Dep.

169:11-19.  Some time later, Dylan related to Mr. Smith that he had walked around the school to

avoid passing by D.O.  D.J.T. Dep. 177:17-178:9.

192.  On September 10, 2003, Alan called Richard Dean again.  A.J.T. Dep. 129:3-6.  He

told Dean about the fight and that while both boys had received identical suspensions for the

fighting, D.O. had not been punished for what he had said.  Dean did not seem to have a good

answer when Alan said that if you are not going to punish them for what they are saying, it is not

going to stop.  *Id.* at 129:9-24.  Dean told Alan that the fight was discussed at the school board

meeting.  *Id.* at 129:9-12.  The school officials knew the accusations, the things the Thenos were

telling the school.  Bogart Dep. 124:5-7.  Alan also talked to board members Kay Smith and Ron

Moore and talked to Rick Lamb twice before the school board meeting on October 12, 2003.

A.J.T. Dep. 162:5-163:6; Lamb Dep. (Exhibit 13) 38:15-39:5; 39:19-20; 42:1-6.  After Lamb and

Alan talked the first time, Lamb called Dr. Erickson and told him about the situation.  Lamb

Dep. 42:13-18.  Erickson addressed the concern in his next Friday newsletter.  *Id.* at 43:24-44:5.

This was before the October 13 school board meeting.  *Id.* at 44:20-22.

193.  On October 13, 2003, Alan stopped by Erickson's office and asked to be placed on

the agenda for the Board meeting that night.  Erickson Dep. 171:20-25.  At that meeting, Alan

said that Dylan had been harassed; he had complained to the school officials; and, they had not

acted sufficiently or effectively and should be fired.  C.T. Dep. 119:9-14; 120:16-21; A.J.T. Dep.

140:17-19; Lamb Dep. 57:5-17.  Alan told them he had visited with Dr. Dean, Dr. Erickson,

Steve Woolf, Mike Bogart and Brent Smith and asked why somebody wasn't taking care of the

problem.  A.J.T. Dep. 155:10-15.  Alan talked to Mr. T___, whose son was also allegedly being

harassed, gave him a business card, asked him to call, and left the room.  A.J.T. Dep. 156:25-

157:6; 132:25-135:14.

194.  Either from the regular Friday Newsletter or the October 13, 2003 meeting, the

Board had been told about an incident that happened to Dylan in Junior High and how that was

handled from Woolf's perspective.  Lamb Dep. 60:20-61:1.  Alan and Lamb had a third

conversation after the board meeting.  *Id.* at 39:6-9.  Lamb remembers being in a meeting where

Bogart updated them on what he had done.  *Id.* at 62:7-10; 63:15-16; 64:1-3.  Bogart told them

he had talked with teachers for them to be aware of the situation.  *Id.* at 64:21-25.  Lamb also

believed that, later, there was also an announcement[6] on the public address system reminding

students of the policy that untoward comments are unacceptable.  *Id.* at 64:25-65:7.

195.  Smith told Bogart that after the fight between D.O. and Dylan, Smith visited with

teachers again and told them to be observant about Dylan and derogatory terms like fag.  Bogart

Dep. 126:17-127:8; 128:17-20.

196.  With respect to ¶ 105, although Dylan had no more problems with D.O. in school,

D.O. yells out faggot at Dylan when Dylan drives past him in his vehicle, and did so as recently

as a week prior to his deposition.  D.J.T. Dep. 114:10-19.  Additionally, after the fight, Alan

overheard D.O. drive by and yell faggot at Dylan.  A.J.T. Dep. 111:1-11.

197.  With respect to ¶ 107, J.B. was not alone in this behavior.  On the same day (on

which Dylan had returned from his suspension for fighting with D.O. and was harassed in small

engines class by J.B.), D.W.#2 confronted Dylan and told Dylan he was a fag for beating up

D.O. and a pussy because Dylan kicked D.O. low.  D.J.T. Dep. 168:22-169:10.  J.B. was

---

[6]As to the announcement, see *infra* at ¶ 205.

harassing Dylan in small engines class in front of the teacher, Pat Albert. *Id.* at 170:2-7.

198.  The next reported problem Dylan had in school was in strength training class when C. L. yelled, "Finish out strong, you queer." D.J.T. Dep. 115:4-11.  Mr. Bond heard C.L. and made him do 50 push-ups. *Id.* at 117:8-110; C.T. Dep. 129:9-12.

199.  With respect to ¶¶ 111-114, according to Matt Bond, when he, Bond, heard C.L., after directing the class to continue their exercises, he summoned C.L. to his location a foot or two inside the weight room which adjoined the wrestling room where the class was exercising, saying words to the effect, "Come here, C___." Then, face-to-face, eye-to-eye, he said, "C___, if you ever say that term again you will be out of here.  You will go to the office.  Do you understand me?"  According to Bond, C.L. replied, "Yes sir, I understand."  Bond then said, "You've got 25 pushups for the language."  C.L. did the pushups there in the doorway between the two rooms. M.Bond Dep. 14:1-15:7.

200.  Bogart thinks that Dylan reported the incident to Bond.  Bogart Dep. 149:20-21. Bond did not report this to Bogart.  C.T. Dep. 131:8-14; M. Bond Dep. 21:7-10.  Bogart first learned of the incident when Cheryl visited him in November, on a Monday.  Bogart Dep. 69:4-7; 129:15-18; C.T. Dep. 107:21-23.  Cheryl met with Bogart on November 17, 2003.  Smith Dep. 143:20-23; C.T. Dep. 130:25-131:3).  They met in the morning, in Bogart's office for fifteen minutes.  C.T. Dep. 133:7-15.  Alan was not involved in talking to Bogart.  A.J.T. Dep. 170:3-10.  Cheryl probably told Bogart that Dylan was very upset.  Bogart Dep. 131:18-19.  Cheryl told Bogart that this incident had happened in the presence of a teacher. *Id.* at 132:22-24.  Smith would have visited with the teacher, Bond, and told him they wanted to know if Dylan was harassed. *Id.* at 133:10-23.

201.  With respect to ¶¶ 111-114, Matt Bond did not report what C.L. had called Dylan to

anyone in the school administration on the day it happened.  M.Bond Dep. 21:7-10.  The following Monday, M. Bond was summoned to the office by Bogart but had not discussed C.L.'s name calling or Dylan with anyone until that meeting.  *Id.* at 21:11-22:20.  M. Bond and Bogart discussed the use of inappropriate language by high school students and how M. Bond deals with it when it happens.  Bogart wanted to know what was being said.  M. Bond Dep. 27:7-20.  M. Bond and Bogart also discussed the context in which terms such as gay, fag, and faggot get thrown around with students in a friendly way, and M. Bond told Bogart that, given the tone of voice and the context in which C.L. had spoken, C.L. had not been using the language in the sense of being Dylan's buddy, but was using it in a derogatory sense, directed at Dylan, and "meant harm by what he said." *Id.* at 25:2-26:7.  After M.Bond told Bogart what had happened, C.L. was brought into the office.  *Id.* at 23:19-24:11.  Bogart asked C.L. what had happened and C.L. described what had happened.  *Id.* at 28:23-29:3.  Bond was excused before there was any discussion of punishment; C.L. remained with Bogart.  *Id.* at 29:5-15.

202.  Bond was not punished or sanctioned for not telling Bogart in a timely way.  Bogart Dep. 135:4-11; 152-20.  Cheryl may have told Bogart that something needs to be done.  *Id.* at 147:13-15.

203.  Cheryl told Bogart that Dylan could not get a date with a girl because of the harassment.  Bogart Dep. 140:21-141:11.  She also told Bogart that they planned to take Dylan out of school.  C.T. Dep. 151:2-11.  Bogart told Cheryl he was working on an announcement regarding the use of words like faggot.  *Id.* at 151:12-18.  Cheryl asked Bogart to mail her a copy of the announcement, which he did.  *Id.* at 151:21-24.

204.  C.L. admitted he said, "Hurry up fag".  Bogart Dep. 129:24.  Bogart told Smith that C.L. had admitted to calling Dylan a queer in class.  Smith Dep. 144:8-11.  Bond confirmed that

31

this incident had happened.  Bogart Dep. 148:16-21; 152:7.   Bogart met with C.L.'s mother, a

teacher at the high school, and she agreed that a detention and note of apology would be

appropriate.  *Id.* at 130:13-18.  C.L.'s family was very unhappy that C.L.  was the first to receive

a detention.  *Id.* at 158:12-16.  Bogart reported this incident to Dr. Erickson.  *Id.* at 171:24-25;

Erickson Dep. 174:24-175:2; 179:1-7.  Erickson was good about letting Bogart handle situations.

*Id.* at 172:7-8.  Bogart probably discussed with Erickson the Thenos' complaints regarding

Dylan.  *Id.* at 172:9-12.  Bogart told Erickson that C.L. had made an inappropriate comment to

Dylan.  Erickson Dep. 176:2-6.

205.  On November 18, 2003, the school made an announcement that no one could use

the words gay or fag.  Bogart wrote a note, on Monday, for all the teachers to read on Tuesday.

Bogart Dep. 153:4-6; 154:9-13.  Bogart did not tell the Thenos that he was going to have the

note read in class.  *Id.* at 154:22-25.  The next day, in Mr. Delay's class, C.L. said that people

need to learn how to grow up and face their problems and not go run to their parents every time

someone says they are gay because no one is ever serious when they say it and was staring at

Dylan the entire time he was talking.  C.L. added it was unfair that they could not use the words

gay or fag any more.  D.J.T. Dep. 158:4-159:3; 180:12-22.

206.  That night, Dylan begged his mother not to send him back to school, saying, "Mom,

I cannot go back there," "Mom, they're laughing at me," "Please, you cannot send me back."  He

was a crying, emotional wreck.  C.T. Dep. 138:2-9.  Dylan dropped out of school after this.

D.J.T. Dep. 182:2-3.  On November 19, Cheryl called Bogart and took Dylan out of school.  C.T.

Dep. 135:16-22.  Cheryl told Bogart that Dylan was harassed because the announcement had

been made.  Bogart Dep. 157:23-158:1.   She also told Bogart that Dylan was crying at home.

Bogart Dep. 130:20-131-3.

207.  Until the end of the semester, Dylan was considered a homebound student and a substitute teacher helped get his schoolwork accomplished that semester.  D.J.T. Dep. 123:18-124:6.  He got his GED and is attending junior college and working.  *Id.* at 124:21-125:23; 6:23-8:10.

## Other Background Facts

208.  With respect to ¶ 127, while it may be true that adolescent students may use the terms gay or fag in a context in which sex is not an issue, perhaps indicating displeasure or dislike of something, when that kind of circumstance arises in the presence of a teacher or administrator, the teacher or administrator should use the opportunity to explain that the language used is inappropriate at school and is not used at school because it can develop into a negative interaction between students.  Dragan Dep. (Exhibit 14) 76:14-77:15.

209.  Something can be sexual without being erotic.  Indeed, something that can be very sexual and at the far end of the scale in terms of its ability to degrade, insult or deride may be anything but erotic.  Devin Dep. 84:20-85:7.

210.  Dr. Mary Devin, denoted an expert witness for Defendants, agreed that "behavior that has the purpose or effect of unreasonably interfering with the . . . student's work or school performance, or that creates an intimidating, hostile or abusive work or school environment" constitutes hostile environment sexual harassment and that sexual harassment often includes sexual innuendo and comments and can include commenting on a person's sexual activities.  Verbal sexual harassment can include spreading rumors about a person's sexuality and name-calling using such words as whore, slut, or faggot.  It can also include insulting, belittling, sexual ridicule and writings or a sexual or offensive nature.  It can include humor or jokes about sex or sexual activities.  Devin Dep, 94:4-95:20.

211.  Dr. Devin agreed that the presence of certain elements, *i.e.*, either:

    (a)  sexual content or connotation;
    (b)  sufficiently severe or pervasive;
    (c)  that a reasonable person would be offended;

or

    (a)  sexual in nature;
    (b)  frequent and severe;
    (c)  threatening or humiliating; and
    (d)  interfering with a student's school performance

would be sufficient for her, as a school administrator to take action or investigate.  Devin Dep. 96:11-97:11.

212.  Dr. Devin agreed that calling a male student a faggot would impugn the nature of the recipient's sexuality.  Devin Dep. 97:22-25.  She also supposed that it would likely impugn the nature of a female student's sexuality, and would be offensive if that female student were called a whore or a slut.  *Id.* at 97:12-21.

213.  Dr. Devin also agreed that if a harasser were trying to provoke a response, the harasser would select terms that would be more closely tailored to the victim.  If a harasser wanted to impugn the sexuality of a male victim, the harasser would be more likely to call him a faggot than a cunt.  Devin Dep. 100:13-101:5.

214.  Dr. Devin agreed that verbal sexual harassment of one student by another can be one aspect of or part of an attempt to exercise power, authority, or control over the recipient of the harassment.  Devin Dep.  98:1-14.

215.  Dr. Devin agreed that it is not unusual or not uncommon for a verbal sexual harasser to engage in the harassment to provoke response by the recipient and that sometimes provoking a response can be a form of exercising control over the recipient.  Devin Dep. at 99:10-21.

216.  It is not uncommon, in Dr. Devin's experience that in cases of student-on-student

34

verbal sexual harassment, for there to be a power differential between the perpetrator of the harassment and the victim in terms of their relative social status, membership in various groups or associations, and reputational aspects of student life.  Devin Dep. 101:6-102:12.

217.  Dr. Devin agreed that it is not uncommon in a school situation for socially isolated boys to be recipients of unwanted verbal sexual harassment.  Devin Dep. 102:13-23.

218.   Dr. Devin agreed that in a circumstance where a rumor about Dylan getting caught masturbating in the bathroom surfaced in the seventh grade year and was spread by members of Dylan's class (of 2005), and that the rumor resurfaced three years later in the tenth grade year among members of the class of 2004, that there would be a possible connection that raises a concern for a school administrator such that the administrator would want to gather information about the extent and severity of any possible problem and do so by conducting a sensitive inquiry.  Devin Dep. 104:18-112:11.

219.  At some point in the sensitive information gathering inquiry, it may be that the focus would evolve into extinguishing the behavior in the future, which would be the primary objective.  That primary responsibility attaches the first time there is an incident.  Devin Dep. 112:12-113:8.  It includes taking effective steps to see that it does not recur.  If first steps fail, alternatives, increasing the intensity of the response in a manner that is commensurate with the prologation of the problem, are employed.  *Id.* at 113:9-114:9.

### Evidence of Deliberate Indifference

220.  The response of the school district to the first incident of harassment in the lunchroom by G.P., A.E., K.L., and C.C. was inadequate.  Despite the indication that Dylan had been teased during that week by some, if not all of those students, the assistant principal, Ms. Strong, simply warned the boys not to do it.  She should have acted more forcefully with those

35

students and taken other action in addition to just speaking with the boys.  Dragan Dep. 31:1-25.

221.  Ms. Strong should have contacted the students' parents to inform them of the situation and that the behavior was not acceptable in the school and to ask them to follow through at home with a discussion with the boys.  Dragan Dep. at 32:1-8; 32:15-24.  Depending on the severity of the harassment in the lunchroom, she should have made a decision to issue in-school or out-of-school suspensions to one or all of the boys.  Dragan Dep. 32:10-24.

222.  The response of the school district to Dylan's report that G.P. had started a rumor that Dylan was caught in the bathroom masturbating was inadequate in that Ms. Strong did nothing in response to Dylan's report.  Dragan Dep. 51:1-14.

223.  When Dylan reported to Ms. Strong that he had called K.L. a faggot and that K.L. had called him a faggot, K.L. was warned about it, but was not suspended.  That was inconsistent with the board policy as reflected in the Student Handbook.  Dragan Dep. 52:6-25; Exhibit 15, Student Handbook .  Swift action should have been taken.  Dragan Dep. 53:1-8.  It is also not good administrative practice which would have been to deal swiftly with the offending students and to take more significant measures than just speaking with the offenders, which in itself was not inappropriate.  *Id.* 53:15-54:9.

224.  With respect to ¶ 94, the effort of Smith to talk to Dylan's teachers for the 2003-04 school year, was a good idea, but it did not go far enough.  It would have been much more effective for an administrator to gather all the teachers in the school, advise them of the circumstances and that he wanted the faculty to work together to create a positive culture or climate in the school to stop harassment in the school environment.  Dragan Dep. 46:5-48:15.

225.  With respect to ¶ 123, the statement was written much too late, after the school already had ample awareness of the fact that Dylan had been sexually harassed for a number of

years.  It took repeated incidents for the school to finally make a statement.  Dragan Dep. 62:16-23.  The statement also warrants criticism because it was just distributed to classrooms with the direction that teachers read it, which is a totally inadequate measure.  *Id.* at 62:24-63:2.  A positive school climate is not developed just by sending a memo like the November 18, 2003 statement around to teachers and asking them to read it.  Such a strategy could cause even more of a problem for the students in the school and particularly for Dylan.  The students knew that Dylan was being harassed and there's a strong likelihood that many students would have been able to figure out that this memorandum was issued in response to issues regarding Dylan, which, in turn, could have made it worse for him.  *Id.* at 63:2-12.

226.  The manner in which the November 18, 2003, statement was issued was totally inappropriate.  The administration should have gotten the teachers together and discussed the issue of the sexual harassment.  The administration should also have gotten the students together and discussed the issue of sexual harassment.  Had the administration taken other, earlier steps to deal with the overall culture, the November 18, 2003 statement might never have been needed Dragan Dep. 63:13-64:2.

227.  A few of the steps that should have been taken were:

(a)  to identify the issues with the culture that are inappropriate, such as students calling each other names that are sexually oriented and constitute sexual harassment;

(b)  bringing staff together to talk about and plan solutions to deal with that issue and positively alter the climate in the school so that the incidents of harassment would be diminished if not completely eradicated, *i.e.*, developing a plan of action;

(c)  providing clear policies and procedures to the staff, students, and parents;

(d)  engaging parents in discussions of the issue so that the community could work together on changing the culture of the school so that it can consistently and effectively deal with sexual harassment issues;

(e)  when individual incidents arise, individual counseling is important as is taking consistent and swift action against students who violate school policy.

Dragan Dep. 64:3-22; *see also id.*, at 65:8-67:21.  Together, these strategies contribute to the

37

positive development of a school culture that sends the message that sexual harassment will not

be tolerated.  *Id.* at 67:21-25.  Additional strategies appear in Dr. Dragan's report (Exhibit 16), at

19-20.

228.  School administrators are charged with assuring that reasonable care is used to

provide a school climate or environment that is free of sexual harassment.  Dragan Dep. 74:12-

22.

229.  With respect to the information contained in ¶¶ 10-15, it bears noting that the codes

of conduct do not necessarily comply with the board of education's written policy in that the

code of conduct allows disciplinary action against students who engage in harassment to be dealt

with along a scale from suspension (being the most severe) to in-school suspension to discussion

with a student while the board of education policy as stated in the handbook mandates that a

student who engages in sexual harassment will be suspended from school.  Dragan Dep. 35:12-

23.

230.  Although the school district had a procedure for handling complaints of sexual

harassment, the procedure was inadequately implemented.  Students, teachers, administrators

and parents all need information on the procedures and how to follow through with a formal

complaint.  Dragan Dep. 78:3-22.

231.  The administrative staff at the junior high school should have notified the high

school of the prior incidents of verbal sexual harassment of Dylan and of his complaints.  Such

information, if given to high school staff would assist the high school with the knowledge of the

past victimization and prompt them to examine their school culture, policies, and procedures to

assess whether they are adequate to curtail the potential of this continuing to happen.  Preparing

the staff, reviewing sexual harassment policies and procedures again with the staff and as

students come in the first year of high school, heightening awareness, making sure that there is consistency of policy and procedure from one school to the other, and, if not, attempting to correct that can assure that the high school culture is going to be positive and can help address issues of sexual harassment.  Dragan Dep. 79:4-81-9.

232.  It would not have been inappropriate to enlist student leaders and friends of Dylan in an effort to learn who was involved and assist in changing the culture and stopping the harassment.  Dragan Dep. 93:11-94:12.  It would have also been appropriate to enlist the involvement of Dylan and his parents to assist in addressing the problematic culture.  Dragan Dep. 105:15-107:17.

233.  LeAnn Bond had never been a part of any investigation, nor was she interviewed by anyone, to determine whether or not Dylan was being verbally sexually harassed.  L.Bond Dep. (Exhibit 17) 8:25-9:10.

234.  Bogart never conducted an investigation to determine the extent to which students were being called faggot, etc.  Bogart Dep. 172:24-173:8.

235.  Assistant Principal Smith did not interview M.W., T.H. and N.S. separately, but as a group.  M.W. Dep. 9:22-10:6; 41:23-42:3.  M.W. does not remember Smith following up the following school year.  He was only talked to the one time by Smith.  M.W. Dep. 25:20-26:6.

**Deliberate Indifference: Things the School District Did Not Do**

236.  Although the school district had a "School Climate Committee", that committee did not at any time use questionnaires, anonymous or otherwise, directed to students or teachers, or otherwise "sample" the school climate, to determine the extent or frequency of sexual harassment of Dylan Theno or of any students.  Smith Dep. 21:4-26:18.

237.  Although the school district recognized that key elements in student achievement

included "feeling safe in their environment", having someone in the school family who cares about them, and responding to a student's individual needs, the school district did not consider or implement a plan to address the individual needs of Dylan.  Smith Dep. 60:19-24.  High School Principal Bogart agreed that feeling "safe" at school was important to student achievement. Bogart Dep. at 14:7-11 .  A principal's "first" responsibility is to the students.  *Id.* at 16:10-11.

238.  Although the school district recognized the importance of high expectations for school success, that teachers and other staff were to be held to high expectations, and that teachers were told to report sexual harassment "of any kind", not one teacher was ever cautioned or reprimanded, in any fashion, for failing to report instances of sexual harassment of Dylan. Smith Dep. at 61:17-62:3; Bogart Dep. at 14:20-16:6; *id.* at 35:10-24.  Principal Bogart cannot account for Teacher Matt Bond not bringing the November 2003 incident to the Administration's attention "in a more timely way" and Mr. Bond was not sanctioned in any way even though he allegedly had been told twice just before the incident to report such matters.  Bogart Dep. at 134:13-135:11.

239.  Although the school district had a policy of an "automatic suspension" for any instance of sexual harassment, not a single student was suspended during the more than four years that Dylan was sexually harassed in the school district.  Smith Dep. at 65:8-12; Exhibit 15, Student Handbook.  Even when D.O. admitted to having first called Dylan a "fag" before Dylan struck him on September 8, 2003, Smith did not even know whether any consideration was given to punishing D.O. for calling Dylan a "fag".  Smith Dep. at 141:13-142:2.  The Superintendent acknowledged that the Student Handbook provision calling for "automatic suspension" for instances of verbal sexual harassment was inoperative "because we do not live by the student handbook."  Erickson Dep. at 90:7-91:8.

40

240.  Although the school district recognized the need to pay particular attention to students who were picked on, not enjoying school, or struggling with school, because their situations could escalate to violence, the school district did not any time implement a system or a set of signals to warn of possible school violence.  Smith Dep. 33:15-37:12.

241.  When instances of sexual harassment came to the attention of the school district over the years, there was never a comprehensive investigation of either any particular event or into the pattern of continuing events.  When students who had harassed Dylan met with school district officials they were not asked what they had said to Dylan, what they had heard others say to Dylan, or what they knew about the extent of the harassment of Dylan.  Smith Dep. at 67:4-68:6, 69:12-18, 22-24; 70:12-72:25, 73:7-76:8; 80:1-81:21; 105:25-109:14; 111:7-112:25; 113:8-115:4.

242.  High School Principal Bogart did not at any time ask Dylan to come into the privacy of his office to ask about his experiences being harassed by other students, but instead from time to time asked Dylan how things were going but only in the school hallways crowded with students during passing periods.  Bogart Dep. at 144:14-145:17.

243.  After the incident involving three upper classmen in the strength class, none of the three students were asked the questions: what did you call Dylan, why did you do it, how often and for how long did you do it, who else calls Dylan such names, etc., according to Principal Bogart because he was "not asking all those questions."  Bogart Dep. at 107:25-108:15.

244.  After D.O. called Dylan a "fag" or "faggot" on September 8, 2003, provoking a fight, it did not occasion an investigation into verbal sexual harassment.  Bogart Dep. at 123:13-124:4.  D.O. was not asked why he called Dylan that, whether he had called Dylan that before, whether other students had called Dylan similar names. *Id.* at 76:23-79:18; instead, Principal

41

Bogart decided to "let that sleeping dog lie." *Id.* at 122:12-25.

245.  After the September 8, 2003 fight after Dylan was called a "fag" or "faggot", the school district did not undertake any effort to determine the extent to which students were calling each other fag, faggot, or queer.  Erickson Dep. at 171:12-17

246.  After the C.L. incident in strength class in November, 2003, Principal Bogart did not conduct an investigation or even question the offender about why he said it, whether Teacher Bond heard it, what other students had called Dylan, etc., and, instead, said that he "acted on the one piece of information that he had".  Bogart Dep. at 143:2-6.  And, Bogart did not investigate to determine if Teacher Bond assigned push-ups to C.L. only after Dylan had complained about being called a name.  *Id.* at 151:17-152:3.

247.  When Principal Bogart was told by Dylan's mother while Dylan was still enrolled at Tonganoxie High School that girls would not go out on dates with Dylan for fear of being called gay, Principal Bogart did not conduct an investigation, ask for any names of students to talk to, or in any way follow up on this report of harassment.  Bogart Dep. at 140:21-141:18.

248.  The next school day after the C.L. incident in strength class, but before Dylan dropped out of school, his mother told Principal Bogart that "something needs to be done" about what was happening to Dylan.  Bogart Dep. at 147:6-15.  Bogart suggested to her that some parents enrolled their students in the Lawrence, Kansas, school system.  *Id.* at 139:5-8.

249.  Assistant High School Principal Smith, whose responsibilities included student discipline and school climate matters, was never asked and never undertook to determine if there was a problem in the school district with students verbally sexually harassing other students.  Smith Dep. at 148:23-149:2.  Principal Bogart never conducted an investigation, "formal or informal", into verbal sexual harassment because he did not see a problem and, as of his

deposition, noted "I still don't see a problem." Bogart Dep. at 172:24-173:8. The Superintendent directed no efforts and was aware of no efforts in the school district to measure the extent of student-on-student sexual harassment. Erickson Dep. at 33:12-16; 41:7-10.

250. The school district never provided a means by which students could make anonymous reports of instances of student-on-student sexual harassment. Erickson Dep. at 130:11-15.

251. According to the District's Superintendent, there was no effort in the school district to determine the effectiveness of its efforts to end the harassment of students. Erickson Dep. at 30:4-10. Student-on-student sexual harassment was never mentioned in the district's employee monthly newsletter; it was never discussed in the Superintendent's one-on-one meetings with teachers; harassment of Dylan was never mentioned at the Superintendent's monthly administrator's meetings; and, the district provided no continuing education or in-service programs for staff on the subject of student-on-student sexual harassment. *Id*. at 57:21-25; 40:13-41:10; 33:4-11; 58:23-59:5; 65:4-25.

252. According to the Superintendent, the school district had a "zero tolerance" policy with respect to sexual harassment of students, but no student was ever disciplined for verbal sexual harassment, Dylan was not the recipient of any sexual harassment, and the Superintendent was not aware of any instances of verbal sexual harassment of any student at any time in the school district. Erickson Dep. at 187:25-188:17; 149:1-16.

253. The Superintendent lacked a functional definition of the term verbal sexual harassment in the district's code of Conduct, defining the disjunctive word "or" as a conjunctive meaning "in addition to". Erickson Dep. at 82:4-85:18.

**Additional Evidence that the Harassment of Dylan Was
Severe, Pervasive, and Objectively Offensive**

*Dylan's Sister, Shannan, and Students H.F., T.S., and M.W.*

254.   Dylan's sister, Shannan, who was two years ahead of Dylan in school, remembers that when she was in junior high, A.M., one of her friends who was an aide for a shop class, said that kids were picking on Dylan.  A.M. told the other kids to leave Dylan alone and to stop picking on him.  S.T. Dep. 40:13-41:4.  Throughout the remainder of her ninth grade year, at the junior high, students would come up to her and ask her if the rumor about Dylan was true.  *Id.* at 42:3-43:4; 43:17-5.  When she was in high school, before an English class, a student asked about or repeated the rumor about Dylan and she corrected him and told him it was not true.  The teacher was listening at the time; there was no further discussion of the issue.  *Id.* at 37:7-40:8.

255.   H.F./H.J. and Dylan were in the same grade.  H.F. Dep. 26:12-14.  When students used the word flamer at the junior high school he understood the word to mean being a homosexual, referring to either effeminate mannerisms or having homosexual tendencies.  *Id.* at 28:12-16; 30:7-13.  It seemed to H.F. that "[e]veryone was just trying to push [Dylan] to his limit."  *Id.* at 28:17-25.  A lot of people were involved in the name calling.  *Id.* at 29:5-13.  H.F. heard the rumor about Dylan being caught in the bathroom.  *Id.* at 29:19-22.

256.   T.S. has known Dylan since before they started school.  T.S. Dep. (Exhibit 19) 7:3-8.  They have gone through school together, but did not have any classes together in their eighth through junior years.  *Id.* at 7:6-21.  They did not usually have the same lunch shift, but they would see each other during the school day during passing periods and in high school, their lockers were in the same area.  *Id.* at 8:6-96.

257.   When the rumor about Dylan got started, a week could not go by without something going around school or hearing something about Dylan being called a faggot.  After the lawsuit

was filed, people – including K.L. and M.M. (who had been among the initial name callers in

seventh grade[7]) and R.S. – were still saying such things as "oh, that faggot's still trying to get

away with this". He heard the banana boy term used in reference to Dylan and in seventh grade

heard the rumor that Dylan had been caught masturbating. T.S. Dep. 26:8-23; 46:7-20. C.L. told

T.S. about referring to Dylan as faggot. *Id.* at 24:19-26:3.

258. The name calling went on from seventh grade until Dylan left school. T.S. Dep.

29:12-24. Some of those he recalls talking about and calling Dylan names such as faggot or

queer were D.O. and D.W.#2, C[K[8]]L, and recently, C.B. and T.A. *Id.* at 30:16-31:12; 33:25-

34:9. In addition, he heard G.P. and K.W. calling Dylan names or referring to him as a faggot.

*Id.* at 39:3-40:8. T.S. did not understand people to be using the words gay or faggot to call

Dylan stupid but rather to calling him to be like a homosexual or faggot. *Id.* at 48:25-49:21.

This continued in eighth, ninth, tenth, and eleventh grade with about the same frequency –

weekly. *Id.* at 49:11-50:5; 51:12-16. When T.S. occasionally would try to defend or stand up

for Dylan when someone called him a fag, he would be asked if he, too, was a faggot. *Id.* at

52:16-53:3; 53:17-54:12. T.S. believed that it was in the tenth grade that he heard Dylan

referred to as banana boy. 58:8-14. That went around the halls for a couple of days. *Id.* at 57:4-

11. M.W. started it, and from there it went around school. *Id.* at 60:12-19.

259. In the last two or three months that Dylan attended school, T.S. noticed changes in

Dylan. He acted run down; he did not really have any friends. His facial expressions made him

appear to be depressed. T.S. Dep. 54:13-55:3. T.S. tried to be a friend and talk to him, ask about

---

[7] *See* D.J.T. Dep. 40:1-7; 43:18-22.

[8] In some depositions, this student's first name begins with a "K", while in others it has
been spelled with a "C". It is the same individual.

his day, but Dylan seemed to be holding back and it seemed as if Dylan did not want to talk about things.  *Id.* at 55:4-18.  Before the harassment began, Dylan was "laid back", but in the last few months before he left school, he looked depressed and wasn't acting like he normally would, which was spunky at times.  He just kind of walked to his locker and walked to his classes and appeared to try to stay out of the halls.  *Id.* at 56:17-57:8.  Dylan appeared depressed to T.S. because he walked with his head down, avoided people, would say "Hi," but would only talk a few seconds before he would walk on to class alone.  *Id.* at 57:9-20.

260.  M.W. first met Dylan in weight lifting class during high school.  Dylan is a year or two younger than M.W..  M.W. Dep. 6:5-16.  M.W. only took the weight lifting class his sophomore and junior years.  *Id.* at 6:24-7:2. M. Bond was the teacher both years.  *Id.* at 7:3-4. MW also shared a math class with Dylan that same year in which the teacher was Miss Cox.  *Id.* at 7:7-14.  M.W. had not heard anything about Dylan before meeting him in these classes.  *Id.* at 7:18-20.  There were about fifteen students in the class and generally you would pair up with one other person with whom to work.  M.W. usually paired with T.H.or N.S.  *Id.* at 8:3-25.  For about a week and a half, M.W., T.H., and N.S. were teasing Dylan about a rumor they had heard from someone else in the class about Dylan having been caught masturbating in the bathroom. *Id.* at 13:11-22.  If this was in February, 2003, it would have been during M.W.'s junior year.  *Id.* at 27:14-28:4.

261.  M.W. also remembered other people saying something about him being gay.  *Id.* at 13:15-19.  One of the people he recalled saying Dylan was gay was D.W.#1.  That occurred during the same year that M.W., TH., and N.S. were making comments about Dylan being caught in the bathroom masturbating.  *Id.* 14:22-15:12; 16:24-17:7; 28:22-24.  M.W. heard it from D.W.#1 himself, possibly at lunch when D.W.#1 was actually talking to T.H. in M.W.'s

presence.  *Id.* at 28:5-14.  During the time they were making comments, M.W. probably made a comment once a day.  He remembered in particular saying that he did not want to have anything to do with a dumbbell bar after Dylan's hands had been on it.  T.H. and N.S. may have made comments that accused Dylan of being homosexual or labelled him as homosexual, but M.W. stuck to the theme of where Dylan's hands had been.  *Id.* at 18:25-19:10; 25:2-13; 30:18-31:9; 41:14-22.  M.W. recalls N.S. saying something to the effect of, "Hey, Dylan, did you need to go to the bathroom?"  *Id.* at 31:11-16.

262.  M.W. remembers one occasion that T.H. said something based on the bathroom rumor loudly enough that M. Bond heard it and M. Bond's response was to say, "You guys get back to work."  M.W. Dep. 31:22-32:18.

263.  Although Dylan did not react much or might have tried to laugh a little with you instead of being laughed at, M.W. knew it probably bothered Dylan.  It did not seem as though it had bothered Dylan that much, or else he would probably have stopped, until either Dylan or M. Bond told Assistant Principal Smith who then made clear that it was serious and needed to stop. M.W. Dep. 20:4-11; 21:20.

264.  M.W. was pulled out of math class and told to go to the office.  When he got there, T.H. and N.S. were already there.  Assistant Principal Smith talked to them as a group.  M.W. Dep. 9:22-10:6; 41:23-42:3.  When he first got called to the office, M.W. did not suspect why Smith wanted to see him, but when he saw T.H. and N.S. there he assumed that it had to do with their behavior regarding Dylan.  *Id.* at 11:9-16.  Smith told them that he knew that they had been picking on Dylan, "about an incident that happened back in junior high", and it had to stop, that it was considered harassment.  Smith did not mention how he knew and if he had said that Dylan had reported it, it would probably have made T.H. even madder.  Smith told them the kind of

behavior in which they had engaged is dealt with by severe punishment like out-of-school suspension or expulsion because it was technically sexual harassment.  They all admitted it and knew they should not have done it.  They agreed to stop, and it was left at that.  Smith turned the conversation to a discussion of whatever sports season it was at the time.  It was about a ten minute meeting.  *Id.* at 17:23-18:16; 33:3-24.

265.  Thereafter, M.W. did not pick on Dylan and stayed away from him.  *Id.* at 18:17-24.  N.S. also stopped,  *Id.* at 23:8-11.  However, T.H. was mad because Alan had talked with T.H.'s father.  *Id.* at 23:12-23.  Over the next couple of weeks, M.W. heard T.H. say about three times words to the effect of, "better not say anything around him or Dylan will go off and tattle or tell his dad or tattle to the principal."  At least two of those times, the comments were made in Dylan's presence.  *Id.* at 23:24-24:18.  Dylan reacted as usual: he "just let it go, shut it off."  *Id.* at 24:19-20.

266.  M.W. does not remember Smith following up the following school year.  He was only talked to the one time by Smith.  M.W. Dep. 25:20-26:6.

*Dr. Dragan*

267.  The comments directed at Dylan over four school years and five calendar  years were severe, pervasive, and objectively offensive in light of the names he was called, *i.e.*, faggot, masturbator, masturbator boy, banana boy, queer.  These terms are severe and can be severe even if used only on one occasion, depending upon the individual and the situation.  Dragan Dep. 90:16-91:8.

268.  It understates and misapprehends the situation in which Dylan was placed, and misses the point, to characterize it as just a series of individual, unrelated instances and to conclude, from that, that the Tonganoxie school administrators were acting appropriately within

48

a range of appropriate actions concerning the sexual harassment of Dylan.  Even though it might have been individual students who were dealt with individually and those individual students may not have necessarily pursued the activity (though it is unknowable – they may have continued without Dylan reporting it further), it is nevertheless a situation involving Dylan that occurred over a number of years that reflects a school culture issue.  Dragan Dep. at 95:9-96:2.

269.  Isolated complaints are not the equivalent of isolated harassment.  If a student goes to an administrator and complains about being harassed, that implies one thing.  But a student might be harassed numerous times on a continual basis and might not go to the administrator to complain.  Dragan Dep. 100:23-101:7.

270.  The fact that the incidents of sexual harassment of Dylan occurred over a period of four school years and five calendar years is an indication that there is a problem with the culture.  Even though on an individual basis individual students may have been dealt with at the time of the reported incident and they may not have continued that behavior, at least overtly and openly, that's still an indication that there is a problem.  He's being targeted.  He's being picked on.  Something is occurring in that culture that is not conducive to good education.  So that is an indication, then, that something needs to be done about it.  Dragan Dep. 101:21-102:9.

271.  The fact that the same rumor about Dylan that surfaced during seventh grade resurfaced in subsequent years, and survived summers and continued into the following school years, suggests that within the school culture there was something that was maintaining that impression of Dylan and it was not being checked.  These facts are an indication that something is radically wrong within the culture of the school that should have been dealt with a lot sooner. Dragan Dep. 102:10-103:9; 103:25-104:6.

272.  The fact that the harassment of Dylan began with students in his own grade, but

later was perpetrated by students in different grades indicates that the culture of the school was actually enhancing the distribution of information about a student beyond his own grade level. It suggests that the culture that permits the sexual harassment is pervasive. Dragan Dep. 103:10-104:6.

273. An administrator confronted with an allegation of sexual harassment should investigate it promptly and thoroughly, but must also look beyond the incident to the culture of the school and change it so that the investigation examines why the harassment is occurring. Dragan Dep. 104:23-105:14.

*Teachers Matt Bond and LeAnn Bond*

274. Matt Bond had heard the rumor around the school that Dylan had been caught in the bathroom masturbating with soap on his hands, and thinks Dylan was no longer in junior high when he heard it. He heard the rumor from his wife, LeAnn, who was teaching in the junior high school at the time she had heard the rumor. M. Bond Dep. 35:18-37:4.

275. LeAnn Bond recalled learning that Dylan was the subject of a rumor about being caught masturbating in the bathroom. L.Bond Dep. 4:23-5:2; 6:8-12. She believes she heard the rumor prior to 2003 in the office at the junior high school building. *Id.* at 5:6-23. She believes she heard the rumor from an adult. *Id.* at 5:24-6:5. She believes that she told her husband about the rumor when they started seeing things on television about the new policy at the high school. *Id.* at 7:7-15. The policy was the one which prohibited use of the words gay, fag, and homosexual. *Id.* at 7:17-24. She learned of that policy by seeing it in the press and on television and asked her husband if they had new rules. *Id.* at 7:25-8:4. Her husband confirmed that they did and that led to her telling her husband of the rumor about Dylan. *Id.* at 8:16-2

*Evidence of Other Sexual Harassment*

276.  Others reported being harassed or being subjected to harassing behavior or comments including:

(a)  S.S.;

(b)  C.F.'s daughter;

(c)  K.G.'s daughter;

(d)  J.T.

D.J.T. Dep. 203:16-207:15.

277.  It was Cheryl's understanding that T.W. harassed T.L.  C.T. Dep. 19:22-20:10.

278.  Mrs. T. (J.T.'s mother) told Cheryl that she was unhappy with Mr. Woolf over the treatment of her son.  C.T. Dep. 20:15-21:3.

279.  S.S.'s mother told Cheryl that he was called sexual names such as gay and fag and was bullied in school and that nothing was done about it.  C.T. Dep. at 21:10-17

*Dr. Gammill Prescribed Medication and Counseling*

280.  Dr. Deborah Gammill, M.D. saw Dylan on December 4, 2003, when he came to her with a complaint of depression.  Dylan related symptoms of having difficulty with sleep, difficulty with concentration, being easily distracted, a depressed mood, and problems with anger and frustration.  She noted increased social stressors at school and that he had been picked on in seventh grade and more recently, had gotten into a fight with classmates who were calling him names.  Gammill Dep. (Exhibit 20) 3:9-10; 5:21-6:13.

281.  Dr. Gammill noted that during that visit, Dylan was a little withdrawn when compared to prior contacts with Dylan in which he had seemed somewhat outgoing, entered into and carried on conversation pretty easily, and readily answered questions.  In this visit, he was

not as forthcoming with an easy discussion.  Although he volunteered information, it was not as easily as in the past.  This was in contrast with his mood on their last visit in June, 2003.  She had not noticed this sort of behavior previously.  Gammill Dep. 6:16-7:24.  Dr. Gammill prescribed Zoloft and arranged for Dylan to see Dorothy Marsh, a counselor.  *Id.* at 7:25-8:2.

282.  By their next follow-up visit on January 29, 2004, Dylan was sleeping okay.  He was doing better than when she saw him in December.  He was going to counseling.  They discussed his plan of working toward his GED, getting a job, saving for college.  His mood was improved and while he was not exactly the same as prior to the December visit, he was more like the Dylan that Dr. Gammill knew.  Gammill Dep. 8:3-9:9.  Dr. Gammill believed that the improvement in the depression and anger was at least partly attributable to the Zoloft.  *Id.* at 16:16-18.

283.  The next time Dr. Gammill saw Dylan was May 13, 2004.  At that time, although the medications were working well, Dylan was having difficulty falling asleep one to two times a week.  She continued the Zoloft prescription even though his mood had improved.  Gammill Dep. 9:16-10:3.

284.  The next time she saw Dylan, on August 31, 2004, he came in with an Achilles problem, and there is nothing about it in the notes, but Gammill usually reviews medications with patients when they come in and make sure they are doing okay.  Since they made no changes, Dylan was apparently doing okay on the Zoloft, so she continued him on the same dosage.  His mood seemed okay.  Gammill Dep. 10:12-24.

285.  It is Gammill's practice to tell her patients that when there is a follow-up appointment, they need to keep it, but if they have problems to call sooner because she assumes that they are doing well unless she hears from them.  She gave Dylan a refill for a year and told

him to contact her if he had problems.  Gammill Dep. 13:17-14:4.

*Dylan Has a Psychological Assessment and Continues to Receive Treatment from a Psychiatrist*

286.  In October, 2004, Dylan underwent an assessment by Dr. Herman Lucke, Ph.D.  Dr. Lucke received his M.A. in clinical psychology from the University of Chile and his Ph.D. from the University of Kansas in developmental and child psychology.  He has been in private practice in Kansas City since 1989.  Lucke Dep. (Exhibit 21) 4:15-5:2; Exhibit 22, Lucke Resume.

287.  During the first session with Dr. Lucke, on October 18, 2004, Dylan and his mother were interviewed and then Dylan took a test, the Millon Adolescent Clinical Inventory (MACI).  Lucke Dep. 7:7-8:5; Exhibit 23, Lucke Evaluation Report.  The MACI is an inventory for adolescents that can be used as a screening device and provides information regarding common areas of concern for adolescents.  It can also provide information about the possible presence of clinical disorders.  Lucke Dep. at 8:7-14.

288. During a second session with Dr. Lucke on October 22, 2004, there was discussion of the test results from the first session and some discussion of further testing.  Lucke Dep. at 33:9-34:1.  He also took the Rorschach test on that date.  *Id.* at 36:14-15.  Then, on October 29, he took the Millon Clinical Multiaxial Inventory III (MCMI), which has a specific scale for PTSD that is more sensitive.  *Id.* at 33:17-34:1; 36:14-17.  The closing session occurred on November 5, 2004.  *Id.* at 36:17-19.  The reason for doing the MCMI was because the MACI does not have a scale for PTSD.  *Id.* at 38:15-19.  Dylan's score on the PTSD scale was 80 whereas the significant level is 75%.  *Id.* at 38:18-39:4.

289.  Dr. Lucke's diagnosis was:

> Axis I:        Post Traumatic Stress Disorder, chronic (DSM-IV 309.81)
>                Anxiety Disorder, NOS, severe (300.00)

Axis II:        Avoidant Personality Disorder (in progress) (301.82)
Axis III:       V71.09, No diagnosis or condition on Axis III
Axis IV:        School and social stressors
Axis V:         GAF: 50

Exhibit 23, Lucke Evaluation Report, at 3-4.  It was Dr. Lucke's opinion that Dylan's

psychological profile is best described as traumatized, chronic, with underlying severe anxiety significant enough to impair his ability to function in the world to his potential. Furthermore, it appears the disorder in the personality is directly related to his negative experiences at school.

*Id.* at 4.  Dr. Lucke distinguished the experience of Dylan from the normal occasional name

calling among teenagers and explained how the combination of harassment, lack of protection,

lack of support groups, social isolation, and real or perceived abandonment by authority figures

coupled with excessively prolonged exposure made the harassment an extreme and

psychologically damaging experience for Dylan.  Dylan found the entire lengthy ordeal

"incomprehensible and irresolvable."  *Id.*  "The harassment, over time, thus threatened his

personal integrity . . .."  *Id.*

290.  Dr. Lucke identified seven characteristics of Dylan's experience that aid in

understanding its psychological impact on Dylan:

(a)  The harassment resulted in social isolation.  Any students who attempted to be friendly to Dylan also became a target for harassment.  Therefore, students generally opted to distance themselves from Dylan denying him of the needed support and peer social contact, and undermining his self -esteem.
(b)  The school environment, in Dylan's perceptions, failed to protect him.  The perceived and/or real lack of an effective reaction plan from responsible caretakers and authorities to stop the harassment left Dylan unprotected and helpless in the school environment.  (Dylan even believes one teacher gave approval to the harassment by calling Dylan one of the harassing nicknames.)
(c)  Dylan experienced a shattering of the security that his own parents were able to protect him.  The inability of Dylan's own parents to convince school authorities to protect Dylan and stop the harassment shattered his general sense of security in the world and deepened Dylan's sense of impotence and vulnerability.
(d)  Dylan was denied important age-appropriate group experiences.  The harassment prevented Dylan from participating in (or even considering) certain school related activities without adding to the harassment.  These included mainstream activities such as

normal friendships, girlfriends, sports, etc., critical to an adolescent's self-concept and self-esteem.

(e)  The harassment negatively impacted future emotional growth and development.  The harassment, by preventing Dylan from participating in mainstream age-appropriate school experiences, stifled certain psychological, interpersonal, and career-directed orientations that will be very difficult to recapture or redirect.

(f)  The harassment occurred at one of the most critical developmental periods in a young man's life.  The harassment took place during the period when Dylan was just attempting to establish himself as an adolescent in his peer group and lay the foundation for young adulthood.

(g)  The exposure to the harassment was of an extremely long duration (reportedly more than three years).

*Id.* at 4-5.

291.  Dr. Lucke considers that Dylan's reaction has not been resolved with termination of the exposure.  It is evident that Dylan engages in efforts to avoid triggering situations and numb himself.  Dylan "carries a distorted view of his future" and, in addition to his anxiety symptoms, has "developed a belief system based upon personal inadequacies and inability to fit in socially." He is distrusting of virtually any support system of peers or authority figures outside of his immediate family.  "Months after removal of the stressors, an increased state of arousal (*e.g.*, sleep problems, irritability, concentration difficulties and hyper-vigilance) is still observable. These symptoms persist even on a significantly high dosage of psychotropic medication."  *Id.* at 5.

292.  Dr. Lucke observed that an anxiety disorder, NOS, diagnosis is also warranted due to a number of symptoms experienced by Dylan that may or may not overlap with PTSD and are not necessarily typical of other anxiety disorders.  Dylan engages in various atypical behaviors to cover his intense fear of being ridiculed and rejected.  *Id.*

293.  Dr. Lucke found that Dylan is "caught in a defensive self-defeating behavior pattern of selective associations with people (including decisions to not associate)."  In the absence of treatment, Dr. Lucke saw Dylan's "incessant worry over ridicule, accusations of social ineptness,

and sensitivity to embarrassment as shaping his life in such a way as to prevent him from developing his full potential as a person." *Id.*

294.  The Global Adaptive Functioning rating (GAF) of 50 indicates the seriousness of Dylan's symptoms.  It is Dr. Lucke's opinion that the "behavioral and emotional manifestations are chronic, long-standing, and have not only interfered with Dylan's ability to continue in an age-appropriate school setting, but interfere with his ability to develop present and future satisfying and productive relationships with people." *Id.* at 6.

295.  In Dr. Lucke's opinion, Dylan's

psychological condition should be considered chronic and serious.  Prognosis is guarded. Psychotherapy and psychotropic medication therapy (as per physician), while indispensable, will not be the only factors in Dylan's rehabilitation.  Parents should be prepared for a slow recovery as Dylan will need to experience successes in educational and occupational groups consistent with his premorbid innate abilities in order to experience genuine recovery.

     Treatment will be difficult as Dylan would like to pretend that he can keep the anxiety and complications at bay by avoiding situations.  Psychotherapy and the relationship with a therapist will be one such situation.  Risking himself in new educational or occupational settings will be another.  The initial treatment phase will be characterized by a minimum rebuilding of personal confidence, social skills, self-concept, and somewhat healthy levels of trust.  This will take a minimum of two to three years. The second phase of rehabilitation is harder to predict, and will sometimes overlap with the first.  The second phase can be characterized as integration into meaningful social relationships and a satisfying self-congruent career direction.  parents should be prepared for Dylan to still be dealing with some of these same psychological issues into his thirties.

*Id.* at 6.

296.  Dr. Mary Devin, named by Defendants as an expert witness does not disagree with the results of the 2001 survey conducted and published by the American Association of University Women which concluded, *inter alia*, that for boys, being called gay is the most disturbing form of harassment.  Devin Dep. 82:1-83:15.

297.  Dylan is under the care and treatment of a psychiatrist.  Gammill Dep. 17:11-16.

**ARGUMENT**

**Introduction**

Dylan Theno started seventh grade in Tonganoxie as an average kid, interested in football and Tae Kwan Do, making average grades.  By the fall of his junior year he had become a quivering and crying child, begging his parents not to force him to return to school to face the certainty of further sexual harassment.  He dropped out of school rather than face his tormentors yet again.  In between, he had been sexually harassed at school continuously, suffering harassment at times daily or at least weekly for more than four years.  School administrators knew of at least fifty discreet incidents and were told that the harassment of Dylan was continuous.  Their responses were wholly ineffective in stopping the harassment of Dylan and seemed calculated more to serve the superficial needs of the district than the educational and emotional needs of Dylan.  The school district was deliberately indifferent to, and had actual knowledge of, the severe, pervasive and objectively offensive sexual harassment of Dylan, resulting in the deprivation of Dylan's educational opportunities.

**I.    SUMMARY JUDGMENT STANDARD**

Summary judgment is not appropriate unless "the pleadings, depositions, answers to interrogatories, and admission s on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Hartnett v. O'Rourke*, 69 Fed.Appx. 971, 976 (10th Cir. 2003) (quoting Fed.R.Civ.P. 56(c)).  The record is viewed in the light most favorable to the nonmoving party, considering factual inferences tending to show triable issues in the light most favorable to the existence of those issues.  *Id.* (citing *Toolbox v. Ogden City Corp.*, 316 F.3d 1167, 1173 (10th Cir. 2003); *Riley v. Brown & Root, Inc.*, 896 F.2d 474, 476 (10th Cir. 1990)).  "Where different ultimate

57

inferences may properly be drawn, the case is not one for a summary judgment." *Id.* (quoting *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1377 (10th Cir. 1980)).  Accordingly, on a motion for summary judgment, the court may not "assess the credibility of . . . conflicting testimony." *Id.* (quoting *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1557 (10th Cir. 1995); and quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To prevail, Defendants must present evidence – not merely conclusory statements – that there are no material issues of fact.  While the defendants must bear the burden of proving there is no genuine issue of material fact, to defeat the motion, the plaintiff must produce evidence that would support a jury verdict.  *Liberty Lobby, Inc.*, 477 U.S. at 256.

This Court must resolve all factual disputes and draw any inferences which may reasonably be drawn from the evidence in favor of Dylan, the non-moving party, and where reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.  *Liberty Lobby*, 477 U.S. at  255.  The Supreme Court has reemphasized that in both Rule 50 and Rule 56 contexts, courts must draw all reasonable inferences in favor of non-movants, and may not make credibility determinations or weigh the evidence.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

> "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, *supra*, at 255, 106 S.Ct. 2505.  Thus, although the court should review the record as a whole, *it must disregard all evidence favorable to the moving party that the jury is not required to believe*.  See [9A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529, p.] 299.  That is, *the court should give credence to the evidence favoring the nonmovant* as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* at 300.

*Reeves* at 150-51 (emphasis added).  The ultimate inquiry on motion for summary judgment is whether "the evidence presents a sufficient disagreement to require submission to a jury or

whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477

U.S. at 251-52.

**II.      PLAINTIFF HAS ELICITED SUBSTANTIAL EVIDENCE WHICH, WHEN VIEWED IN THE LIGHT MOST FAVORABLE TO HIM AS THE NON-MOVING PARTY, RAISES GENUINE ISSUES OF MATERIAL FACT ON THE ELEMENTS OF HIS TITLE IX CLAIM**

      **A.  The Law Applicable to Title IX Claims**

As the attachments to these suggestions demonstrate, Dylan has more than sufficient

evidence to reach a jury on his claim of sex discrimination under Title IX, 20 U.S.C. § 1681 *et*

*seq*.  Title IX provides that

> "[n]o person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination under any
> education program or activity receiving Federal financial assistance."

20 U.S.C. § 1681(a).  Recipients of federal education funding may be liable for damages under

Title IX for discrimination in the form of student-on-student sexual harassment.  *Davis v.*

*Monroe County Board of Education*, 526 U.S. 629 (1999).  In *Davis*, the Supreme Court held

that deliberate indifference to known acts of harassment amounts to an intentional violation of

Title IX, capable of supporting a private damages action, when the harassment is student-on-

student in certain circumstances which are present here.  *Id*., 526 U.S. at 643.

More specifically, *Davis* holds that a funding recipient may be liable for subjecting its

students to discrimination where the recipient is deliberately indifferent to known acts of

student-on-student sexual harassment and the harasser is under the school's disciplinary

authority.  *Id.* at 646-47.  Where, as here, the misconduct occurs during school hours and on

school grounds, the misconduct is taking place "'under an operation'" of the funding recipient.

*Id.* at 646 (citing *Doe v. University of Illinois*, 138 F.3d 653, 661 (7th Cir. 1998)).  Liability lies

because of the funding recipient's failure to act, not because the harasser's actions are treated as

those of the recipient.

As noted in *Murrell v. School District No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999), the *Davis* Court cited with approval *Doe v. University of Illinois*, 138 F.3d at 661, 668, which had held that a school district is liable if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the [harasser] and the power to take action that would end such abuse and failed to do so.  "The failure promptly to take *appropriate* steps in response to known sexual harassment is itself intentional discrimination on the basis of sex, and so, once a plaintiff has alleged such failure, [he] has alleged the sort of intentional discrimination against which Title IX protects."  *Id.* at 661 (emphasis added).  Such a failure occurred here on a mammoth scale.

In *Davis*, where the matter arose in the context of a Rule 12(b)(6) dismissal, the Court pointed out that there were repeated acts of sexual harassment over a five-month period; there were allegations in support of the conclusion that the misconduct was severe, pervasive, and objectively offensive in that it was not only verbal but included objectively offensive touching (the harasser ultimately pled guilty to criminal sexual conduct); multiple victims were sufficiently disturbed by the harasser's conduct to seek an audience with the school principal; there was an allegation that the harassment had a concrete, negative effect on the victim's ability to receive an education; and, there were allegations suggesting that both actual knowledge and deliberate indifference on the part of the school board could be demonstrated where the board made no effort to investigate or end the harassment.

In *Murrell v. School District No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999) (citing *Davis*, 526 U.S. at 642-44), the Tenth Circuit distilled the following elements from *Davis*, holding that a plaintiff must allege four factors to state a claim of school district liability under Title IX.  He

must allege that the district: (1) had actual knowledge of, and (2)  was deliberately different to,

(3) harassment that was so severe, pervasive, and objectively offensive that it (4) deprived the

victim of access to the educational activities, benefits, or opportunities provided by the school.

*Id.*

Defendants argue that the elements of a Title IX claim are absent relying on the earlier

*Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996).  *Seamons*, however, does not compel the

conclusion that judgment as a matter of law is appropriate because Dylan has not shown that the

harassment was on the basis of sex.  First, *Seamons* was decided prior to the Supreme Court

opinion in *Davis* and the Tenth Circuit's subsequent opinion in *Murrell*, which construed *Davis*

and established for this circuit the elements of a Title IX action, post-*Davis*.  *Seamons*, in fact,

draws on the Eleventh Circuit's opinion in *Davis* that was reversed by the Supreme Court's

opinion.  Indeed, Brian Seamons' action failed because he failed to satisfy the Eleventh Circuit's

third element in that he failed to allege that the conduct being challenged – which was after the

locker room assault – was sexual in nature.[9]  *Seamons*, 84 F.3d at 1232-33.   In this Circuit, at

this time, the four elements of a Title IX sexual harassment hostile environment claim are those

explicitly stated in *Murrell*.

Second, *Davis* makes clear that Title IX liability stems not from the Fourteenth

Amendment (as does Title VII), but from the Spending Clause, and therefore, the Title VII

agency principles of liability and concomitant requirements advocated to bolster Defendants'

---

[9]It bears noting that although he concurred in the result in *Seamons* for other reasons, Judge McKay viewed the incident as a whole and as clearly sexual in nature.  "These actions clearly derive their power to embarrass and to intimidate from their sexual and sex-based nature."  *Id.* at 1239-40 (McKay, J., concurring).  That is exactly the case here.

*Seamons* argument[10] are inapplicable.  It does so drawing on *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 283 (1998), in which the Court explicitly rejected the proposition that Title VII standards apply to Title IX claims.  *Davis* at 645-46; *see also Morlock v. West Central Education Dist.*, 46 F.Supp.2d 892, 908 (D. Minn. 1999) (the Supreme Court's decision in *Gebser* makes clear that courts should not incorporate notions of what constitutes hostile environment "discrimination" in the Title VII employment context into Title IX).

Third, and most important, as stated, *supra* at 60, *Murrell* favorably cited *Doe v. University of Illinois*, on this very point.  *Murrell*, 186 F.3d at 1247 (citing *Doe*, 138 F.3d at 661, 668).  In *Doe*, the court held that the "failure promptly to take *appropriate* steps in response to known sexual harassment is itself intentional discrimination *on the basis of sex*, and so, once a plaintiff has alleged such failure, [he] has alleged the sort of intentional discrimination against which Title IX protects."  *Doe*, 138 F.3d at 661.  Under *Murrell*/*Doe*, liability is imposed on schools only upon a showing of actual knowledge about the harassment on the part of school officials, combined with a failure to respond appropriately to end the harassment.  That is the case here.  Defendants' *Seamons* argument must be rejected.  The four elements of a Title IX sexual harassment hostile environment case are those explicated in *Murrell*.  Plaintiff has adduced sufficient evidence to create genuine issues of material fact on all four elements of his Title IX claim as demonstrated in the following sections.

**B.  The District Had Actual Knowledge**

Defendants do not seriously contest that they had actual knowledge, but attempt to limit their knowledge to a few discreet acts.  To the contrary, here is what the defendants knew and

---

[10]Memorandum in Support of Defendants' Motion for Summary Judgment (hereinafter "Defendants' Memorandum), Section A.1. at 25-29.

when they knew it, beginning in Dylan's seventh grade.

Early in the year, K.L. called Dylan a faggot and they fought.  The teacher, Ms. Nickell, took them to Assistant Principal, Mrs. Strong, and the school's counselor became involved. Statement of Facts (SOF) ¶ 133.  C.C. also called Dylan a faggot, was taken to the office, and warned.  SOF ¶ 134.  In November, 1999, S.S. called Dylan a "fag" and said that Dylan "likes to suck cock."  A fight followed.  The matter went again to Mrs. Strong and both boys were suspended for fighting.  SOF ¶ 135.

In February, 2000 Dylan and his mother each complained to Principal Woolf about a series of on-going sexual harassment incidents in the lunch room, comments to Dylan about masturbating, "sucking dick", and "jacking off".  SOF ¶ 136.  Later in February, three boys harassed Dylan about allegedly having been caught in the bathroom masturbating and later a girl also asked Dylan about that rumor.  Dylan reported the matter to Mrs. Strong.  SOF ¶¶ 138-139. Dylan was upset and crying; his sister saw him and called their mother, who came to school and the matter was discussed with Mrs. Strong.  SOF ¶¶ 140-141.  Principal Woolf and Superintendent Erickson learned of this matter at this time as well.  SOF ¶¶ 142-143.

The very next day, Dylan was called the "jack-off kid" in gym class.  SOF ¶ 144.  Later, two boys harassed Dylan by spitting on the bathroom wall, saying "look, Dylan was here", calling him a fag, and repeating the bathroom rumor.  SOF ¶ 145.  Dylan told his father that he was being harassed on at least a weekly basis.  SOF ¶ 146.  That spring a note was put in Dylan's locker that said "flamer" and "you're gay".  This was reported again to Mrs. Strong.  SOF 150. Another student repeatedly called Dylan "gay" and Mrs. Theno reported it to Mrs. Strong.  SOF 151.

During seventh grade alone, Dylan and his mother had reported repeated instances of

sexual harassment and during that year this harassment was known by one teacher, the junior

high school counselor, its assistant principal, the principal and the district's superintendent.

Some of these incidents were one-time harassments; others were series of sexually harassing

statements to Dylan.  In all, the school district had knowledge of scores of instances involving

many different students sexually harassing Dylan.  The harassment had already become a part of

the school's culture.

In eighth grade, Dylan continued to suffer sexual harassment on an on-going basis.  He

was called "masturbator" in the halls and at basketball games; students put their hands in their

pants to make fun of Dylan, called him queer, faggot, and masturbator; and made fun of him on

the team bus about "jacking off"; kids smeared ice cream around their mouth and asked Dylan if

it look familiar; yelled  "queer" at him during a basketball game loudly enough that Dylan's

parents in the stands, and presumably the coach on the bench, heard it.  SOF ¶¶ 154, 156, 157.

Dylan was made fun of in gym class "all the time", including one occasion when kids asked the

gym teacher to go check on Dylan to see if he was "jacking off over there".  SOF ¶ 158.

Dylan and has parents reported many of these eighth grade incidents to school officials.

Dylan reported some to Mr. Woolf.  SOF ¶¶ 154, 155, 156, 159.  Cheryl complained at least

once about the ongoing harassment and Alan complained at least three times to Principal Woolf,

who vaguely recalled some of the specific complaints.  SOF ¶ 160.

The harassment, and the complaints to school officials by all three Thenos, continued in

the Ninth and Tenth grades.  SOF ¶¶ 162-184.  During Dylan's tenth grade year, in his first

meeting with Smith about the problems that Dylan had been experiencing in strength training

class, Alan mentioned that those problems directly related to the rumor that had originated

during Dylan's seventh grade year.  Smith Dep. 62:25-64:7; 85:20-86:4.[11]  Also during that year, the increasingly frustrated Thenos escalated their complaints about school district inaction by twice calling a school board member, and they prepared a log of some of the harassment of Dylan and gave it to school officials.  SOF ¶¶ 179-181.

The defendants had actual knowledge of the sexual harassment of Dylan Theno from almost the moment it began.  They had knowledge that it involved many different students, that it had survived summer vacations, and that it had consistent themes.  They thus knew that the sexual harassment of Dylan Theno had become endemic to their school system, imbedded in the school culture, and resistant to mere warnings to perpetrators.  By the time Dylan entered high school – Tenth Grade – the defendants knew that three years of merely warning students had wholly failed to stop the sexual harassment of Dylan Theno.  And Dylan still had three more years of school ahead of him in Tonganoxie.

Thus, beginning in the seventh grade and continuing until the day before his withdrawal from school, Dylan and/or his family notified school officials of, and complained about, the harassment.  As their complaints to lower level administrators met with no success in eliminating the harassment, they escalated their complaints to Superintendent Erickson and, ultimately, to the school board.  Deciding who exercises substantial control for the purposes of Title IX liability is necessarily a fact-based inquiry.  *Murrell*, 186 F.3d at 1247.  But the *Murrell* court believed that *Davis* made clear that a "school official who has the authority to halt known abuse, perhaps by measures such as transferring the harassing student to a different class, suspending

---

[11]Such evidence disputes the defendants' assertion that "the record is undisputed that neither plaintiff nor his parents brought information regarding most of that harassment to the knowledge of school officials."  Defendants' Memorandum at 29.  Defendants cannot turn a blind eye to the ramifications of what they were hearing and claim they did not have actual knowledge.

him, curtailing his privileges, or providing additional supervision, would meet this definition."
*Id.* All of the defendant administrators here possessed the requisite control over the situation and, as the foregoing discussion demonstrates, they all had actual notice.

### C.  The School District Was Deliberately Indifferent

> The "failure *promptly* to take *appropriate steps* in response to known sexual harassment *is itself intentional discrimination on the basis of sex*, and so, *once a plaintiff has alleged such failure*, [he] has alleged *the sort of intentional discrimination against which Title IX protects.*"

> *Doe v. University of Illinois*, 138 F.3d 653, 661 (7th Cir. 1998) (emphases added) (*cited in Murrell v. School District No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999)).

For years Dylan Theno suffered sexual harassment that was often daily, or at least weekly.  SOF ¶¶167, 240, 146.  As the harassment continued from seventh grade to eighth grade, the warnings to offenders had not stopped the harassment.  As it continued unabated from eighth grade to ninth grade – still in Junior High – the continued reliance solely on warnings to the offenders obviously remained ineffective.  When the sexual harassment continued into tenth grade and when it was known that now the high school perpetrators were a class older than Dylan, the continued reliance on mere warnings was manifestly failing and inappropriate.  The school district had acted neither promptly nor appropriately, and this failure to act effectively to end the sexual harassment of Dylan was by now, if not much earlier, deliberate indifference.

When the three junior boys began sexually harassing Dylan during his tenth grade year in strength class in February 2003, several major migrations of the harassment had occurred.  It had survived three summers away from school.  It had moved from the junior high to the senior high, and it had passed beyond Dylan's Class of 2005 and been taken up by the older boys in the Class of 2004.  SOF ¶¶ 170-177.  If more proof was needed, this was proof-positive that the district's just-warn-the-offenders policy of dealing with the sexual harassment of Dylan was not effective

and no longer appropriate.

Inherent in the deliberate indifference standard is the implicit notion of effectiveness or appropriateness. If not, a governmental official could simply acknowledge the harassment and sympathize with the victim to meet the standard. "Dylan, I feel your pain and have warned the boys again" does not satisfy the deliberate indifference standard. At some point (when the harassment continued into eighth grade? into ninth grade? into tenth grade?), the response of sympathizing with the victim and continuing to warn the offenders was obviously not ending the harassment. What may have earlier been adequate attention to the problem later became deliberate indifference to it when the harassment continued and spread. Whether at some point the school district became deliberately indifferent to sexual harassment of Dylan Theno is for the jury to decide. At this point, there is more than ample evidence that the school district's year-after-year continued reliance on the manifestly ineffective policy of merely warning offenders and doing nothing else was not appropriate.

It is not as though the district lacked the means to address the issue. If its officials lacked the training and experience, it could have consulted the free websites of prominent educational organizations, many of which offer access to advice on dealing with sexual harassment. It could have hired then as consultants the educators it has hired now as experts to guide the development of effective and appropriate responses to the continuing harassment. It could have consulted the educational text, Hoy and Miskel[12], used in the basic educational administration courses at both Kansas and Kansas State Universities[13], for assistance in modifying hostile aspects of school

_____

[12]WAYNE K. HOY & CECIL G. MISKEL, EDUCATIONAL ADMINISTRATION: THEORY, RESEARCH AND PRACTICE (7th ed. 2005).

[13]Neal Dep. (Exhibit 24) 18:10-15; Devin Dep. 5:9-11; 8:8-9:5.

culture.  It could have anonymously surveyed students and teachers to determine the extent and source of the harassment.  It could have provided in-service training for teachers and staff.  It could have implemented its own Student Handbook provision that specified mandatory suspension for any sexual harassment.  Exhibit 15, Student Handbook.  It could have explained to students in an assembly at the beginning of one of the school years why sexual harassment was hurtful and would, beginning then, be dealt with by suspensions.  It could have warned teachers of specified sanctions for failing to report instances of students sexually harassing other students.  There is no end to the proven strategies, most of them cost-free, that the school district could have implemented.  Its failure promptly to adopt some – any – appropriate strategy, when it became obvious that merely continuing to warn offenders had proven ineffective, was deliberate indifference.

Deliberate indifference is found where the alleged response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.  *Davis*, 526 U.S. at 648-49; *Murrell*, 186 F.3d at 1247-48.  Ample evidence exists to support jury submission of this element of Plaintiff's claim.  As stated *supra* at 60, 62, the "failure *promptly* to take *appropriate* steps in response to known sexual harassment *is itself intentional discrimination on the basis of sex*, and so, *once a plaintiff has alleged such failure*, [he] has alleged *the sort of intentional discrimination against which Title IX protects*."  *Doe*, 138 F.3d at 661 (emphases added).  Dr. Dragan testified that from the very outset, the very first incidents of harassment in seventh grade met with an inadequate response from district employees in a position to take action.  SOF ¶¶ 220, 221 (citing Dragan Dep. 31:1-25; *id.* at 32:1-24).  In *Murrell*, 186 F.3d at 1243, the Tenth Circuit upheld the plaintiff's claim of deliberate indifference when the school did not inform law enforcement, investigate, or discipline the offending student.  Here, administrators conducted

uninspired and ineffective investigations in which offending students were not even asked to confirm what they had done.  *See, e.g.*, SOF ¶¶ 241-247, 249-251 (little or no investigations known offenses).  In most cases, there was no discipline of offending students but, rather, only warnings.  Dylan's parents' pleas were given lip service only.

Plaintiff does not, as Defendants suggest[14], complain that harassers were not suspended, although that is what the Student Handbook mandated.  Although when they were trying to get the attention of administrators and board members, his parents may not have fully appreciated this, Plaintiff and his parents now well understand that the law does not require that he be allowed to dictate exactly what consequences are meted out against harassers.  The point is that the measures the administrators did invoke did not work[15] and the administrators knew it because Dylan and his parents kept returning with more complaints and made known the fact that the harassers were not stopping.  Thus, it became unreasonable to not take more aggressive measures.  *Doe*, 138 F.3d at 667-68 ("it should be enough to avoid Title IX liability if school officials investigate aggressively all complaints of sexual harassment and respond consistently and meaningfully when those complaints are found to have merit"[16]).  Furthermore, Defendants are mistaken when they claim[17] that no individual reappears in plaintiff's complaints after

_____

[14]Defendants' Memorandum at 30.

[15]The Court should not draw the suggested inference that all of the measures recited by Defendants were employed in each instance in which Dylan or his parents complained of harassment.  *See* Defendants' Memorandum at 31.  Only on one occasion – in the case of C.L. – was a written apology and a detention imposed at the very end, as Dylan was withdrawing from school.  SOF ¶ 204 (C.L.'s parents were unhappy that he was first to receive a detention).

[16]Every instance of sexual harassment Dylan or his parents complained of was determined by school officials to be substantiated.  There is no record of a single meritless complaint.

[17]Defendants' Suggestions at 30.

addressed by an administrator.  SOF ¶¶ 218, 260, 264, 271.  Since the conduct did not cease and they knew it, the remedial action was not sufficient.  It is not second-guessing the administration's decisions to see that the measures taken did not stop the harassment and to ask that effective measures be taken.

In elaborating on the deliberate indifference standard, the First Circuit has observed that while an institution may escape Title IX liability by taking timely and reasonable measures to end the harassment, "[o]f course, if it learns that its measures have proved inadequate, it may be required to take further steps to avoid new liability."  *Wills v. Brown University*, 184 F.3d 20, 25 (1st Cir. 1999); *see also Flores v. Morgan Hill Unified School District*, 324 F.3d 1130, 1138 (9th Cir. 2003) (in light of evidence, a jury could conclude that defendants took no more than the minimal amount of action in response to the complaints of harassment).  Here, administrators engaged in some documentation, but the interviews and the investigations of Strong, Woolf, Smith, Bogart, and Erickson tended to be perfunctory affairs at best.  SOF ¶¶ 241-247, 249-251. The parties have adduced conflicting evidence on the appropriateness and effectiveness of the measures that the administrators took, with Dr. Dragan explaining why the measures fell short and what could have been done, but was not.  SOF ¶¶ 220-221, 223-227; *see also* ¶¶ 236-253. This substantial evidence that administrators' efforts were ineffective raises a genuine issue of material fact as to whether or not the school officials were deliberately indifferent.

There is good reason to require that where officials know that their measures have failed to eradicate the harassment they must take further steps.  These are our children.  They see adults not following through and failing to make the tough decisions to protect them and they apply that lesson to their own concerns and insecurities.  Or, they take matters into their own hands and fight their harassers.  SOF ¶ 190.  Efforts that are no more than window dressing or lip service

not really designed to change the school culture and eradicate the hostile and harassing environment surely cannot be allowed to excuse the officials' ineffectiveness and exempt the district from liability.  These administrators did not so much as impose a *detention* on anyone who had harassed Dylan until they imposed one on C.L. right before Dylan withdrew from school.  A jury could easily find that this is so inadequate as to be unreasonable.

Although in appropriate cases a court may determine as a matter of law that conduct is not "clearly unreasonable", a standard calling for a determination of whether a "response to the harassment or lack thereof is clearly unreasonable in light of known circumstances" does not lend itself well to a summary judgment determination.  *Hart v. Paint Valley Local School District*, 2002 WL 31951264 (S.D. Ohio Nov. 15, 2002) at *9 (citing and quoting *Davis*, 526 U.S. at 648-49 and *Vance v. Spencer County Public School District*, 231 F.3d 253, 260 (6th Cir. 2000)).  As in *Hart*, given the state of the record, the Court should not here determine as a matter of law that the school district acted reasonably in light of the known circumstances.

Defendants cite *C.R.K. v. U.S.D. No. 260*, 176 F.Supp.2d 1145 (D.Kan. 2001), in which Judge Brown found an absence of deliberate indifference.  But the circumstances in *C.R.K.* are distinguishable.  The original alleged rape took place off school grounds and was being investigated by law enforcement authorities.  The "no contact" order that the plaintiff complained was not adequately enforced had been issued by the criminal court and not by the school.  There was evidence that even after the alleged rape, the plaintiff and the alleged assailant were seen with their arms around each other.  The Derby School District, which has buildings in both Derby and Wichita, is a much larger school district in terms of population than Tonganoxie, and that complicated and compromised the ability of Derby administrators to monitor conduct which often took place outside the view of school personnel.  Indeed, in *C.R.K.*,

many of the steps requested by or on the plaintiff's behalf were undertaken.  And, these measures seem more reasonably calculated to be effective under the circumstances presented than those undertaken (or not undertaken) here.  *C.R.K.*, 176 F.Supp.2d at 1164-65.  Although the Derby administrators relied on corrective counseling and mediation in two particular instances, the cited passage makes clear that the Derby administrators employed a wide range of corrective and preventive measures that were much more tailored to the circumstances than the mere reliance here on ineffective warnings repeated over four years.

### D.  The Sexual Harassment Was Severe, Pervasive, and Objectively Offensive

As to the third *Murrell* element, Dylan has adduced abundant evidence that for more than four years he was the victim of verbal (and some gesturing and picture drawing) harassment of a sexual nature.  TSD's sexual harassment policy bans harassment of a verbal as well as a physical nature.  Defendants' own expert witness agreed that "behavior that has the purpose or effect of unreasonably interfering with the . . . student's work or school performance, or that creates an intimidating, hostile or abusive work or school environment" constitutes hostile environment sexual harassment and that sexual harassment often includes sexual innuendo and comments and can include commenting on a person's sexual activities.  She testified that verbal sexual harassment can include spreading rumors about a person's sexuality and name-calling using such words as whore, slut, or faggot as well as insulting, belittling, sexual ridicule and writings or a sexual or offensive nature.  It can include humor or jokes about sex or sexual activities.  SOF ¶ 210 (citing Devin Dep, 94:4-95:20).  Defendants' expert further agreed that calling a male student a faggot would impugn the nature of the recipient's sexuality.  SOF ¶ 212 (citing Devin Dep. 97:22-25).  A factfinder could easily find that Dylan was subjected to harassment of a sexual nature and that it was based on his gender because calling him a fag or flamer or gay

impugns the nature of his sexuality and implies that he is deviant for one of his gender.

Dylan has also produced evidence that the harassment was severe, pervasive, and objectively offensive.  Starting during his seventh grade year and never ending until he withdrew from school in his junior year, Dylan was repeatedly called names such as "fag", "faggot", "jack off boy", "banana boy", "queer", "flamer" or "masturbator" or was referred to as being gay or queer.  He was taunted for years with the rumor that started in seventh grade to the effect that he had been caught masturbating in the boys' restroom.  One boy told a gym teacher to check on Dylan when he went to the restroom because he might be masturbating.  SOF ¶ 158.  Kids spat on the wall in the bathroom and said, "Look, Dylan was here."  SOF ¶¶ 37, 145.  A basketball teammate in junior high tormented Dylan with crude drawings in the condensation on the bus windows that the teammate claimed were images of Dylan masturbating; the following year, the same teammate wrote crude comments about and drawings of Dylan on a locker room chalkboard, and, indeed, persisted with his taunting even into Dylan's high school years.  SOF ¶¶ 154-156, 162, 260.  The conduct spread to the point that when he missed a shot in an eighth grade basketball game, a teammate on the bench yelled out, "way to go, queer Theno".  SOF ¶ 157.  In high school, the harassing comments and incidents continued.  Just walking down the halls during passing periods, Dylan would randomly hear other students call him the same kinds of names.  After D.O. called Dylan, "Faggot, faggot, faggot" one morning on the way into the school building and a fight ensued.

The severity and pervasiveness of the harassment Dylan endured is evidenced in a myriad of ways.  Students in other grades knew about the harassment.  Dylan's sister, Shannan, who was in ninth grade when the rumor originated, heard it from other students the same day it started and heard about it again in high school.  SOF ¶ 254.  T.S. testified that incidents of harassment

occurred nearly weekly from Dylan's seventh grade year until he withdrew some four years later. SOF ¶¶ 256-258.

Dr. Dragan testified that the harassment was severe, pervasive, and objectively offensive. SOF ¶ 267.  He noted in particular that the fact that the harassment continued with the same theme and was instigated by the same perpetrators, such as D.W.#1 and K.L., whom the district claimed to have stopped, was telling of its severity and pervasiveness.  SOF ¶¶ 270-272.  For example, M.W. heard the same rumor from D.W.#1 when Dylan was in tenth grade that was first articulated by G.P. when Dylan was in the seventh grade and repeated in the eighth grade by D.W.#1.  SOF ¶ 261.  A.E. was one of the original harassers in seventh grade and he was still harassing Dylan about being a banana boy in tenth grade.  SOF ¶¶ 148, 178.  He was, in fact, known to administrators as an offender because he was one of the boys allegedly called in at the beginning of Dylan's eleventh grade year.  SOF ¶ 185.  Similarly, though T.H. discontinued calling Dylan fag or gay and stopped explicit references to the rumor or homosexual behavior, he merely changed the language of his taunts; they still related back to the original homosexual insults in that they focused on Dylan's reaction (which was reporting the incidents to his father, who reported them to the administration).  SOF ¶ 265.

With particular regard as to pervasiveness, Dr. Dragan also emphasized that it misapprehends the situation to characterize it – as Defendants do – as just a series of individual, unrelated instances and to conclude that the Tonganoxie school administrators were acting appropriately within a range of appropriate actions concerning the sexual harassment of Dylan. Even though some students were cautioned individually and those individuals may not have necessarily pursued the activity, it was nevertheless a larger situation involving Dylan that occurred over a number of years.  *See supra* at ¶ 268.  The fact that the incidents of sexual

harassment of Dylan occurred over a period of five school years and four calendar years is an indication that there was a problem with the school's culture.  Something was occurring in that culture that was not conducive to good education and that was an indication that something needed to be done about it.  The fact that the same rumor about Dylan that started during seventh grade resurfaced in subsequent years, and survived summers and continued into the following school years, suggests that within the school culture there was something that was maintaining that impression of Dylan and it was not being checked.  These facts are an indication that something was radically wrong within the culture of the school that should have been dealt with much sooner and that a district-wide change in culture was  needed.  SOF ¶¶ 270-273.

Severity is evident in the ugliness of the actual language of the rumors and epithets and the tone with which and circumstances in which they were hurled at Dylan.  Even Dr. Devin agrees (with the 2001 survey of the American Association of University Women) that for boys, being called gay is the most disturbing form of harassment.  SOF ¶ 296.  But severity also is demonstrated by the very real consequences that the sexual harassment caused him.  Dylan ended up a quivering, crying, curled-up child, begging not to be forced to go back to school to be subjected yet again to the sexual harassment that had made attending school emotionally traumatic for him.

When Dylan later underwent a psychological evaluation, he was diagnosed as suffering from post-traumatic stress disorder, anxiety disorder, and avoidant personality disorder.  SOF ¶¶ 286, 289-295.  In fact, Dr. Lucke identified seven different characteristics of Dylan's experience that aid in understanding its psychological impact on Dylan and make obvious that from the perspective of its consequences, the harassment was severe.  SOF ¶ 290.  But a fact finder could also find that the harassment was severe from an understanding that, as Dr. Lucke expressed it,

Dylan's personal integrity was threatened by the harassment.  SOF ¶ 289.  Furthermore, Dylan's problems have not resolved and, even with treatment, may persist into his thirties, further indicia that the harassment he endured was severe.  SOF ¶¶ 291, 295.  He is presently under the care of a psychiatrist, still sees the counselor occasionally, and continues to take Zoloft.  SOF ¶ 297.

The objective offensiveness of the harassment is inherent in the names used and the subject matter of the rumors, pictures, and notes suggesting that Dylan was engaging in sexual activity that the taunters associated with sexual orientation or behavior that was abnormal or homosexual in nature.  There is virtually no context in which someone would not be offended if they were frequently and mean-spiritedly called fag, faggot, masturbator boy, jack off boy, banana boy, or queer.  The district contends that among youth, it is common to throw around the word "gay" to connote displeasure with something or some behavior or to imply that something is stupid.  Defendants argue that when Dylan was called these offensive names or was the butt of jokes based on the rumor that he had been caught masturbating in the bathroom, this sexual harassment was actually the light-hearted spirit or fun-loving tone behavior.  This is ridiculously wrong.  There is nothing in the content of the four-year pattern of verbal sexual harassment to suggest it was not meant to hurt Dylan.  *See especially* SOF ¶ 201 (M.W. saying in front of Dylan that he did not want to lift weights after Dyan had used them because of where Dylan's hands had been).  Second, there is substantial evidence from which a fact-finder could conclude that the harassers' intent was not benign.  *See*, *e.g.*, *supra* at ¶ 201 (given the tone of voice and the context, C.L. had not been using the language in the sense of being Dylan's buddy, but was using it in a derogatory sense, directed at Dylan, and "meant harm by what he said."); at ¶ 258 (T.S. did not understand people to be using the words gay or faggot to call Dylan stupid but rather to calling him to be a homosexual or faggot); at ¶ 255 (when students used the word

flamer, H.F. understood the word to mean being a homosexual, referring to either effeminate mannerisms or having homosexual tendencies; it seemed that "[e]veryone was just trying to push [Dylan] to his limit").  Third, although students may sometimes use the term "gay" in a playful fashion, using "gay" to mean "stupid" still applies a negative connotation (stupidity) to sexual orientation while using it in all sorts of contexts.  From the perspective of the lesbians or gays, that is like calling them stupid by virtue of their sexual orientation.  It can be hurtful and harassing, and when educators hear it at school, they should stop it and take the opportunity to condemn it and explain why the term should not be used that way.  SOF ¶ 208.

Cumulatively, this is more than sufficient evidence to create a genuine issue of material fact as to whether or not Dylan has shown that the harassment was severe, pervasive, and objectively offensive, and, as explained *infra* in § E., it had the systemic effect of depriving Dylan of access to educational programs, activities, opportunities, or benefits.

### E.  The Harassment Had the Systemic Effect of Depriving Dylan of Access to Educational Programs, Activities, Opportunities, or Benefits

There is no serious dispute that Dylan was deprived of access to educational programs, activities, opportunities, or benefits because of the harassment.  Still, Plaintiff has substantial evidence as to this genuine issue of material fact establishing that it happened in two ways.  First, it occurred while he was in school and second, it caused him ultimately to give up trying to go to high school.  It forced him, to avoid the continuing harassment, to drop out, get his G.E.D. and enroll in community college.  Dylan had become socially isolated at school.  As Dr. Lucke observed, the harassment prevented Dylan from participating in (or even considering) certain school related activities including mainstream activities "such as normal friendships, girlfriends, sports, *etc.*, critical to an adolescent's self-concept and self-esteem" that are a part of the social development that schools provide along with "the three "R's".  The harassment caused Dylan to

begin to avoid situations in which he might encounter it and he withdrew from school life as a practical matter well before his technical withdrawal from school.

T.S. testified tellingly to this increasing isolation and depressed mood from the point of view of a sympathetic contemporary.  In the last two or three months that Dylan attended school, T.S. noticed changes in Dylan.  He acted run down; he did not really have any friends.  His facial expressions made him appear to be depressed.  T.S. Dep. 54:13-55:3.  When T.S. tried to talk to him, Dylan seemed to be holding back and did not want to talk about things.  *Id.* at 55:4-18.  Before the harassment began, Dylan was "laid back", but during the last few weeks he was in school, his occasional spunkiness was absent.  He just walked to his locker and his classes and appeared to try to stay out of the halls.  *Id.* at 56:17-57:8.  Because Dylan walked with his head down, avoided people, would say "Hi," but would only talk a few seconds before he would walk on to class alone, T.S. thought he was depressed.  *Id.* at 57:9-20.  Again, as Dr. Lucke put it, Dylan  became socially isolated.

And then, when once again Dylan suffered insult on top of injury upon the announcement of the gay and fag word use ban and was humiliated in class for his obvious-to-all role in prompting the change by the allegedly punished perpetrator, C.L., it finally became too much pf a burden for Dylan to return to school.  It had to be humiliating and embarrassing for Dylan to sit there and hear his harasser say, while pointedly staring at him, that "people", clearly meaning him, need to learn how to grow up and face their problems and not go run to their parents every time someone says they are gay, adding how unfair it was to the harassers that they could not use the words gay or fag any more.  The announcement only served as an invitation for resentment to be added to the emotional onslaught leveled at Dylan, and, of course, it was.

Tonganoxie, Kansas, by any measure, is a small community.  Its population in the year

78

2000 was 2,728.  http://www.tongie.org/FAQ.html.  In small towns, the schools play an even

larger role in community life than they do in larger towns and cities.  Who you are is often

defined in high school and when you are labeled in school it can label you for your whole life,

especially if you want to live there as an adult among those with whom you went to school.

When you have not graduated from high school with your lifelong schoolmates it can deprive

you of that final common bond that forever links you with your graduating class.  No reason to

go to reunions; no happy memories of shared good times in the tradition of those who went

before you – your siblings, your parents, perhaps even your grandparents.  Dylan withdrew from

Tonganoxie High School from which, this month, his former classmates will send out

announcements, don caps and gowns, attend baccalaureate and commencement ceremonies,

receive congratulatory cards and gifts, go to parties – in short, will celebrate their shared

graduation from high school.[18]  Because of the deliberate indifference of district administrators

and board members to known sexual harassment that was so severe, pervasive, and objectively

offensive that he could no longer endure school, Dylan had to withdraw.  He was deprived of

access to the educational benefits and opportunities provided by the school.  Dylan is not

celebrating this month with his former classmates, but his harassers are.

**III.   THERE IS SUBSTANTIAL EVIDENCE CREATING GENUINE ISSUES OF MATERIAL FACT ON PLAINTIFF'S CLAIM OF NEGLIGENT SUPERVISION**

Summary judgment on Plaintiff's negligent supervision claim should be denied.  Kansas

has recognized that there can be recovery predicated on failure to provide supervision when the

---

[18]Just this week, Tonganoxie's newspaper, THE MIRROR, published five pages of photographs of the members of the Class of 2005.  Dylan's was not among them.  THE MIRROR, May 11, 2005, at 5A-10A.  *See also*, Shawn Linenberger, *Nearly 120 Tonganoxie Students Set to Graduate Saturday Night*, THE MIRROR, May 11, 2005, at 14A; <http://www.tonganoxiemirror.com/section/local/story/7776> (visited May 13, 2005).

situation is known to have been potentially dangerous.  *Sly v. Board of Education of Kansas City, Kansas*, 516 P.2d 895, 903 (Kan. 1973).  Although foreseeability may be a factor pertinent to the determination of causation, and deliberate malicious assaults should not be required to be anticipated by school personnel in the absence of notice of prior misconduct of that nature or the likelihood thereof, *id.*, here, as above demonstrated, there was repeated notice to the defendants of prior misconduct of the same nature as that to which Dylan was continuously subjected. Liability may attach – for harm within the risk – when a defendant has reason to believe that an undue risk of harm to others would exist as a result of the failure to supervise.  *Kansas State Bank & Trust Company v. Specialized Transportation Services, Inc.*, 819 P.2d 587, 598 (Kan. 1991) (liability results because the employer had reason to believe that an undue risk of harm to others would exist as a result of the employment of the alleged tortfeasor for such harm as is within that risk).  Whether the risk of harm is reasonably foreseeable is a question to be determined by a jury and only when reasonable persons could arrive at but one conclusion may a court determine the question as a matter of law.  *Id.* (citing *Robbins v. Alberto-Culver Co.*, 499 P.2d 1080 (1972)).

Dylan has evidence to create genuine issues of fact as to the elements of a negligent supervision claim.

### A.  A Legal Duty

The existence of a legal duty is a question of law.  *Dunn v. Unified School Dist. No. 367*, 40 P.3d 315, 328 (Kan.App. 2002) (Marquardt, J., dissenting) (citing *Honeycutt v. City of Wichita*, 836 P.2d 1128, 1136 (Kan. 1992)).  Kansas has recognized that a school district owes students a duty "to properly supervise students and to take reasonable steps to protect students' safety."  *Dunn*, 40 P.3d at 326 (quoting *Greider v. Shawnee Mission Unified School D. 512*, 710

F.Supp. 296, 299 (D.Kan.1989)).  Kansas had previously assumed the existence of a duty to

properly supervise and provide a safe environment to students existed, but an equally divided

court by rule affirmed the trial court's dismissal on the grounds that no breach of the duty had

been shown in *Paulsen v. Unified School District No. 368*, 717 P.2d 1051 (Kan. 1986).

Similarly, in *Sly v. Board of Education of Kansas City, Kansas*, 516 P.2d 895, 903 (Kan. 1973),

the Court assumed that the duty to exercise due care for students existed and affirmed the trial

court's finding that no evidence of breach of the duty existed.[19]  The existence of a duty is of

significance not only to make the claim, but in order to defeat immunity under the Kansas Tort

Claims Act, which makes governmental liability the rule and immunity the exception.  *Kansas*

*State Bank*, 819 P.2d at 599 (citing *Nichols v. U.S.D. No. 400*, 785 P.2d 986 (Kan. 1990)).  The

discretionary function exception to the general rule of liability is not applicable in those

situations where a legal duty exists, either by case law or by statute, which the governmental

agency is required to follow.  *Id.* at 600 (citing and quoting *Dougan v. Roseville Drainage Dist.*,

757 P.2d 272 (1988))[20].

---

[19]At least one other jurisdiction has found that school defendants voluntarily assumed a special duty to protect a student from a neighborhood bully who was often seen on school grounds and who had threatened the student with harm and affirmed the verdict with respect to breach of the duty.  *Greene v. City of New York, et al.*, 170 A.D.2d 321, 322 (N.Y.S. 1991). And, in *Jefferson County School Dist. R-1 v. Justus*, 725 P.2d 767 (Colo. 1986) (*cited and quoted in Glaser v. Emporia Unified School District No. 253*, 21 P.3d 573, 581 (Kan. 2001)), while the school district had promulgated a written policy regarding bicycling to and from school, it was not merely the existence of the policy that created the question of assumption of the duty, but instead, it was the affirmative acts taken by the district in furtherance of enforcing the policy that gave rise to the question of whether a duty had been assumed.  *Id.* at 772.

[20]Alternatively, although it is not entirely clear that the board's policy is a "mandatory guideline", it is arguably mandatory on the evidence, and, under Kansas case law, "[i]t is clear that failure to follow mandatory guidelines is not subject to immunity under the discretionary function exception to the KTCA.  *Kansas State Bank*, 819 P.2d at 600 (citing *Fudge v. City of Kansas City*, 720 P.2d 1093, 1100 (Kan. 1986); *Jackson v. City of Kansas City*, 680 P.2d 877, 888 (Kan. 1984)).  *Fudge* has been superceded by subsequent amendments to the KTCA

Although the law establishes the legal duty, Dylan has evidence to support a conclusion that the defendants owed a legal duty to supervise properly students under their control and custody within the schools and to take reasonable steps to protect students' safety, including Dylan's.  Dr. Dragan testified that school administrators are charged with assuring that reasonable care is used to provide a school climate or environment that is free of sexual harassment.  SOF ¶ 228 (citing Dragan Dep. 74:12-22).  Dr. Erickson agreed that it is the responsibility of a school district to provide a safe and secure learning environment and recognized that when students are subjected to conditions in school that undermine or diminish their self-esteem, it can impair their ability to achieve.  Erickson Dep. 125:24-126:7.  He also agreed that it is the responsibility of a school district to the extent feasible to prevent acts or conditions that would undermine the self-confidence or self-esteem of students.  *Id.* at 126:13-17.  This element is satisfied.

## B.  The Duty Was Undertaken

Here, of course, not only was there a duty and policy prohibiting sexual harassment, defendants had undertaken to protect students and to enforce the policy, albeit ineffectively.  Further, the policy and its *effective* enforcement were reasonably calculated to prevent the type of harm that befell Dylan.  The policy strictly prohibited sexual harassment and required that action be taken against harassers, including in instances of student-on-student harassment and verbal harassment.  See Exhibit 15, Student Handbook.  Additionally, there is abundant evidence

---

precluding liability where the claim is that the failure is one of failing to adopt or enforce written *personnel* policies protecting persons' health or safety unless a duty of care, independent of such policy, is owed to the specific individual injured, except that the finder of fact may consider the failure to comply with any written personnel policy in determining the question of negligence.  *Jarboe v. Board of County Com'rs of Sedgwick County*, 938 P.2d 1293, 1300-01 (Kan. 1997) (citing and quoting KAN. STAT. ANN. § 75-6103).  Here, however, the statutory amendment would not apply because the policy is not a personnel policy.

that when the Thenos contacted district administrators and board officials about the harassment of Dylan they were told action would be taken to stop the harassment.  For example, administrators told Dylan that they "would take care of it."  D.J.T. Dep. 66:9-12.  Similarly, they told Dylan to return with further reports.  SOF ¶ 174.  Thus, there is evidence from which it could be found that the duty was undertaken.

### C.  The Duty Was Breached

Whether a school district properly supervised a student is a question of fact to be decided by the jury and reviewed only for the sufficiency of the evidence.  *Dunn*, at 327 (citing *Ferrill v. Board of Education, Cen. Sch. Dist. No. 1*, 6 A.D.2d 690, 174 N.Y.S.2d 91, 93 (1958)).  The record is replete with the things that the district administrators and board officials did not do from which a jury could conclude the duty to provide a safe learning environment free of sexual harassment had been breached by defendants in that they failed to exercise reasonable care to prevent the ongoing sexual harassment of Dylan within the school building and classes during the time that school was in session and at organized school activities by:

a.  failing to effectively discipline students, known to them, and known to have been involved in harassing Dylan;

b.  failing to investigate the incidents reported and take steps to eliminate or reduce them by changing the school culture;

c.  failing to discipline, train, and appropriately supervise lower level administrators and teachers under their supervision who failed to protect Dylan from sexual harassment; and,

d.  by creating or permitting an atmosphere in which students felt they could harass Dylan openly and with impunity.

*See inter alia*, *supra* at ¶¶ 220-226, 236-254.  There is ample evidence to create a genuine issue of material fact on whether the duty was breached.

### D.  The Breach Caused Damage

Whether conduct in a given case is the cause in fact or proximate cause of the plaintiff's injuries is normally a question of fact for the jury.  *Cessna Aircraft Co. v. Metropolitan Topeka Airport Authority*, 940 P.2d 84, 97 (Kan.App, 1997) (citing *Baker v. City of Garden City*, 731 P.2d 278, 281 (Kan. 1987)).  Only where the facts are such that they are susceptible to only one inference, is the question one of law that may be disposed of summarily by the court when the plaintiff has failed to establish the necessary burden of proof.  *Baker*, 731 P.2d at 281.  The discussion of the consequences of the severe harassment on Dylan, *supra* at II.C., relates the evidence of damage that a jury could find was caused by defendants' breach of duty.  From the evidence, a jury could find that the damage began with the first incident of harassment that went unredressed as Dylan suffered what for boys, is the most disturbing form of harassment. SOF ¶ 296.  As the harassment continued and worsened, the effect on Dylan began to take a cumulative toll.  By ninth grade, he was experiencing stomach problems that required (what was at that time) prescription medication.  By December, 2003, he was sufficiently depressed that his physician prescribed Zoloft and recommended counseling.  There is evidence that he suffers from PTSD, anxiety disorder, and avoidant personality disorder and that the disorder in his personality is directly related to his negative experiences at school.  SOF ¶ 289.

Given that a duty exists and that on each of the other elements of a claim of negligent supervision Dylan has adduced evidence from which a jury could find that the duty was undertaken, a breach of the duty, and damages resulting from the breach, summary judgment on this claim must be denied.

CONCLUSION

For the above reasons, this Court should conclude that there exists evidence to raise

genuine issues of material fact on the elements of Dylan's Title IX and negligent supervision

claims and deny Defendants' motion for summary judgment.


Respectfully submitted,

ARTHUR BENSON & ASSOCIATES


By  s/ Jamie Kathryn Lansford
Arthur A. Benson II  D.Kan. # 70134
Jamie Kathryn Lansford D.Kan #70220
Aften P. McKinney  Ks. Bar. #09507
4006 Central Avenue (Courier Zip: 64111)
P.O. Box 119007
Kansas City, Missouri 64171-9007
(816) 531-6565
(816) 531-6688 (telefacsimile)
abenson@bensonlaw.com
jlansford@bensonlaw.com
amckinney@bensonlaw.com

Attoneys for Plaintiff


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing was served via the Court's
electronic filing system this  13th  of May, 2005, on:

J. Steven Pigg
Terelle A. Carlgren
Fisher, Patterson, Sayler & Smith, L.L.P.
3550 S.W. 5th Street, P. O. Box 949
Topeka, Kansas  66601-0949
(785) 232-7761
(785) 232-6604 (telefacsimile)
spigg@fisherpatterson.com
tcarlgren@fisherpatterson.com

s/ Jamie Kathryn Lansford
Attorney for Plaintiff