# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

DYLAN J. THENO,[1]

          Plaintiff,

v.                                      Case No. 04-2195-JWL

TONGANOXIE UNIFIED SCHOOL
DISTRICT NO. 464, et al.,

          Defendants.

_____

## MEMORANDUM AND ORDER

This case arises from student-on-student harassment of plaintiff Dylan J. Theno while he was a junior high and high school student in defendant Tonganoxie Unified School District No. 464. The defendants are the school district, the school board members, the school district's superintendent, two principals, and two assistant principals. Plaintiff contends that the school district violated Title IX of the Education Amendments Act of 1972, 20 U.S.C. §§ 1681 *et seq.*, by being deliberately indifferent to the harassment. Plaintiff also asserts a state law claim against all of the defendants for their negligent failure to supervise the students under their custody and control.[2]

_____

[1] Plaintiff originally filed this lawsuit as D.J.T. (a minor), by and through his next friend and father, A.J.T. In accordance with the parties' stipulation, *see* Pretrial Order (doc. 77), ¶ 12, at 30, the clerk is directed to substitute Dylan J. Theno as the plaintiff in this lawsuit because he reached the age of majority on April 16, 2005.

This matter is presently before the court on Defendants' Motion for Summary Judgment (doc. 78).  For the reasons explained below, defendants' motion is granted in part and denied in part.  Specifically, the motion is denied with respect to plaintiff's Title IX claim against the defendant school district because the court is persuaded that plaintiff has raised genuine issues of material fact with respect to whether the harassment was gender-based, whether the school was deliberately indifferent to known harassment, and whether the harassment was so severe, pervasive, and objectively offensive that it effectively deprived plaintiff of educational opportunities.  The motion is granted with respect to plaintiff's negligent supervision claim because the court finds that Kansas courts would not recognize such a claim under the facts of this case.

## STATEMENT OF FACTS

Plaintiff, who is a male, was pervasively harassed by other students over the course of a four-year period beginning in 1999 when he was in seventh grade.  As explained in detail below, the harassment consisted of name-calling, teasing, and crude gestures with various sexual overtones.  He brings this lawsuit against the school district, the members of its school board, and various school district personnel for their failure to prevent the harassment.  Specifically, at all relevant times defendant Richard Erickson was the superintendent of the

_____

[2] Plaintiff abandoned Count III at the final pretrial conference and subsequently voluntarily dismissed Count II.  His Title IX and negligent supervision claims are therefore the only claims remaining in the case.

2

school district, defendant Stephan Woolf was the principal of the junior high school, defendant Michael Bogart was the principal of the high school, and defendant Brent Smith was the assistant principal of the high school.   The harassment ended when plaintiff left public school in November of 2003 when he was in eleventh grade.   He subsequently earned his GED and is now attending college.   Following is a chronology of the various incidents that occurred during the approximately four-year period of harassment.

***Seventh Grade Events (1999-2000 School Year)***

In October of 1999, K.L. and C.C. called plaintiff a faggot.   K.L. kicked plaintiff's feet from behind, trying to trip him.   Plaintiff pushed K.L. into an ironing board.   The teacher took plaintiff, K.L., and C.C. to the office.   The junior high school assistant principal, Ms. Strong, talked to them and told them that they would get in-school suspensions if they did it again. Plaintiff told Ms. Strong that K.L. was calling him a faggot.   Plaintiff also talked with Mr. Woolf on this occasion.

In November of 1999, plaintiff and S.S. got in a fight at a school basketball game after S.S. threw rocks at Dylan.   S.S. was walking down the sidewalk yelling, "Dylan's a fag.   Dylan likes to suck cock."   Dylan punched S.S., who then told Ms. Strong.   Dylan received a three-day out-of-school suspension for the fight.   He was told that S.S. received a one-day in-school suspension.   Dylan also talked with Mr. Woolf about the fight with S.S.

On more than one occasion after Christmas that school year, plaintiff was harassed by students in the lunchroom who were calling him a fag and making comments such as "Dylan

masturbates with fish," "How was it fag?" and "Don't you need to make a trip to the bathroom?" A male student, G.P., started making fun of plaintiff at lunch.   According to plaintiff, G.P. was "saying stuff like I'm gay, said I masturbate with fish, put a piece of string cheese in his mouth and he started sucking it in and out and said I'm Dylan sucking cock."   Plaintiff had no difficulty with G.P. before this incident.   G.P. was not mad at plaintiff but was "trying to look cool in front of the other kids because he had just started sitting at that table."   Two days later, two male students – M.M. and D.C. – began to make fun of plaintiff regarding a rumor that he got caught masturbating in the bathroom.   Plaintiff was told that G.P. started the rumor.   At lunch later that day, three male students and one female student teased plaintiff about the bathroom rumor, asking if he was going to "make a trip to the bathroom."

Plaintiff left the lunchroom and went to see Ms. Strong and told her what had happened. She left to go talk with the other kids and, meanwhile, Mr. Woolf pulled plaintiff into his office and wanted to know what happened.   When Ms. Strong returned, she said that "I warned them again.   I told them if gay, fag, or queer ever left their mouths that they would be three days out-of-school suspended."   Ms. Strong counseled G.P. regarding his inappropriate comments and G.P. agreed to never make such statements again.

Plaintiff was going to go back to his class, but he saw his sister, Shannan Theno. Plaintiff told Shannan about the rumor.   Shannan, in turn, called Mrs. Theno and told her about the rumor.   Mrs. Theno came to the school and found plaintiff standing in the doorway of Ms. Strong's office.   Plaintiff told her what was happening and that the administrators had "just

warned them again."  Plaintiff told his mother that he had told Ms. Strong that G.P. had started the rumor.

Ms. Strong and Mrs. Theno talked.  Mrs. Theno told Ms. Strong that N.B. was not the problem, that G.P. had admitted to N.B., who, in turn, had told Dylan, that G.P. had started the rumor and that nothing had been done to G.P.  Mrs. Theno was not happy that the other boys were only warned.  She believed that the boys should have been suspended for their statements.

Mrs. Theno later spoke by telephone with superintendent Erickson.  Mrs. Theno asked Dr. Erickson to review the manner in which the principal (Mr. Woolf) and assistant principal (Ms. Strong) had handled the situation.  Dr. Erickson told Mrs. Theno that he would look into the matter and get back to her.  A few days later, he reported to Mrs. Theno that he had visited with Mr. Woolf and Ms. Strong and reviewed the school's code of conduct.  He told Mrs. Theno that he felt the administrators handled the situation in accordance with the student handbook.  Mrs. Theno responded that she was disappointed.

Plaintiff's father contacted G.P.'s father to arrange a meeting.  Mr. Theno and plaintiff talked with G.P. and G.P.'s father at the park.  G.P. apologized and said it would never happen again.  Also, G.P. subsequently informed the other students sitting at the table that he had made up the story about plaintiff masturbating.  Since that time, plaintiff has had no further problems with G.P. or with C.C.  He may have had a couple of later arguments with K.L. in which words such as "gay" or "fag" were used but he did not report the arguments "because they weren't very serious, it was just short little argument and that was it."

Not long after Ms. Strong, Mr. Woolf, and Dr. Erickson learned of plaintiff's problems at the lunch table, an eighth grader in plaintiff's gym class called him the jack-off kid.   That eighth grader was D.W.#1.

Sometime later, plaintiff had a problem with A.E. at the lunchroom.   A.E. put his hair up to mimic the way plaintiff wore his hair and said, "Look, I'm Jack."   Plaintiff was then called "jack off boy."   Plaintiff and A.E. had been friends with no previous problems.   Plaintiff did not report the incident with A.E. to any staff.   A.E. made fun of plaintiff on other occasions but plaintiff recalls no specifics and no occasion in which he reported A.E. to an administrator or teacher.   On February 17, 2000, plaintiff was counseled and moved to a different lunch table for five days for calling other students faggots after they made fun of his hair.   On February 24, 2000, A.E. was disciplined and was given a three-day lunch detention and a warning that the "next incident of harassment will result in more severe consequences."

One day before school while kids were congregating in the cafeteria before the bell for class rang, D.C. and M.M. started making fun of plaintiff.   They were asking him "how it was" that he got caught masturbating in the bathroom.   Plaintiff asked them what they were talking about and they told him that they had heard the rumor from G.P.   Although plaintiff told them the rumor was not true, they kept making fun of him, not just that one time, but after that as well.   The next time he heard the rumor was later that day in class from a female student, D.S., who asked plaintiff, "Didn't you get caught?"   Plaintiff asked her what she was talking about and she said, "I heard you got caught masturbating in the bathroom."

6

Also during seventh grade, two boys who plaintiff thinks were M.M. and S.M. spat on the wall in the bathroom and said, "Look, Dylan was here."  They would also call plaintiff fag and make fun of him about the rumor.

On another occasion, plaintiff found "stuff" stuck in his locker that had "flamer" written across it and said, "You're gay."  Plaintiff asserts that he was told by H.J. that K.W. had placed the item in his locker.  Plaintiff asserts that he told Mrs. Strong and that she warned the boys. K.W. and H.J. called plaintiff flamer thereafter.  On one occasion, plaintiff had a fight with H.J. after H.J. called plaintiff a flamer.  Plaintiff reported the incident to Mr. Woolf.  H.J. received a three-day in-school suspension.

An eighth grade student, J.H., made fun of plaintiff during gym class about masturbation. On one occasion, J.H. went to the gym teacher, Phil Jeannin, and told Mr. Jeannin to go check on plaintiff because he "might be jacking off over there."  Mr. Jeannin told J.H. to "be quiet." That was the only occasion in which J.H. made a comment within hearing of the teacher. Although J.H. made other comments to plaintiff, plaintiff did not report those to the gym teacher.

Later that year after spring break, plaintiff reported to his mother that N.B. had called him gay or fag.  Mrs. Theno went up to school and told Ms. Strong, who said she would look into it.  The next day, Mrs. Theno asked plaintiff about it and plaintiff said that nothing had happened to N.B.  Plaintiff did not report any other comments about N.B. at that time.[3]

---

[3] Some children made similar comments to plaintiff at a bike ramp and also one time during the summer when plaintiff was walking past some homes.  This conduct, however, did

***Eighth Grade (2000-2001 School Year)***

In the eighth grade, things were quiet at first, although random people would make fun of plaintiff. For example, as he was walking down the hall, someone would say, "hey, masturbator." Plaintiff did not report those incidents to school personnel.

Plaintiff had problems with D.W.#1 harassing him. D.W.#1 called plaintiff "faggot, queer, masturbator, and he was making fun" of plaintiff, and D.W.#1 told the other kids that plaintiff had his hands in his pants playing with himself. On one occasion when they were coming back from basketball practice on the bus, D.W.#1 drew a picture of plaintiff in the condensation on the window and said to the team, "Look, it's Dylan, jacking off." Plaintiff tried to ignore D.W.#1, hoping it would stop. Plaintiff did not report the incident to any of the coaches on the bus, but the following day he reported it to Mr. Woolf. Mr. Woolf later advised plaintiff that he had told D.W.#1 that "if he kept making fun of [plaintiff] that he was going to kick him off the basketball team." D.W.#1 stopped making fun of plaintiff for awhile until after basketball season was over. After that, D.W.#1 used ice cream bars to taunt Dylan by rubbing the ice cream around his mouth and making crude comments.

---

not take place in a context that was under the school district's control and therefore it is not actionable under Title IX. *See Davis v. Monroe County*, 526 U.S. 629, 645 (1999) (because the harassment must occur under the operation of a funding recipient, it "must take place in a context subject to the school district's control").

Also during the eighth grade, plaintiff missed a shot at a basketball game and one of the kids on the bench shouted, "Way to go, queer Theno." Plaintiff's parents were able to hear this in the stands.

Mr. Theno went to the school in January of 2001 to talk to Mr. Woolf about D.W.#1. Mr. Theno went to school several other times that year to talk to Mr. Woolf about the continuing harassment.

### *Ninth Grade Events (2001-2002 School Year)*

The next major problem occurred during plaintiff's ninth grade year in gym class. Someone (plaintiff believed it was D.W.#1) had written on a chalkboard in the locker room that plaintiff likes men, is a fag, is a queer, and masturbates. On the first occasion, plaintiff erased the board. On the second occasion, plaintiff talked to Mr. Woolf and Mr. Woolf said he would handle it. Nothing was written on the board the next day, but someone wrote something again the following day. Plaintiff returned to complain to Mr. Woolf. Mr. Woolf apologized, stating that he had been busy and forgotten. Mr. Woolf talked with D.W.#1. Mr. Woolf also talked to the gym teacher, Matt Bond, and told him to keep an eye on plaintiff and make sure this did not occur again. Thereafter, nothing further was written on the board and plaintiff has had no problems with D.W.#1 since that time.

Mr. Woolf also interviewed A.E. regarding whether he had called plaintiff names or heard others calling him names. A.E. denied knowledge of such conduct.

Mr. Theno talked again with Mr. Woolf.  Mr. Theno also met with Dr. Erickson in early February of 2002.  This was the first time that Mr. Theno had talked with Dr. Erickson and he visited with him about several incidents of name calling that had occurred over a period of time.  Shortly after visiting with Mr. Theno, Dr. Erickson visited with Mr. Woolf and reviewed the incidents based on the information that Mr. Theno had given to Dr. Erickson.  The incidents involved name calling such as faggot and the like.  On February 27, 2002, Mr. Theno wrote a letter to Dr. Erickson.  In the letter, Mr. Theno reiterated the complaints he had voiced in their earlier meeting and complained that the harassment of plaintiff had been going on for two and a half years.  Subsequently, Dr. Erickson and Mr. Woolf discussed the manner in which Mr. Woolf handled incidents of harassment.

Mrs. Theno did not recall plaintiff reporting any further specific incidents of harassment during the remainder of his ninth grade year, but the harassment was daily.  Plaintiff would report incidents to her, but would ask her not to go to the school because doing so would only "make it worse."

### Tenth Grade Events (2002-2003 School Year)

The Tonganoxie High School includes tenth through twelfth grades.  Thus, plaintiff moved up to high school after his ninth grade year.  The high school does not receive a list of students who are moving up from junior high, and therefore the high school administrators and faculty first learn who the students will be when those students come to school for enrollment or on the first day of school.  Mr. Woolf did not talk to anyone at the high school before

10

plaintiff began his ninth grade year in order to alert the high school that plaintiff had experienced problems and that his parents had raised complaints.

Plaintiff first experienced harassment at the high school in February of 2003 in strength training class.    T.H. started making fun of plaintiff saying that he had gotten caught masturbating in the bathroom.    This happened more than once; it was an ongoing thing. Plaintiff had similar problems with N.S. and M.W. in strength training class because T.H. had gotten them into making fun of plaintiff.    Plaintiff did not specifically report any of the incidents to the teacher, Matt Bond, but he believed that Mr. Bond heard their comments. Once, while plaintiff was talking to Mr. Bond, T.H. walked up and said: "Mr. Bond, watch out, Dylan might go jack off in the bathroom."    Mr. Bond laughed.    Plaintiff said nothing but walked away.

The harassment had been going on a week or so before plaintiff told his father about it. Mr. Theno went to school on or about February 21, 2003, and visited with high school assistant principal Brent Smith to relate that plaintiff was having problems in strength training class with three students—T.H., M.W., and N.S.—making comments to plaintiff relating to masturbating. Plaintiff's father also mentioned an incident in Ms. Lee's class about plaintiff being called a banana boy.  Plaintiff wore a bright yellow coat and A.E. had started calling him "banana boy." A.E. had also told a teacher, Ms. Lee, to call plaintiff banana boy and Ms. Lee did so. Plaintiff's father mentioned that plaintiff had experienced some problems in seventh grade of a similar nature.

11

Mr. Smith investigated the complaint by talking first with plaintiff to obtain his account. Plaintiff reported to Mr. Smith that T.H. or M.W. were making comments such as you need to go to the bathroom to do your daily thing.   According to plaintiff, this had occurred approximately two weeks earlier.   Plaintiff told Mr. Smith that no one else had heard the statements other than Mr. Bond.   At the same time, plaintiff also discussed A.E. and Ms. Lee's "banana boy" comments.   Mr. Smith advised plaintiff that if he had any further problems Mr. Smith would need plaintiff to help him by coming to him immediately rather than waiting.

Mr. Smith met with the boys who had been harassing plaintiff in strength training class. Mr. Smith talked about the seriousness of sexual harassment and explained that if something were to be construed as sexual harassment, a suspension from school would be likely.   Mr. Smith also talked with Mr. Bond.   Mr. Bond reported that he had not heard and was not aware of any comments of a sexual nature directed to plaintiff.   Mr. Smith informed Mr. Bond of the complaints so that he would be aware of and pay more attention to the situation.   Mr. Smith next talked to Ms. Lee, inquiring about the banana boy comment.   Ms. Lee was "very surprised" and "seemed oblivious to the fact that there might have been something inappropriate to him being called that."   Ms. Lee said that they had been calling plaintiff banana boy because he had a yellow coat.   She was apologetic that there was an issue.

Mr. Smith talked to plaintiff afterwards and said that he had talked to the boys and that they would not do it anymore.   Plaintiff had no further problems with M.W. or N.S.   T.H. also stopped making fun of plaintiff with the terms such as faggot or queer.   The only subsequent problem with T.H. involved comments such as "don't go tell your dad" or "please don't go tell

Mr. Smith" to get people to laugh.   Plaintiff reported no further problems regarding being called banana boy.

Mr. Smith called Mrs. Theno and reported to her that the students had admitted giving plaintiff a hard time and that he would have a conference if either she or her husband wanted to talk.   Mr. Theno came to Mr. Smith's office the next day and was upset when he entered the office.   Mr. Smith advised Mr. Theno that he "thought [he] had handled the situation in the way it needed to be handled."

On or about March 6, 2003, Mr. Theno called school board member Richard Dean and outlined some of plaintiff's problems.   On March 12, 2003, plaintiff and his parents met with Dr. Dean.   Mr. Theno gave Dr. Dean a copy of sixteen pages of notes from Mrs. Theno.   Dr. Dean suggested that if plaintiff were harassed in any way that he should immediately talk to Mr. Smith and also call Dr. Dean immediately at work.   Subsequently, Dr. Dean shared Mr. Theno's concerns with the board of education.   Dr. Dean gave each board member a copy of the log of incidents prepared by Mrs. Theno.   During the board's March meeting, the board directed that help be given to plaintiff and also directed that the school administration document all situations involving plaintiff.

After Mr. Smith received the letter containing the log of incidents, he and Mr. Bogart felt that they needed to take a more proactive stand and talk to the other boys.   Mr. Bogart asked Mr. Smith to speak with each of the other students.   Mr. Smith brought in each of the boys mentioned in the notes—A.E., G.P., J.V., D.W.#1, N.B., and K.L.—and admonished them, taking a "proactive stance" to make sure that nothing was going on or would happen to plaintiff.

When Mr. Smith talked with A.E., A.E. said that the banana boy comments had nothing to do with past comments that may have been made by students.  A.E. said that the comments had probably been taken wrong.  The other students either denied knowledge of any comments or were aware of prior problems but no recent problems.  Each assured Mr. Smith that they would not be a part of any problem.  Mr. Smith stressed to these students that "any further inappropriate comments or gestures that can be construed as harassment [would] cause them problems."  Mr. Smith further told these students to inform any of their friends "who might have a problem with this issue, that it better not happen."  Mr. Smith told each of these students that he did not want them making any inappropriate comments toward plaintiff.

**Eleventh Grade (2003-2004 School Year)**

During the summer between tenth and eleventh grades, Mr. Theno provided Mr. Smith with information including the names of students who had harassed plaintiff in the past.  Mr. Theno also contacted a school counselor, Kathy Walker, and told her about plaintiff's harassment.  Ms. Walker went to Mr. Smith and Mr. Smith sent her to Mr. Bogart.  On or about August 12, 2003, Mr. Bogart, Mr. Smith, and another school counselor, Scott Smith, met regarding plaintiff's harassment problems.  Mr. Bogart asked Mr. Smith to talk to each of plaintiff's teachers to make sure they were aware that there had been some problems previously and to instruct them to be alert for any inappropriate comments toward plaintiff.  On August 20 and 21, Mr. Smith talked to some of plaintiff's teachers for the 2003-2004 school year and advised them to be alert for any such comments.  Mr. Bogart and Mr. Smith

14

also met with some of the boys who had previously harassed plaintiff and advised them that suspension from school was likely if any inappropriate comments were directed toward plaintiff.

Only days after school started, D.O. was sitting at the same lunch table as plaintiff and started making fun of him, calling him fag, and referring to the rumor about masturbating in the bathroom.   Plaintiff tried to ignore it, hoping that it would stop, and he did not say anything. This was the first time plaintiff had any problems with D.O.   After D.O. started harassing plaintiff at lunch, problems arose outside of school between plaintiff and D.O.   On September 8, 2003, as plaintiff opened the door to walk into school, D.O. was there with three of his friends and he stepped forward into plaintiff's face and said, "Faggot, faggot, faggot."   Plaintiff hit D.O. with a punch to the nose, kneed him, and a fight ensued.   After H.G. broke up the fight by getting between the two boys, Mr. Williams took plaintiff to Mr. Smith's office.   Plaintiff told Mr. Smith what D.O. had been doing.   At some point, D.O. was taken to Mr. Bogart's office.   Plaintiff also told Mr. Bogart what D.O. had said.   Mr. Bogart gave plaintiff and D.O. each three-day out-of-school suspensions.   Mr. Smith visited with teachers again and told them to be observant about plaintiff and derogatory terms like fag.   After this, plaintiff had no other problems with D.O. in school, although D.O. continues to harass him outside of school.

Another male student, J.B., who was "really good friends with D.O.," harassed plaintiff in small engines class, telling plaintiff that he was a "fag" and "pussy" because he had kicked D.O. "low."   Plaintiff did not report the statements by J.B. but asserts that the statements were

made in front of the auto mechanics teacher.  Also, D.W.#2 confronted plaintiff and told him

he was a fag for beating up D.O. and a pussy because plaintiff kicked D.O. low.

On October 13, 2003, Mr. Theno met in executive session with the school board.  He

was advised at the start of the meeting that on the advice of the school board's attorney the

school board would not answer any of his questions.  He complained about the harassment and

asserted that administrators should be terminated and Dr. Dean should resign from the school

board.

The next incident of harassment occurred in strength training class on November 16 or

17, 2003.  Plaintiff was doing lunges with weights but did not go all the way down on his lunge.

A fellow student, C.L., yelled "finish out strong you queer."  Plaintiff had no previous problems

with C.L.   Plaintiff did not report C.L.'s statement but the teacher, Matt Bond, heard it.

According to Mr. Bond, he told C.L. that "if you ever say that term again you will be out of

here.  You will go to the office.  Do you understand me?"  C.L. replied, "Yes sir, I understand."

Mr. Bond then made C.L. do pushups.

Mr. Bogart first learned of this particular incident during a conference with Mrs. Theno

on November 17, 2003.  Mr. Bogart met with C.L. and C.L.'s mother, imposed a detention on

C.L., and required C.L. to write a letter of apology to plaintiff.  C.L. subsequently gave plaintiff

a written apology.  C.L.'s family was very unhappy that C.L. was the first to receive a detention.

Plaintiff had no subsequent problems with C.L.    Mr. Bogart reported the incident to Dr.

Erickson.

16

On one other occasion a classmate in strength training made fun of plaintiff regarding the masturbation rumor. Plaintiff never reported that student's comments to anyone.

On November 18, Mr. Bogart issued an announcement that prohibited any use of the terms "gay" or "fag." The announcement was written for teachers to deliver during first period classes. After this announcement was read in Mr. Delay's class (presumably plaintiff's class), C.L. made comments to the effect that people "need to learn how to grow up and face their problems their self [sic] and not go run to their parents . . . every time someone says that to them because no one is ever serious when they say it and he was staring at [plaintiff] the whole time he was saying that."

That night, plaintiff begged his mother not to send him back to school, saying things like "Mom, I cannot go back there," "Mom, they're laughing at me," and "Please, you cannot send me back." He was a crying, emotional wreck. On November 19, Mrs. Theno called Mr. Bogart and took plaintiff out of school. She told Mr. Bogart that plaintiff was harassed because the announcement had been made. Until the end of the semester, plaintiff was considered a homebound student and a substitute teacher helped him complete his schoolwork that semester. He got his GED and is attending junior college and working.

**Other Background Facts**

The school district had policies in place generally prohibiting sexual harassment. The board of education had adopted written policies prohibiting sexual harassment, and the school's

17

policies prohibiting sexual harassment were also embodied in the school's code of conduct and the student handbook.

Plaintiff has produced expert testimony in which the expert opines that the school personnel's responses to the known harassment incidents were inadequate.   The expert states that, rather than simply speaking to the harassers the school should have undertaken a variety of other measures such as issuing suspensions, conducting more extensive investigations to determine the extent of the harassment, interviewing students individually rather than collectively, and holding faculty meetings to address school cultural issues.   Also, the staff at the junior high school should have forewarned the staff at the high school of the prior incidents of harassment.   Additionally, the manner in which the school district issued the announcement on November 18, 2003, was totally inappropriate because the students probably figured out that the announcement was being issued in response to issues relating to plaintiff and this made it worse for him.   Instead, the administration should have brought teachers and students together to try to develop a school culture that sends the message that sexual harassment will not be tolerated.

It is uncontroverted that plaintiff has sought medical help as a result of the harassment. He has received psychotherapy, psychiatric treatment, and medication.


*Defendant's Motion for Summary Judgment*

Based on these facts, defendants seek summary judgment on plaintiff's remaining claims in which plaintiff asserts a Title IX claim against the school district and a state law

18

negligent supervision claim against all defendants.   Defendants contend that they are entitled to summary judgment on plaintiff's Title IX claim because the sexual harassment was not gender related, it was not sufficiently severe and pervasive, and the school district responded reasonably and without deliberate indifference to the known harassment.   Defendants further argue that they are entitled to summary judgment on plaintiff's negligent supervision claim because Kansas does not recognize a claim for negligent failure to supervise employees to prevent harassment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.   *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."   *Wright ex rel. Trust Co. v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998)).   An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."   *Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

19

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).   In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.   The nonmoving party may not simply rest upon its pleadings to satisfy its burden.   *Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).   Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."   *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).   To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."   *Adams,* 233 F.3d at 1246.

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and

inexpensive determination of every action.'"   *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).


## ANALYSIS

For the following reasons, the court finds that plaintiff has raised genuine issues of material fact sufficient to withstand summary judgment on plaintiff's Title IX claim against the defendant school district because a rational trier of fact could find that the harassment was gender based, that the defendant school district was deliberately indifferent to known harassment, and that the harassment was so severe, pervasive, and objectively offensive that it deprived plaintiff of educational opportunities.   The court will, however, grant defendants' motion with respect to plaintiff's state law negligent supervision claim because the court concludes that Kansas courts would not recognize a negligent supervision claim under the facts of this case by imposing upon school personnel the duty to supervise students in such a manner as to prevent emotional harm to other students.

## I.   **Title IX Claim**

Title IX of the Education Amendments Act of 1972 (Title IX), 86 Stat. 373, as amended, states, in relevant part, that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."   20 U.S.C. § 1681(a). In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the Supreme Court held that public schools, as recipients of federal funds, can be liable under Title IX for student-

on-student sexual harassment "but only where the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities" and "only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Id.* at 633; *see also Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999) (discussing the elements of a Title IX peer harassment claim under *Davis*).

### A.    *Gender-Based Harassment*

In *Davis*, the Supreme Court recognized a cause of action for student-on-student harassment in the context of a case involving male-on-female harassment, not same-sex harassment as is at issue in this case.  The Supreme Court has, however, held that same-sex harassment arising from a hostile work environment is actionable under Title VII, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), and courts routinely look to Title VII case law for guidance in evaluating Title IX claims, *see, e.g.*, *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001) ("Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims."). Therefore, the court readily concludes that same-sex student-on-student harassment is actionable under Title IX to the same extent that same-sex harassment is actionable under Title VII.  *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65-66 (1st Cir. 2002) (relying on *Oncale* to hold that a hostile environment claim based upon same-sex harassment is cognizable under Title IX); *cf. Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir.

22

1998) (noting that the defendants conceded in light of *Oncale* that same-sex sexual harassment is actionable under Title IX).

Same-sex harassment in a hostile work environment is actionable under Title VII if the plaintiff can "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." *Oncale*, 523 U.S. at 81. In *Oncale*, the Supreme Court gave examples of three evidentiary methods by which a same-sex plaintiff can show that the harassment was based on sex. 523 U.S. at 80-81; *see also Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263-65 (10th Cir. 2005) (discussing the three evidentiary routes that a plaintiff may follow under *Oncale* in order to establish an inference of gender discrimination in the context of same-sex harassment). First, a plaintiff can show that the harassment was motivated by sexual desire. *Oncale*, 523 U.S. at 80. Second, a plaintiff can show that the harasser was motivated by a general hostility to the presence of the same gender in the workplace. *Id.* Or, third, a plaintiff may offer direct comparative evidence about how the harasser treated both males and females in a mixed-sex workplace. *Id.* at 80-81. The Supreme Court emphasized that "whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted '*discrimina[tion]* . . . because of . . . sex.'" *Id.* (emphasis and alteration in original).

In this case, plaintiff has not offered evidence that satisfies any of the three evidentiary methods listed in *Oncale*. A rational trier of fact could not infer from the record that plaintiff's harassers were motivated by a sexual desire toward him. It is undisputed that

plaintiff is not homosexual and the record does not reflect that any of his harassers actually perceived him to be homosexual or were homosexual themselves.   Although the harassment often included homosexual content (e.g., terms such as "queer," "faggot," and "gay"), the harassers were using these simply as terms of derision.   Furthermore, a rational trier of fact could not infer from the record that plaintiff's harassers were motivated by a general hostility to the presence of males at school or that they treated males comparatively worse than females at school.

Nonetheless, it is well settled that the three evidentiary methods listed in *Oncale* for proving that same-sex harassment was based on sex were intended to be instructive, not exhaustive.   *See Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999). Gender stereotyping is another method of proving actionable harassment under Title VII.   *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (male partners discriminated against a female based on sex when they denied her partnership because she did not match sex stereotypes).   The Courts of Appeal have held that this gender stereotyping theory provides another method (other than the three methods listed in *Oncale*) for proving that same-sex harassment is based on sex, *see Smith v. City of Salem*, 378 F.3d 566, 571-575 (6th Cir. 2004); *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2001); *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 874-75 (9th Cir. 2001); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 261 n.4 (1st Cir. 1999), and an unpublished opinion suggests that the Tenth Circuit would likely agree, *see James v. Platte River Steel Co.*, 113 Fed. Appx. 864, 867-68, 2004 WL 2378778 (10th Cir. Oct. 25, 2004).

24

In this case, a rational trier of fact could infer that plaintiff was harassed because he failed to satisfy his peers' stereotyped expectations for his gender because the primary objective of plaintiff's harassers appears to have been to disparage his perceived lack of masculinity.   The name-calling, standing alone, probably would not be sufficient to withstand summary judgment. *See, e.g.*, *Benjamin v. Metro. Sch. Dist.*, No. 00-0891-C-T/K, 2002 WL 977661, at *3-*4 (S.D. Ind. Mar. 27, 2002) (holding the harassers' use of the terms "bitch," "whore," and "slut" were not based on gender bias under *Oncale*); *Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 930-31 (C.D. Ill. 2002) (remarking that there was little in the record to support the fact that males who called the female plaintiff "bitch," "pussy," and "slut" were motivated by the plaintiff's gender).   But, in this case, the bulk of the more severe harassment traced its origins back to the rumor that began when plaintiff was in seventh grade that he was caught masturbating in the bathroom.   The fact that plaintiff's peers made crude drawings and teased him because he was perceived to be a masturbator, when combined with arguably related crude name-calling, reflects that plaintiff's harassers believed that he did not conform to male stereotypes by <u>not</u> engaging in such behavior at school, i.e., that he did not act as a man should act.   Consequently, plaintiff has raised a genuine issue of material fact regarding whether he was harassed on the basis of his sex.   *See, e.g.*, *Schmedding v. Tnemec Co.*, 187 F.3d 862, 865 (8th Cir. 1999) (complaint stated Title VII same-sex harassment claim where harassment included rumors that falsely labeled the plaintiff as homosexual "in an effort to debase his masculinity"); *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1092-93 (D. Minn. 2000) (complaint stated Title IX same-sex harassment claim under gender

stereotyping theory where plaintiff did not meet his peers' stereotyped expectations of masculinity).

> **B.**     ***Deliberate Indifference***

A school district is liable for damages under Title IX only where the district itself remains deliberately indifferent to known acts of harassment.  *Davis*, 526 U.S. at 642-43.  In describing the proof necessary to satisfy the standard, the Supreme Court has stated that a plaintiff may demonstrate the school district's deliberate indifference to discrimination "only where the [school district]'s response to the harassment . . . is clearly unreasonable in light of the known circumstances."  *Id.* at 648.  This "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action."  *Id.*  Victims do not have a right to seek particular remedial demands and courts should not second guess school administrators' disciplinary decisions. *Id.*

Here, the defendant school district urges the court to find that its responses to known incidents of harassment were not clearly unreasonable as a matter of law.  This, the court cannot do.  Certainly, school personnel's responses to the various discrete incidents of known harassment might not have been clearly unreasonable because the discipline that the school meted out (mostly warnings) was largely effective with respect to each of the known harassers. That is, each time the school disciplined a known harasser, to the best of the school's knowledge that particular harasser ceased harassing plaintiff (with limited exceptions).  But, viewing the evidence in the light most favorable to plaintiff, as the court must at this procedural

26

juncture, a rational trier of fact could find that the school's response to the known harassment was clearly unreasonable because this is not a case that involved a few discrete incidents of harassment.   It involved severe and pervasive harassment that lasted for years, with other students engaging in the same form of harassment after those who were counseled had stopped, and the school rarely took any disciplinary measures above and beyond merely talking to and warning the harassers.   It was not until plaintiff's eleventh grade year that the school began taking measures that were arguably more aggressive.   By that time, the harassment had been going on for a number of years without the school handing out any meaningful disciplinary measures to deter other students from perpetuating the cycle of harassment.   While the court recognizes that the school was not legally obligated to put an end to the harassment, a reasonable jury certainly could conclude that at some point during the four-year period of harassment the school district's standard and ineffective response to the known harassment became clearly unreasonable.

In this respect, the court finds particularly persuasive the Sixth Circuit's reasoning in *Vance v. Spencer County Public School District*, 231 F.3d 253 (6th Cir. 2000).  In *Vance*, as in this case, the plaintiff suffered harassment at the hands of a number of her peers for a number of years.   Also in *Vance* the school largely "talked to" the plaintiff's harassers, much as Tonganoxie school personnel did in this case.  The Sixth Circuit recognized that under *Davis* a school is not required to remedy peer harassment by expelling every student accused of misconduct or engaging in particular disciplinary action.   *Id*. at 260.   Nonetheless, "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it

continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances." *Id.* at 261. In this case, for years the school used the tactic of merely talking to and warning the students who harassed plaintiff. Admittedly, the school did investigate some of the more significant incidents and even eventually proactively spoke to students and teachers in an effort to prevent further incidents. But whether the school's belatedly stepped-up efforts were "too little, too late" is a question for the jury. Plaintiff has raised a genuine issue of material fact sufficient to withstand summary judgment on this issue.

###   C.   *Severity and Pervasiveness*

In order to be actionable under Title IX, the sexual harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. In this respect, the school district argues that the harassment was not sufficiently severe and pervasive to be actionable under Title IX. The school district notably does not, however, argue that plaintiff was not deprived of educational opportunities because of the harassment. The school district's argument in this respect is based on the elements of a Title IX student-on-student harassment claim as outlined by the Tenth Circuit in *Murrell v. School District No. 1*, 186 F.3d 1238 (10th Cir. 1999). In *Murrell*, the Tenth Circuit stated that the elements of a Title IX peer harassment claim are "that the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Id.* at 1246. This court believes, however, that the Tenth Circuit's statement breaking

28

down (3) and (4) into separate elements was likely an inadvertent characterization of the Supreme Court's holding in *Davis*, which expressly ties severity to deprivation, and was dicta in any event because it was not necessary to the Tenth Circuit's holding in *Murrell*.[4]  The court notes that *Murrell* is an aberration in this respect, as the other Courts of Appeal that have been confronted with this aspect of the Supreme Court's holding in *Davis* have analyzed this issue as one element, not two.  *See, e.g., Hawkins v. Sarasota County Sch. Bd.*, 322 F.3d 1279, 1285, 1288-89 (11th Cir. 2003) (persistent and frequent harassment over a period of several months consisting of sexually explicit and vulgar language such as gesturing to his genitals and telling the plaintiffs to "suck it" combined with acts of objectively offensive touching such as chasing plaintiffs around and trying to touch their breasts, trying to look up their skirts, and rubbing his body on theirs was not "so" severe, pervasive, and objectively offensive as to support Title IX claim because plaintiffs could not demonstrate a systemic effect of denying equal access to an educational program or activity); *Gabrielle M. v. Park Forest-Chicago Heights*, 315 F.3d 817, 823 (7th Cir. 2003) (relying on the same rationale that notwithstanding the harassment the victim was not denied educational opportunities); *Vance*, 231 F.3d at 258-59 (affirming district court's denial of the defendant's post-trial motion for judgment as a matter of law; finding abundant evidence of harassment that was severe and pervasive as well

---

[4] The pivotal issue in *Murrell* that required reversal was that the district court had concluded that the plaintiff failed to establish institutional liability for peer harassment based on the Fifth Circuit's opinion in *Rowinsky v. Bryan Indep. Sch. Dist.*, 80 F.3d 1006, 1011-12 & n.11 (5th Cir. 1996).  After the district court had issued its opinion, the Supreme Court issued its opinion in *Davis*, and the Tenth Circuit reversed the district court under the then-newly announced standards of *Davis*.

as circumstances that effectively denied the plaintiff an education); *see also, e.g., Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 930-32 (C.D. Ill. 2002) (finding harassment did not meet this standard where plaintiff did not show that the harassment was so severe and pervasive that it had the systemic effect of denying her access to an educational program or activity); *Johnson v. Indep. Sch. Dist. No. 47*, 194 F. Supp. 2d 939, 946 (D. Minn. 2002) (same). Accordingly, the court will evaluate the defendant's motion for summary judgment on this issue under the single-element standard as expressly announced by the Supreme Court in *Davis*—that is, that the harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650.[5]

"Whether gender-oriented conduct rises to the level of actionable harassment . . . depends on a constellation of surrounding circumstances, expectations, and relationships." *Id.* at 651 (citations and quotations omitted). Harassment that is sufficiently severe to be actionable in the Title VII context is not necessarily actionable in Title IX peer harassment claims because the Supreme Court has explained that "schools are unlike adult workplaces and . . . children may regularly interact in a manner that would be unacceptable among adults." *Id.* In *Davis*, the Court reasoned as follows:

---

[5] The court here is not saying that it disagrees with the Tenth Circuit's interpretation of the law and so it will deviate from it. Of course, the court could not and would not do so. But *Davis* is so clear in its linkage (that the harassment must be so severe, pervasive and objectively offensive that it deprives the plaintiff of educational opportunities) that it is quite clear that the Circuit could not have intended to recast the analysis for a case in which severity is a pivotal issue.

[A]t least early on, students are still learning how to interact appropriately with their peers. It is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it. Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target differences in gender. Rather, in the context of student-on-student harassment, damages are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect.

*Id.* at 651-52 (emphasis added).

In this case, viewing the evidence in the light most favorable to plaintiff, a rational trier of fact could find that the harassment of plaintiff was so severe, pervasive, and objectively offensive that it effectively denied him an education in the Tonganoxie school district. Plaintiff was tormented by his peers for four years. He was routinely called names such as "fag," "faggot," "jack-off boy," "banana boy," "queer," "flamer," or "masturbator." He was referred to as being gay or queer. He was teased for years based on the rumor that started in seventh grade to the effect that he had been caught masturbating in the boys' restroom. One boy told a gym teacher to check on plaintiff when he went to the bathroom because he might be masturbating. Kids spat on the wall in the bathroom and said, "Look, Dylan was here." A basketball teammate in junior high school made crude drawings in the condensation on the bus windows that he claimed were images of plaintiff masturbating. The next year, an individual wrote comments and drawings on a locker room chalkboard. He began suffering from stomach problems that required prescription medication and depression so severe that his physician prescribed medication and he sought counseling. He was diagnosed with post-traumatic stress disorder, anxiety disorder, and avoidant personality disorder that likely stemmed from the

31

2195-JWL   Document 91   Filed 06/24/05   Page 32 of 36

harassment. The harassment was so humiliating that he eventually left school, and therefore, under all of these circumstances, the trier of fact could conclude that he was deprived of educational opportunities.

The court finds the school district's argument that the harassment is not actionable because it involved only name-calling and crude gestures, not physical harassment, to be without merit. Certainly, the court is mindful that this case involves student-on-student harassment in the context of a junior high school and a high school and consequently the various types of behavior exhibited by plaintiff's harassers, when viewed in isolation, unfortunately are not altogether uncommon. But, in this case, the harassment did not involve a few isolated events. It was unrelenting for years. Although some of the isolated incidents could be characterized as mere insults, teasing, and name-calling, collectively they reflect much more than "simple acts" of teasing and name-calling. They reflect a pattern of harassment that was arguably severe and pervasive. Plaintiff has raised a genuine issue of material fact sufficient to withstand summary judgment on this issue. Accordingly, the school district's motion for summary judgment on plaintiff's Title IX claim is denied.

## II.   Negligent Supervision Claim

With respect to plaintiff's negligent supervision claim, the court concludes that Kansas courts would not recognize a negligent supervision claim under the facts of this case by imposing upon school personnel the duty to supervise students in such a manner as to prevent emotional harm to other students. Kansas courts have certainly indicated that a school owes students a duty to properly supervise school personnel and other students under certain

circumstances.  All of those cases, however, have involved physical, bodily harm to the student. *See generally, e.g.*, *Barrett ex rel. Barrett v. Unified Sch. Dist. No. 259*, 272 Kan. 250, 32 P.3d 1156 (2001) (student died from heat stroke at football practice due to coach's alleged negligence and gross negligence); *Beshears ex rel. Reiman v. Unified School District No. 305*, 261 Kan. 555, 930 P.2d 1376 (1997) (student injured during fight with another student); *Honeycutt ex rel. Phillips v. City of Wichita*, 251 Kan. 451, 836 P.2d 1128 (1992) (student lost parts of both legs after being run over by a train); *Kansas State Bank & Trust Co. v. Specialized Transportation Servs., Inc.*, 249 Kan. 348, 819 P.2d 587 (1991) (student was sexually molested by school bus driver); *Paulsen v. Unified Sch. Dist. No. 368*, 239 Kan. 180, 717 P.2d 1051 (1986) (student sustained hand injuries while operating table saw in woodworking class); *Sly v. Board of Ed.*, 213 Kan. 415, 516 P.2d 895 (1973) (student was assaulted by other students); *Dunn v. Unified Sch. Dist. No. 367*, 30 Kan. App. 2d 215, 40 P.3d 315 (2002) (students were injured when plate glass door that they were attempting to open shattered); *see also Doe v. Unified Sch. Dist.*, 255 F. Supp. 2d 1239 (D. Kan. 2003) (sexual abuse); *Kurtz v. Unified Sch. Dist. No. 308*, 197 F. Supp. 2d 1317 (D. Kan. 2002) (sexual abuse); *Kimes v. Unified Sch. Dist. No. 480*, 934 F. Supp. 1275 (D. Kan. 1996) (student fell in school's welder work area and suffered head and facial injuries).  Unlike those cases, in this case plaintiff sustained emotional harm, not physical injury.  Furthermore, the evidence does not suggest that the defendants had any reason to suspect that plaintiff's peers might harm him physically rather than simply calling him names and teasing him.  Plaintiff has not cited and this

court has not located any law from the state of Kansas tending to suggest that Kansas courts would recognize such a claim.

The court has also evaluated the general principles of tort law cited in the Kansas cases and finds no authority to support such a claim.  For example, the Restatement (Second) of Torts § 315 (1965) imposes a duty to control the conduct of a third person where a special relationship exists, but only to prevent that person from causing "physical harm" to another. Restatement § 324A also imposes a duty to exercise reasonable care in the performance of an undertaking, but, again, only to prevent "physical harm."  Perhaps the most colorable basis for plaintiff's claim is Restatement § 320.  This provision recognizes that a person who has custody of another "is under a duty to exercise reasonable care so as to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm" under certain circumstances.  "Harm" in the context of Restatement § 320 undoubtedly refers to physical harm, but it could also arguably mean a duty to prevent emotional harm.  Although the court has considered this possible interpretation, it finds it to be unsupported by any authority.  The comments to this section of the Restatement as well as the related case citations indicate a duty to prevent foreseeable physical harm, not purely emotional harm.  *See generally, e.g.*, *Hesler v. Osawatomie State Hosp.*, 266 Kan. 616, 971 P.2d 1169 (1999) (discussing principles of Restatement § 320 in a case where individuals were killed and injured in car accident caused by psychiatric patient who was out on weekend pass); *Schmidt v. HTG, Inc.*, 265 Kan. 372, 961 P.2d 677 (1998) (same, where waitress was raped and murdered by former co-worker who had

recently been paroled from prison); *Jackson v. City of Kan. City*, 263 Kan. 143, 947 P.2d 31 (1997) (same, where plaintiff's throat was cut by his girlfriend while he was in police custody); *Jarboe v. Bd. of County Comm'rs*, 262 Kan. 615, 938 P.2d 1293 (1997) (same, where boy was shot and severely injured by escapee from youth residence facility); *P.W. v. Kan. Dep't of Soc. & Rehab. Servs.*, 255 Kan. 827, 877 P.2d 430 (1994) (same, where child was abused at day care center); *C.J.W. ex rel. L.W. v. State*, 253 Kan. 1, 853 P.2d 4 (1993) (same, in a case involving sexual assault by another inmate).

As a practical matter, imposing upon public schools the duty to supervise students in such a manner as to prevent emotional harm to other students would undoubtedly subject Kansas schools to an enormous number of lawsuits.  This court is unwilling to impose a rule of such broad liability, particularly absent plaintiff's citation to any authority suggesting that any court has recognized such a duty.  Accordingly, defendants' motion for summary judgment on this claim is granted.[6]

---

[6] Defendants argue that plaintiff's negligent supervision claim is really a negligent infliction of emotional distress claim which is not sustainable under the facts of this case, but that argument is misplaced.  The court does recognize the possibility that plaintiff might have a claim for negligent infliction of emotional distress given his documented physical and psychological problems. *Cf. Burrow ex rel. Burrow v. Postville Cmty. Sch. Dist.*, 929 F. Supp. 1193 (N.D. Iowa 1996) (student-on-student sexual harassment supported claim for negligent infliction of emotional distress, although only because a genuine issue of material fact existed regarding whether plaintiff suffered some physical harm).  Nonetheless, plaintiff asserts no such claim in the Pretrial Order (doc. 77) and, furthermore, in response to defendant's motion for summary judgment plaintiff did not attempt to rebut defendants' argument on this issue.  Thus, plaintiff clearly is not attempting to assert a negligent infliction of emotional distress claim.

35

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (doc. 78) is granted in part and denied in part as set forth above.

**IT IS SO ORDERED** this 24th day of June, 2005.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

36