# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DYLAN J. THENO,**

       **Plaintiff,**

**v.**                           **Case No. 04-2195-JWL**

**TONGANOXIE UNIFIED SCHOOL
DISTRICT NO. 464, et al.,**

       **Defendants.**

_____

## MEMORANDUM AND ORDER

This case arises from same-sex student-on-student harassment of plaintiff Dylan J. Theno while he was a junior high and high school student in defendant Tonganoxie Unified School District No. 464. The jury returned a $250,000 verdict against the school district on plaintiff's claim that the school district violated Title IX of the Education Amendments Act of 1972 (Title IX), 20 U.S.C. §§ 1681 *et seq.*, by being deliberately indifferent to the harassment. This matter is presently before the court on the school district's renewed Motion for Judgment as a Matter of Law (Doc. 148) pursuant to Fed. R. Civ. P. 50(b). Therein, the school district argues that the evidence at trial was insufficient to prove (1) that plaintiff was harassed based on his gender; (2) that plaintiff suffered harassment based on gender of which the school district had actual knowledge that was so severe, pervasive, and objectively offensive that it effectively deprived him of access to educational benefits or opportunities; and (3) that the school district acted with deliberate indifference to known acts of harassment. The court has

carefully reviewed the transcript and the record and concludes that, viewing the evidence in the light most favorable to plaintiff, the evidence was sufficient for the jury to return a verdict in plaintiff's favor as to each of these elements.   Accordingly, the school district's motion is denied.

## STANDARD FOR MOTION FOR JUDGMENT AS A MATTER OF LAW

Judgment as a matter of law under Rule 50(b) "should be cautiously and sparingly granted."   *Black v. M & W Gear Co.*, 269 F.3d 1220, 1238 (10th Cir. 2001).   Relief is appropriate only if the evidence, viewed in the light most favorable to the nonmoving party, "points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion."   *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1293 (10th Cir. 2002).   The court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury.   *Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1241 (10th Cir. 2001).

In essence, the court must affirm the jury verdict if the record, viewed in the light most favorable to the nonmoving party, contains evidence upon which the jury could have properly returned a verdict for the nonmoving party.   *Roberts v. Progressive Independence, Inc.*, 183 F.3d 1215, 1219-20 (10th Cir. 1999).   Conversely, the court must enter judgment as a matter of law in favor of the moving party if "there is no legally sufficient evidentiary basis . . . with respect to a claim or defense . . . under the controlling law."   *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1268 (10th Cir. 2000) (quotation omitted).

# DISCUSSION

The court has addressed the issues presented by the school district at two prior procedural junctures in this case. *See Theno v. Tonganoxie Unified Sch. Dist. No. 464*, 377 F. Supp. 2d 952, 952-68, 970-77 (D. Kan. 2005) (denying the school district's motion for summary judgment as to plaintiff's Title IX claim and the school district's motion for reconsideration of that denial). Familiarity with the court's previous rulings is presumed and the court will not reiterate in great detail its rulings on issues of law that have already been decided. Instead, the court will focus its attention on the evidence at trial and legal arguments raised by the school district that the court has not previously addressed. The evidence at trial was essentially consistent with, and in some ways stronger than, the record presented on summary judgment. Consequently, for largely the same reasons stated by the court in its prior orders, the court finds that the trial record contains adequate evidence upon which the jury could have properly found that plaintiff was harassed based on his gender; that the harassment was so severe, pervasive, and objectively offensive that it effectively deprived him of access to educational opportunities or benefits; and that the school district acted with deliberate indifference to known acts of harassment. Accordingly, the school district is not entitled to judgment as a matter of law and its motion is denied.

## I.    **Gender-Based Harassment**

Title IX of the Education Amendments Act of 1972 (Title IX), 86 Stat. 373, as amended, states, in relevant part, that no person "shall *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any

3

education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (emphasis added). This is a same-sex harassment case. As such, looking to Title VII case law for guidance, the court placed on plaintiff the burden of establishing that the harassment was not merely tinged with offensive sexual connotations but actually constituted discrimination based on plaintiff's gender under the Supreme Court's holding in *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). Plaintiff did not present evidence that satisfied any of the three evidentiary routes listed in *Oncale*, but the court allowed the case to be submitted to the jury under a gender stereotyping theory rooted in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989). *See Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005) (gender stereotyping theory offers alternative to the three evidentiary methods listed in *Oncale* for a plaintiff to establish that same-sex harassment constituted discrimination because of sex). Thus, the court instructed the jury as follows with respect to this element of plaintiff's Title IX claim:

> . . . Title IX prohibits discrimination "on the basis of sex," which means gender-based harassment. Harassment is not discrimination based on sex merely because the words or gestures used have sexual content or connotation or are based upon sexual orientation or perceived sexual orientation.
>
> The harassment must be not merely tinged with offensive sexual connotations, but must actually constitute harassment based on gender. To constitute gender-based harassment under Title IX, the harasser must be motivated by Mr. Theno's gender or his failure to conform to stereotypical male characteristics. If you find that the harassers were so motivated, then you may conclude that the harassment was based on his gender.

(Jury Instructions, Doc. 114, Instruction No. 12, at 13.) After more than a day and a half of deliberations, the jury returned a verdict in which it specifically found that plaintiff "proved,

by a preponderance of the evidence, that he was harassed by other students based on his gender." (Verdict, Doc. 146, Question 1, at 1.)

The school district argues that a gender stereotyping theory of gender-based discrimination was not included in the pretrial order, that the court was the first to suggest this theory in ruling on the school district's motion for summary judgment, and that the school district was thereby deprived of fair notice and an opportunity to address the claim through discovery and motion practice. Rule 16(e) of the Federal Rules of Civil Procedure provides that a pretrial order controls "the subsequent course of the action unless modified by a subsequent order." The laudable purpose of this rule is to avoid surprise by "putting the cards on the table." *Wilson v. Muckala*, 303 F.3d 1207, 1216 (10th Cir. 2002) (quoting *Clark v. Pennsylvania R.R. Co.*, 328 F.2d 591, 594 (2d Cir. 1964)). A pretrial order should be liberally construed to cover all legal or factual theories embraced by its language, *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1220 (10th Cir. 2000), or inherent in the issues defined therein, *Whalley v. Sakura*, 804 F.2d 580, 582-83 (10th Cir. 1986).

In this case, the pretrial order repeatedly addressed the fact that plaintiff was required to prove that the harassment was gender-based in order to prevail on his Title IX claim. The school district contended that "Title IX addresses discrimination based on gender, not 'sexual harassment'" and that plaintiff was required to prove that he "suffered harassment that discriminated against him on the basis of his gender" and that the "harassment was not merely gender-based name calling" as essential elements for the claim. (Pretrial Order, Doc. 77, at 11.) The school district listed as a defense that "[t]he harassment of Plaintiff was not based

on gender as required to be actionable under Title IX." (*Id*. at 16.)  The issue of whether the school district was deliberately indifferent to the treatment of plaintiff "based on his gender" was listed as a factual issue.  (*Id*. at 26.)  And, the issue of whether the evidence would support a claim of "gender based harassment in violation of Title IX" was listed as a legal issue.  (*Id*. at 27.)  Thus, the gender stereotyping theory of same-sex gender-based harassment was merely a subsidiary issue that was embraced within and inherent in the legal and factual issues listed in the pretrial order.  This is not a situation in which the gender stereotyping theory constituted an entirely new claim or theory of recovery, as was the case in *Wilson*, the case relied upon by the school district.  The court is unpersuaded that the school district was unfairly surprised by the introduction of this legal theory—a theory which the court readily deduced from case law from the Supreme Court and the Courts of Appeal—simply because the pretrial order did not contain every possible permutation of every possible legal theory pertaining to this element of plaintiff's Title IX claim.  This court's pretrial order form did not require such precision and detail.  *Cf. Palmer v. Krueger*, 897 F.2d 1529, 1533 (10th Cir. 1990) (where ultimate issue is negligence, giving unavoidable accident jury instruction was only going outside the pretrial order in a technical sense because it was only a different way of examining the negligence question); *Berroth v. Farm Bureau Mut. Ins. Co.*, 232 F. Supp. 2d 1244, 1249 n.7 (D. Kan. 2002) (rejecting the defendant's argument that the court should not consider a "direct evidence" theory because the pretrial order was sufficient to preserve plaintiff's claim under either a direct evidence or circumstantial evidence theory where it only required plaintiff to set forth her factual contentions and general theories of recovery).

Furthermore, the court is unpersuaded that the school district was unfairly surprised by the fact that the court submitted the case to the jury on this theory.  The court issued its order denying the school district's motion for summary judgment on plaintiff's Title IX claim and relying on this gender stereotyping theory on June 24, 2005.  This was more than a month before the trial date of August 2, 2005.  During the interim, the school district filed a motion for reconsideration.  But, notably, the school district did not seek a continuance of the trial so that discovery could be reopened to more adequately explore the evidence pertaining to this gender stereotyping theory.  *Cf. Palace Exploration Co. v. Petroleum Dev. Co.*, 316 F.3d 1110, 1117-18 (10th Cir. 2003) (district court abused its discretion by not considering claim first asserted seventeen days before trial; noting the defendant had "ample ability to cure any potential prejudice" where it could have "moved for a continuance at that time or at any time . . . before trial began"); *Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1210-12 (10th Cir. 2002) (district court abused its discretion by denying motion to amend pretrial order on the Friday before trial was to begin on Monday; noting any possible prejudice or surprise could have been easily cured by a continuance).  Indeed, the facts relating to the issue appeared to have been adequately explored during discovery, in the school district's motion for reconsideration, and at trial.  Thus, the court finds the school district's argument in this regard to be without merit.

The court turns, then, to the sufficiency of the evidence on this element.  The school district argues that there was no evidence plaintiff's harassers were motivated by perceptions that he was effeminate or homosexual.  Rather, they simply picked on him and teased him by

using sexually charged words and themes as a crude topic for teenage banter.  According to the school district, for example, "the masturbation jokes were motivated by the harassers' desire to be funny, or to provoke or embarrass plaintiff using a socially awkward subject."  The school district argues that plaintiff tried to fashion a gender-based harassment claim "by showing that he was not a 'typical boy' because he had an unusual hairstyle, enjoyed Tae Kwan Do, and wore an earring," yet there was no evidence that these things were atypical for a boy of his age or that these things were considered unmanly traits.  The school district contends that, viewing the evidence in the light most favorable to plaintiff, the harassment was motivated by his failure to meet *social* stereotypes, not gender stereotypes, inasmuch as his individual style and interests were considered "uncool" by his peer group.  Thus, the school district argues that the harassment was akin to plaintiff having been called "geek," "weirdo," or "spaz."  Certainly, this is one permissible view of the evidence and if the court were to view the evidence in the light most favorable to the school district, the jury could have properly found for the school district rather than plaintiff on this element.  But of course the court must view the evidence in the light most favorable to plaintiff at this procedural juncture.  Viewed in such a light, the court concludes after careful consideration of this issue that the evidence was sufficient for the jury to find that plaintiff's harassers were motivated by his failure to conform to stereotypical gender expectations.

Plaintiff testified at trial that his childhood interest in the Teenage Mutant Ninja Turtles sparked his interest in Tae Kwan Do.  He began doing Tae Kwan Do when he was seven years old and continued through his high school years, and he was apparently quite good at it.  He

played football briefly in seventh grade, but quit just before the second game due to a knee injury. Nelson Bell called him a "pussy" for quitting the team. That same school year, Kyle Webb, Harold John, and Luke Stevens started calling him a "flamer" and "faggot." Plaintiff and Harold John got in a fight initiated by one of these name-calling incidents. Kyle Webb put "flamer" and "faggot" notes in plaintiff's locker. Kaleb Lawrence and Chris Clark called him a "faggot" and "queer," and this led to a fight. Another time, after a basketball game, Shawn Slawson came running up to plaintiff screaming, "Dylan sucks cock . . . Dylan likes men," and that led to another fight. Andrew Eveland had a banana at lunch one day and "he took the banana and said, 'Here you stupid faggot. Why don't you shove this up your ass? I'm sure you'll like it.'" Another time at lunch Garrett Palmer "put a piece of string cheese in his mouth" and said, "Look at this. I'm Dylan sucking cock." He also said, "Hey guys, did you hear Dylan likes to masturbate with fish?" Another day plaintiff sat down in the lunch room and was told by some boys that they heard he got caught "jacking off" in the bathroom (a rumor which was untrue and which Garrett Palmer later admitted to starting). Numerous boys then began teasing him about the rumor. For example, two weeks later a boy in gym class yelled, "Hey, Mr. J[eannin, the junior high school gym teacher], . . . you don't want to get too close to Dylan. He might try to get up on you." Plaintiff testified that he "would walk down the hallway and it would just be terrible." He would go into the bathroom and boys would spit on the walls and say, "Hey, look. Dylan was here." Boys would peek over the walls of the stalls in the bathroom and say, "We're just making sure you're not jacking off over there."

He heard similar comments in eighth grade when he was walking down the hallway or was in the restroom.  Other boys called him "gay" and "fag," and not in a playful, bantering way.[1]  When plaintiff was on the bus with the basketball team, Daniel Workman called him a "faggot," "queer," and "masturbator."  Mr. Workman drew a picture in the condensation on the window of the bus and said, "Hey, everybody, look.  It's Dylan jacking off, that stupid faggot."  One day at lunch Mr. Workman "wiped ice cream all around his mouth and said, 'Look, guys.  I'm Dylan.  Guess what I've been doing?'"  One time when plaintiff missed a shot during a basketball game someone on the bench "screamed out, 'Way to miss that shot, fag.'"  Another time, plaintiff ran the end of his thumb through the band saw during shop class and the boys in his shop class starting telling him he "was a faggot and a queer" for doing that.

In ninth grade, the harassment continued.  Other boys called him "faggot," "queer," "masturbator," and "jackoff kid," and spit on the walls in the bathroom and watched while he was going to the bathroom.  If he reported the behavior to the principal, the boys would call him a "pussy."  By that time, plaintiff no longer played sports.  He started working at a local restaurant.  In strength training class, Daniel Workman started writing things on the chalkboard like "Dylan's a fag; Dylan's gay; Dylan likes men."  People would write "faggot" in the dust on his car and would smear donuts on his car.

---

[1] Travis Schultz was one of plaintiff's closest friends.  He testified that plaintiff was called names like "faggot" and "queer" on an almost weekly basis from seventh through eleventh grade, and not in a friendly banter type of way.

He began high school in tenth grade.  Things were mostly "okay" at the beginning of the school year, although plaintiff would randomly hear people yell out "fag" or "queer."   In February of that school year, he was in strength training class when Tim Hopkins "came running by [him] screaming, 'Fag. . . . I can't believe you got caught jacking off in the bathroom, you stupid faggot.'"  Mr. Hopkins started calling plaintiff a "faggot" in the locker room and ran up behind him and said, "Oh, just had to make sure you're not jacking off."  Mr. Hopkins walked right up to plaintiff while he was talking to the gym teacher, Mr. Bond, and said, "Watch out, Mr. Bond.  You might want to make sure Dylan doesn't go jack off."  Mr. Bond laughed.  Matt Weyer and Nick Stein started making fun of plaintiff in strength training class, asking him if he had made his "daily trip to the bathroom yet," calling him "faggot," telling him he needed "to go jack off."  Andrew Eveland, the boy who had told plaintiff to shove a banana up his ass in seventh grade, talked another teacher, Mrs. Lee, into calling plaintiff "banana boy" in her class.

In the eleventh grade, Dan O'Hare started calling plaintiff "faggot" while they were sitting at the lunch table.  He asked plaintiff if he had made his "daily trip to the bathroom" and told plaintiff that he "was a stupid faggot."  Plaintiff walked into school one morning and Mr. O'Hare "got up in [his] face" and said "faggot, faggot, faggot."  A fight between the two ensued. Days later, some of Mr. O'Hare's friends called plaintiff a "faggot" and a "pussy" and told him they could "kick [his] ass" because he "hit Dan in the nuts."  After that he was "being called a faggot every day, masturbator, queer."  One day the students were doing lunges in strength

11

training class and Clay Lamb yelled out at plaintiff in front of the whole class, "Finish out strong, you queer."

When plaintiff was asked why he believed the other boys said things like this to him, he testified:

> [b]ecause I was a different kid, you know, I wasn't the alpha male. I didn't -- you know, I had different hair than everybody else; I wore earrings. My hair went everywhere from having a flat top to a mullet at one point. I was different. I wasn't like all the other kids. I did Tae Kwan Do. I didn't play football through high school. I didn't play basketball through high school. I wasn't, you know, the big time sports guy at school. I was different. And I guess because, you know, my hair and I did Tae Kwan Do and I wore earrings, to them I was kind of a girly girl.

Plaintiff's mother, Cheryl Theno, offered similar testimony, explaining that "we taught our kids to be their own person [sic]." Travis Schultz testified that plaintiff was different from the boys who harassed him in the sense that plaintiff wore earrings, had a buzz cut and spiked his hair, did Tae Kwan Do, and tended to be shy. Erika Morton, a fellow student, testified that the fact that plaintiff played football for a little while in seventh grade and then dropped out was considered "weird." Harold Fatzer, another fellow student, testified that plaintiff talked about Tae Kwan Do like other boys talked about basketball. Stephen Woolf, the junior high school principal, testified that plaintiff did well in Tae Kwan Do, but he sensed that the other students did not accept plaintiff's "bragging" about his Tae Kwan Do medals and trophies.

Particularly poignant on the issue of the harassers' motivation was the testimony of Stephen Peterson, an expert who ironically was hired by the school district's attorney to perform a comprehensive forensic psychiatric assessment of plaintiff for this lawsuit. Dr.

12

Peterson testified that he ultimately determined that plaintiff "was a self-assured young man who was somewhat nonconforming."  He explained that plaintiff had been a Tae Kwan Do competitor for ten years and had been working since eighth grade because he wanted to earn enough money to buy a car and a motorcycle.  Plaintiff really did not enjoy school and did not participate in many of the usual things like sports and yearbook or newspaper.  Instead, he was interested in earning money and being somewhat out on his own.  In doing so, his part-time job took him out of the usual circle of activities.  On cross examination, Dr. Peterson agreed that a person whose masculinity has been threatened or questioned can react by trying to act in a more manly fashion, i.e., "masculine overcompensation."  Clearly, the implication here was that plaintiff's reaction of starting to work so young so that he could buy a car and a motorcycle and the fact that at times he instigated physical altercations with his harassers (e.g., Dan O'Hare) were perfectly logical consequences of the fact that his masculinity was threatened by the type of harassment he suffered at school.  Dr. Peterson wrote in his notes that plaintiff was persistently teased about his "nonconformity" and suffered mild distress relating to his "nonconformity" with respect to issues such as the jackoff comments; his rattail, tufted, and shaved head; and Tae Kwan Do.  He also wrote that plaintiff "invited chiding by his outlandish personal style."

The jury was entitled to draw reasonable inferences from this evidence by relying on their "[c]ommon sense, and an appropriate sensitivity to social context."  *Oncale v. Sundowner Offshore Servcs., Inc.*, 523 U.S. 75, 82 (1998).  As such, the evidence was sufficient to support the verdict.  The evidence revealed that plaintiff did not conform to his peers'

stereotypical expectations concerning how a teenage boy should act, particularly a teenage boy in the relatively small rural community of Tonganoxie, Kansas. Instead of simply picking on him by using non-sexual terms such as "geek," "weirdo," or "spaz," they resorted to crude gestures, teasing, and name calling with sexual innuendos and undertones in an effort to debase and derogate his masculinity. It was within the province of the jury to consider the words, conduct, and demeanor of the harassers, most of whom testified at trial, along with the jury's own perceptions of plaintiff's persona, as indicators of the harassers' true motivation. *See id.* at 81-82 (the impact of such behavior "often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used"). Viewing the evidence in the light most favorable to plaintiff, the jury's finding that the harassers were motivated by his failure to conform to stereotypical gender expectations is supported by the evidence.

The school district's reliance on *Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996), is misplaced. *Seamons* predated *Oncale*, which is the seminal Supreme Court case addressing the extent to which same-sex harassment is actionable, by two years. Therefore, *Oncale* and its progeny now provide the framework for analyzing the circumstances under which same-sex harassment is actionable. For that reason, in evaluating whether the same-sex harassment of plaintiff was based on his gender, the court relied on *Oncale*, subsequent Tenth Circuit case law applying *Oncale* such as *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263-67 (10th Cir. 2005), and *Medina v. Income Support Div.*, 413 F.3d 1131, 1134-35 (10th Cir. 2005),

14

and related case law from other courts that have confronted the issue of whether same-sex harassment akin to the harassment at issue in this case is actionable under *Oncale*.[2]

Moreover, leaving aside the issue of whether the Tenth Circuit's holding in *Seamons* continues to be good law in light of *Oncale*, the facts of *Seamons* are nonetheless distinguishable from those of this case. In *Seamons*, the student, Brian Seamons, was assaulted by five upper-class football teammates who used athletic tape to tape his genitals and tie him naked to a towel bar in the locker room, then brought a girl who he had previously dated in to the locker room to see him. *Id.* at 1230. Plaintiff's Title IX claim in *Seamons* was not, however, based on this hazing incident. *Id.* ("Brian does not complain of the original assault against him."). Rather, it was based on the school administrators' response after he reported the incident. The football coach brought him before the football team, accused him of betraying the team by bringing the incident to the attention of the administration, tried to force him to apologize, and dismissed him from the team when he would not apologize. *Id.* The school district meted out punishment by canceling the final playoff game of the season, which was a state playoff game. *Id.* The plaintiff contended that the school district's response to the hazing incident constituted sexual harassment because the coach expected him to conform to

---

[2] Although not pertinent to the Tenth Circuit's ruling in *Seamons* that the harassment at issue was not based on the plaintiff's sex, the court also notes that *Seamons* predated the seminal Supreme Court cases of *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998) (outlining the parameters of school district liability under Title IX for teacher-on-student harassment), and *Davis v. Monroe County*, 526 U.S. 629 (1999) (same, for student-on-student harassment). *Cf. Seamons*, 84 F.3d at 1233 n.7 (noting uncertainty at that time regarding the parameters of Title IX sexual harassment hostile environment claims).

a macho male stereotype, as evidenced by the fact that he made comments to the effect that plaintiff should have taken the hazing incident "like a man" and trivialized the incident by saying "boys will be boys." *Id.* The court concluded that the plaintiff failed to allege the harassment was based on sex because the school district's response to the locker room assault "(which it must be remembered, post dates the locker room assault)" did not create a "*sexually charged* hostile environment." *Id.* at 1132-33 (emphasis in original). The court reasoned that the plaintiff "fails to allege any facts that would suggest . . . that sex was used to contribute to a hostile environment for him." *Id.* at 1133. In *Seamons*, then, the hostile environment was not an attempt by the school district "to exacerbate or create a hostile sexual environment for Brian." *Id.* In contrast, in this case, the harassment of plaintiff was pervasively comprised of crude sexual gestures, innuendos, teasing, and name calling. All of this contributed to a sexually charged hostile environment that appeared to have been motivated by his peers' belief that he failed to conform to stereotypical gender expectations for a teenage boy in their community. Motivated by his failure to conform to those expectations, they used his sexuality to denigrate his masculinity. Thus, the court is unpersuaded by the school district's reliance on *Seamons*.

## II.     Severity and Pervasiveness

In order to be actionable under Title IX, the harassment must have been "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. The court instructed the jury regarding this element as follows:

16

Schools are unlike the adult workplace. Children may regularly interact in a manner that would be unacceptable among adults. Simple acts of teasing and name-calling among school children do not constitute sufficiently severe, pervasive, and offensive harassment, even where those comments target differences in gender. The harassment must have been so severe, pervasive, and objectively offensive that it had the effect of denying Mr. Theno access to educational benefits or opportunities.

(Jury Instructions, Doc. 114, Instruction No. 13, at 14.)  The jury returned a verdict in which it specifically found that plaintiff had met his burden of proof on this element.  (Verdict, Doc. 146, Question 2, at 2.)

The court finds the evidence was sufficient to support the jury's verdict on this issue. The school district's attempt to categorize the evidence as a few isolated incidents is entirely unpersuasive when viewing the evidence in the light most favor to plaintiff.  This is not a case involving "simple acts" of teasing and name calling that targeted differences in gender.  The harassment continued for years with the same sexually derogatory themes.  The fact that the harassment was so severe and pervasive that it ultimately caused him to leave school, thus depriving him of educational opportunities and benefits, was also supported by the evidence. Medical and psychological testimony indicated that plaintiff suffered physical side effects as a result of the harassment, that as the years progressed he was increasingly less able to tolerate or "laugh off" the harassment, and that the fact that he ultimately left school was wholly attributable to the school district's failure to combat the harassment.  This aspect of the jury's verdict was well supported by the evidence.

## III.   Deliberate Indifference

A school district is liable for damages under Title IX only where the district itself remains deliberately indifferent to known acts of harassment. *Davis*, 526 U.S. at 642-43.  The court instructed the jury that this "deliberate indifference standard is not a mere 'reasonableness' or 'negligence' standard.  Deliberate indifference means that the school district's response or lack of response was clearly unreasonable in light of all the known circumstances." (Jury Instructions, Doc. 114, Instruction No. 14, at 15.)  The jury returned a verdict in which it specifically found that plaintiff had met his burden of proof on this element. (Verdict, Doc. 146, Question 3, at 2.)

Again, the court finds that the evidence supported this aspect of the jury's verdict.  The school district argues that the evidence showed the school district addressed every complaint it received regarding the harassment of plaintiff and that the school district's response with respect to each known incident of harassment ended the harassment by each disciplined harasser, with subsequent incidents of harassment occurring by other, previously undisciplined harassers.  The court rejects the school district's reliance on *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998), for the reasons stated in the court's prior order denying the school district's motion for reconsideration, and also because of the evidence that was produced at trial on this issue.  Certainly, the evidence revealed that the school district did, in fact, take meaningful measures in response to some of the known incidents of harassment, and a jury could have properly returned a verdict in the school district's favor on this issue.  But, viewing the evidence in the light most favorable to plaintiff, the evidence was largely to the contrary.

18

Plaintiff testified that in seventh grade Harold John walked into school, hit plaintiff, told him he was a faggot, and received only an in-school suspension.   Plaintiff reported the "flamer" and "faggot" notes in his locker to Mrs. Strong, the junior high school assistant principal, and she said she would take care of it.   After Kaleb Lawrence called plaintiff a faggot and kicked his feet, plaintiff pushed Mr. Lawrence and Mrs. Strong told plaintiff that plaintiff (not Mr. Lawrence) was going to receive an in-school suspension.[3]   Plaintiff testified that Mr. Lawrence and Chris Clark called him names like "faggot" after being warned by Mrs. Strong not to do so again.   After the incident with Shawn Slawson, even after plaintiff told Mrs. Strong about the language used by Mr. Slawson, Mr. Slawson received a one-day in-school suspension whereas plaintiff received a three-day out-of-school suspension.   Plaintiff told Mr. Woolf, the junior high school principal, about the inappropriate comments Mr. Slawson had made that spurred the fight and Mr. Woolf told plaintiff that he did not believe him.   Justin Hardman "yelled out" comments to Coach Jeannin, but Coach Jeannin did nothing.   Plaintiff told Mrs. Strong about the incidents in the bathroom and she told him she would handle it, yet there was no evidence that she did so.

In eighth grade, when Daniel Workman openly teased plaintiff on the basketball school bus, "the coaches just kind of sat there."   Although Mr. Woolf talked to Mr. Workman about the incident, the evidence revealed that the warning was ineffective inasmuch as Mr. Workman continued to harass plaintiff later that school year and the following school year.   Someone

---

[3] Mrs. Waldschmidt, the school counselor, ultimately talked Mrs. Strong out of suspending plaintiff for this incident.

"screamed out" the comment about plaintiff missing the shot at the basketball game, from which a fair inference can be drawn that the basketball coaches and other school administrators who were present at the game heard the comment, and yet there was no evidence that anyone was disciplined.  Mr. Weller, the shop teacher, overheard the comments in shop class and did not do anything about them.  Plaintiff did not tell Mr. Woolf about many of the incidents because he "never did anything."

In ninth grade when plaintiff reported the second time that Daniel Workman wrote things on the chalkboard in strength training class, Mr. Woolf said he would take care of it.  Mr. Woolf, however, later told plaintiff he was too busy to address the situation and it happened again a third time.  During the middle of that school year, plaintiff's father, Alan Theno, went to the school to talk to the superintendent, Dr. Erickson, about the severity and regularity of the harassment.  Mr. Theno did not believe that anything "came about" as a result of that meeting.

In tenth grade, plaintiff was talking to Mr. Bond, the strength training teacher, when Tim Hopkins came up and made comments to plaintiff right in front of Mr. Bond, and Mr. Bond laughed.  The other boys harassed plaintiff "in front of Mr. Bond all the time, but he would not do anything to those kids because those kids are his football players."  One of the harassers, Matt Weyer, testified that the harassment went on "pretty openly" and Mr. Bond never took any action to stop it.  Mr. Smith, the assistant high school principal, eventually called Messrs. Hopkins, Weyer, and Nick Stein into his office to talk about the harassment of plaintiff.  Mr. Weyer testified that Mr. Smith talked about the harassment of plaintiff only "for like two

20

minutes," then he "led into stuff about football."   After that, Mr. Hopkins continued to say things to plaintiff.

After the fight with Dan O'Hare in the eleventh grade, plaintiff told Mr. Smith that he felt like "he had his chance to take care of the problem.   I told him he said he would take care of it and he did nothing."   He told Mr. Bogart that "he should have did his job in the first place and that would have never happened."   Plaintiff and Dan O'Hare both received three-day out-of-school suspensions for the fight, but Mr. O'Hare did not receive any punishment for initiating the incident by calling plaintiff a "faggot."   Upon plaintiff and Mr. O'Hare's return from the suspension, Mr. Bogart did not revisit the fact that Mr. O'Hare's "faggot" name-calling had spurred the fight because Mr. Bogart decided to "let that sleeping dog lie."   Josh Blanks, one of the boys who made comments to plaintiff after the fight, did so in front of Mr. Albert, the small engines repair teacher and yet Mr. Albert did nothing.   Clay Lamb yelled out the comment in strength training class loud enough that Mr. Bond heard it.   Mr. Bond did nothing in response to Mr. Lamb's comment until plaintiff said, "Mr. Bond?!"

Viewing this evidence in the light most favorable to plaintiff, it was sufficient for the jury to find that the school district's response was clearly unreasonable in light of all the known circumstances, and consequently that the school district was deliberately indifferent. The record reflects that a sufficiently significant number of school administrators essentially turned a blind eye to the harassment by ignoring, tolerating, or trivializing the harassment. Plaintiff and his parents were at times treated dismissively by some of the school administrators.   Mr. Bogart, the high school principal, testified that there is a "very thick

grapevine" in the Tonganoxie schools.   This, combined with common sensibilities about the general nature of high school environments, could have led the jury to believe that there was general awareness among the student body that plaintiff's harassers were not meaningfully disciplined.   An overall view of the school district's efforts, then, reveals that under the facts and circumstances of this case those efforts were not reasonably calculated to end the harassment of plaintiff.   The result was a school culture in which many students appeared to have felt at ease making inappropriate comments to plaintiff openly in front of teachers and other students, even during classes.   As such, the court cannot find that the school district took prompt remedial action.   The jury's finding of deliberate indifference is supported by the evidence.

The school district's reliance on *Doe ex rel. Doe v. Dallas Independent School District*, 220 F.3d 380 (5th Cir. 2000), is unpersuasive.   That case involved teacher-on-student harassment in which minor students were sexually molested by a teacher and claimed that the school district was deliberately indifferent in the manner in which it handled a prior allegation of sexual abuse against the teacher.   In that case, the principal investigated the prior allegation and ultimately concluded, in error, that the prior allegation was without merit.   *Id.* at 388.   The court found that although the principal's "erroneous conclusion had tragic consequences" and was ineffective in preventing the teacher from sexually abusing students, it was not an inadequate response.   *Id.*   In *Doe*, however, the principal had at least investigated the allegations.   This case is distinguishable in the sense that, although at times the school administrators appeared to have given meaningful attention to some of plaintiff's complaints

of harassment, at other times school personnel apparently chose to turn a blind eye to the harassment. This case was permeated with triable issues of fact concerning the extent to which the school district had actual knowledge of the harassment and whether the school district was deliberately indifferent to known acts of harassment. These were issues of fact for the jury to decide based on the evidence presented at trial, and the jury was not required to accept the school district personnel's testimony on these issues. The court simply cannot conclude that the evidence was insufficient to support the jury's verdict on this issue.

**IT IS THEREFORE ORDERED BY THE COURT** that the school district's Motion for Judgment as a Matter of Law (Doc. 148) is denied.

**IT IS SO ORDERED** this 18th day of October, 2005.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge